# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMIMON INC. and AMIMON LTD, <br><br>           Plaintiffs, <br><br> v. <br><br> SHENZHEN HOLLYLAND TECH CO. LTD and  EC PRO VIDEO SYSTEMS INC., <br><br>           Defendants. | Civil Action No. 1:20-cv-09170-ER |

## FIRST AMENDED COMPLAINT

Plaintiffs, Amimon Inc. and Amimon Ltd., (collectively, "Amimon") allege as follows for their First Amended Complaint against Defendants Shenzhen Hollyland Tech Co., Ltd. ("Hollyland") and EC Pro Video Systems Inc. ("ECPro") (collectively, the "Defendants").[1] The allegations herein are made based upon personal  knowledge as to Amimon with respect to their actions and upon information and belief as to all  other matters. This amended complaint is made with leave of the Court pursuant to its order during the January 28, 2021 pre-motion conference.

## PARTIES

1.  Amimon Inc. is a company organized and existing under the laws of Delaware having a principal place of business at 2025 Gateway Place, Suite 450, San Jose, CA 95110.

---

[1] Former Defendant Ikan International, LLC consented to the entry of judgment and a permanent injunction prohibiting the  further sale of any product incorporating an Amimon chipset as reflected in the December 9,  2020 Order entered by the Court (ECF No. 15).

2.      Amimon Ltd. is a company organized and existing under the laws of the State of Israel having a principal place of business at Zarhin 26 Ra'anana 4366250 Israel.

3.      Defendant Shenzhen Hollyland Tech Co., Ltd. is a company organized and existing under the laws of the People's Republic of China with its principal place of business at Skyworth Innovation Valley 801, No. 1 Tangtou Road, Tangtou Community, Shiyan Street, Bao'an District, Shenzhen, China.

4.      Defendant EC Pro Video Systems Inc. is a company organized and existing under the laws of the State of New York, with its principal place of business at 253 West 51st Street, New York, NY 10019.

## JURISDICTION AND VENUE

5.      This is an action for theft of trade secrets, copyright infringement, and unfair business practices. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, 2202, the trade secret laws of the United States, 18 U.S.C. §§ 1836 and 1839. This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts. This Court has further jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and an amount in controversy in excess of $75,000.

6.      This Court has personal jurisdiction over all of the Defendants. Personal jurisdiction exists generally and specifically over all of the Defendants because they (directly and/or through their subsidiaries, divisions, groups or distributors) have sufficient minimum contacts with the Southern District of New York as a result of substantial business conducted within the State of New York.

7.     Defendant ECPro also employs individuals in the State of New York, including in New York City.

8.     All Defendants have further availed themselves of contacts and business in this District and the State of New York by actively advertising and promoting the products that contain the misappropriated technology.

9.     Personal jurisdiction also exists specifically over all the Defendants because they have each committed acts of misappropriation in this District and the State of New York, because they each directly and/or through their subsidiaries, divisions, groups, or distributors, advertise, market, use, offer for sale, import for sale and/or sell and rent products at issue in this case containing the misappropriated technology in this District and the State of New York, and place those products in the stream of commerce with the expectation and knowledge that they will be purchased by consumers in this district.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants transact business in this district, have misappropriated trade secrets in this district, and are subject to personal jurisdiction in this District.

## BACKGROUND

### Amimon

11.     In the United States and around the world, Amimon leads the industry in developing the technologies that enable high-quality wireless video transmission in real time. Ever since the company's founding in 2004, Amimon engineers and technicians have focused on developing the hardware, software, and systems necessary to create innovative and durable products that enable rapid and seamless transmissions in a variety of different business applications and environments.

12.     Amimon's integrated circuits, otherwise referred to as chipsets, enable the zero latency (<1mS) wireless transmission of high-quality audio-video signals over long distances and are used in most professional video companies for producing professional films as well as news

3

and live sports broadcasting. In recent years, Amimon's unique technology is being used for unmanned aerial vehicle video transmission, as well as in thousands of hospital operating rooms to transmit real time video during live operations.

13.     Amimon's leadership in this sophisticated technical field does not come cheap. For many years, Amimon has employed top engineers and spends 5 to 10 million dollars annually to research new technologies and to develop a wide range of digital products and solutions for the low latency transmission of audio and video signals for mission-critical applications that have revolutionized the cinematography and broadcast industries. Amimon's substantial investments in research and other forms of innovation require protection, and Amimon relies on its trade secrets, in addition to its copyrights, patents and trademarks, to guard the intellectual property created by the ingenuity and industry of its employees.

14.     Amimon distributes its chipsets and products in a variety of forms including as raw chipsets for third-party integrators as well as in finished transmitters and receivers. An image of a licensed transmitter and receiver incorporating Amimon's chipset, manufactured by Teradek is shown below:



15.     Amimon chipsets, like many integrated circuits, require software to control communications between the various system components and enable the functionalities for which they are designed. Amimon expends significant resources to develop and protect the specialized software source code for its chipsets.

16.     Source code is the version of software as it is originally written (i.e., typed into a computer) by a human in plain text (i.e., human readable alphanumeric characters).

17.     The software that Amimon provides to customers who purchase its chipsets is a binary (compiled) version of its source code.  The binary software is encrypted so as to only run on Amimon's chipsets in the manner in which it was designed and distributed by Amimon.  This binary code cannot be decompiled, reverse engineered, decrypted, modified or reviewed to discern the underlying source code or alter the function of the Amimon chipsets.

18.     Amimon does not disclose, sell or distribute its source code.  Amimon's source code is not disclosed in any patent filing or technical publication.

19.     To protect its significant investment in its innovative source code, Amimon protects its intellectual property through, among other ways, copyright applications filed with the United State Copyright Office. For example, Amimon filed a copyright application under 37 C.F.R. § 202.20(c) for Version: 4_x_24_9_Build 1057 of its source code and was granted Copyright Registration No. TX0008882781 for "software for zero-latency video transmission" by the United States Copyright Office (the "MAC Source Code").[2]

**Hollyland and EC Pro**

20.     The story of Defendants Hollyland and ECPro (Hollyland's U.S. Distributor and Exclusive Service Center) is the opposite. Hollyland and EC Pro's story is not one of innovation, but rather of misappropriation, misuse, copying, and intentional and cooperative efforts to hide their misconduct from detection. Unlike Amimon, Hollyland and EC Pro have not invested the

---

[2] 37 C.F.R. § 202.20(c) permits applicants for software copyrights to exclude from disclosure code portions deemed proprietary and/or trade secrets. Amimon availed itself of this regulation in applying for its copyright.

human effort and financial capital in the substantial, time-consuming research required to produce truly innovative technologies and products.

21. Instead of developing its own technology to compete in the market, Hollyland and EC Pro embarked on an unlawful plot to target individuals having access to Amimon's technology and surreptitiously take Amimon's confidential and proprietary trade secrets and use those trade secrets to market and service a competing product, at a significantly lower price.

22. Specifically, Hollyland and EC Pro misappropriated Amimon's confidential, proprietary and copyrighted MAC Source Code, which was then slightly altered, recompiled and installed as a new binary without authorization on Amimon chipsets that were acquired on the gray market.

23. The chipsets containing the modified MAC Source Code were then packaged into and sold as Hollyland and Ikan branded products sold by Hollyland and ECPro. In further violation of Amimon's trade secrets, ECPro has possession of the MAC Source Code, at least, through its replacement of circuit boards along with the installation of software and firmware updates as part of its exclusive service of Hollyland's products in the United States.



Hollyland transmitter
and receiver
distributed by ECPro

Ikan transmitter and
receiver

24. Hollyland and ECPro intentionally hid their wrongful conduct from Amimon to ensure it would not be uncovered.

25.     Hollyland and ECPro relied on and continue to rely on Amimon's trade secret information to develop and supply at least the Cosmo and MOMA Legend products as well as the Ikan Blitz products in the United States. Hollyland and ECPro's ongoing sales of and service of these products in the United States continue to perpetuate the misappropriation of Amimon's trade secrets and violate Amimon's copyrights.

26.     Egregiously, and notwithstanding its unlawful conduct, Hollyland and ECPro publicly tout the very inventions stolen from Amimon as their "innovation[s]," evidencing a degree of willful, wanton misappropriation rarely seen even in cases like these.[3]

27.     Hollyland currently markets its infringing products under the Cosmo product lines and in the past under the MOMA Legend product line. Ikan marketed its infringing products under the Blitz product line. Each of these infringing products incorporates an Amimon chipset and Amimon's confidential software generated and/or derived from the misappropriated MAC Source Code.

28.     Hollyland and ECPro knew that the information it gathered without permission was confidential and that the code and documents were replete with Amimon's trade secrets. Despite this knowledge, they simply copied and used these critical trade secrets for their own competing products – products that bear the hallmark, and indeed, the very code of Amimon's innovation, product development, and technical and business strategies. Their misappropriation was deliberate, wholesale, and systematic, leaving no doubt about its unlawful scheme.

29.     Amimon obtained an exemplar Hollyland Cosmo product, examined the chipset to confirm it was an Amimon chipset and then conducted testing on the embedded software to confirm its version and functionality.

30.     The following is an image of the Hollyland Cosmo product showing the Amimon chipset on its circuit board:

---

[3] See, e.g. hollyland-tech.com, https://www.hollyland-tech.com/video/ (last visited November 2, 2020).



31.    Upon investigation, it was revealed that the Hollyland product was running a compiled version of the MAC Source Code slightly modified to alter the functionality of the chipset outside of the parameters permitted by Amimon's software distributed with its products. Amimon never provided its chipsets or MAC Source Code to Hollyland or ECPro for modification or otherwise.

32.    Amimon also learned that in contrast to its software, the software running on the Hollyland product was not secure, potentially allowing third-parties to monitor and intercept the wireless video and audio signals of live broadcasts or high-value motion picture productions.

33.    Amimon also obtained an exemplar Ikan Blitz product, which was manufactured for Ikan by Hollyland, examined the chipset to confirm it was an Amimon chipset and then conducted testing on the embedded software to confirm its version and functionality.

34.    Amimon's investigation revealed that the Ikan product was running an <u>identical</u> compiled version of the MAC Source Code present in the Hollyland branded products.

35.     The only way that that the code on the Hollyland and Ikan products could be modified in the manner which they are is through misappropriating and modifying the  MAC Source Code and then compiling and flashing the derivative (modified) code back onto the Amimon chipset.

36.     Amimon's investigation confirmed without any doubt that Hollyland and ECPro misappropriated the MAC Source Code, modified that source code, and installed the modified code on the Amimon AMN2220 chipsets they surreptitiously obtained on the gray market, repackaged and sold as Hollyland and Ikan products.

37.     ECPro is the dedicated distribution and service facility for Hollyland in the United States.[4] ECPro has access to and uses Amimon's misappropriated software in ECPro's repairs including, but not limited to, circuit board replacements, software and firmware updates and reprogramming, and distribution of, at least, Hollyland products. ECPro is aware that the code contained in the relevant Hollyland products is the result of misappropriated and modified the MAC Source Code.

38.     As the leader in the real-time high-quality wireless video transmission industry, Amimon has expended considerable resources in R&D, which resulted in volumes of confidential trade secrets. In addition, as a result of its substantial investments and long-standing dedication to innovation, Amimon has been awarded patents covering, among other things, its digital video transmission technology. Significant aspects of Amimon's products are highly confidential, and are maintained by Amimon in strict confidence as trade secrets to protect their value and the substantial investments Amimon has made to develop them. This includes the MAC Source Code. Indeed, this confidential information derives considerable value from not being known outside of Amimon.

---

[4] See, e.g. ecprostore.com, https://ecprostore.com/pages/hollyview (last visited November 2, 2020).

39.     Amimon protects its trade secrets in numerous ways, including by restricting access to confidential information only to select individuals, and even then, only subject to strict confidentiality and non-disclosure agreements.

40.     Unless halted, Defendants' illegal actions will serve as the roadmap for other companies who have not invested in research and development themselves to steal the trade secrets of competitors and violate the intellectual property rights of true innovators. Simply put, Defendant's conduct must be stopped.

## COUNT I
### Trade Secret Misappropriation Under the Defend Trade Secrets Act
### (18 U.S.C. §§ 1836(b), 1839 *et seq.*)

41.     Amimon incorporates and re-alleges each and every allegation above as if fully set forth herein.

42.     Amimon is the owner of certain valuable trade secrets contained in and relating to low latency wireless high-definition audio-video transmission, including as described herein. These trade secrets are related to Amimon's products and services that are used in or intended for use in interstate and foreign commerce. These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Amimon.

43.     As stated above, Amimon sells its products throughout the United States.  For example, Amimon's low latency wireless high-definition audio-video transmission technology and solutions are sold and used throughout the United States.

44.     Individuals connected to Hollyland and ECPro gained access to Amimon's trade secrets through improper means. Hollyland and ECPro thereafter improperly acquired and retained Amimon's trade secrets.

45.     Amimon took reasonable measures to maintain the secrecy of its trade secret information by requiring employees to maintain the confidentiality of all such information.

46.     The trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or their use, unless they were trained in their use.

47.     Hollyland and ECPro improperly acquired Amimon's trade secrets and have since improperly used and disclosed those trade secrets, including by incorporating them into products Hollyland and ECPro market and sell.

48.     In addition to the sale of new product, ECPro has access to and uses Amimon's misappropriated software for its service and repair business which includes, at least, circuit board replacements, software and firmware updates and chip reprogramming for Hollyland branded products sold throughout the United States. ECPro is aware that the code contained in the relevant Hollyland products is the result of misappropriated and modified MAC Source Code.

49.     Hollyland and ECPro have misappropriated Amimon's trade secrets, including Amimon's proprietary and confidential MAC Source Code, by acquiring, using, copying and/or disclosing the information described above, including by manufacturing, marketing, offering, selling and/or servicing in the United States products that comprise, embody, and/or incorporate the trade secrets described herein.

50.     ECPro is aware that the Amimon proprietary and confidential MAC Source Code was misappropriated. ECPro has access to the misappropriated and confidential software code. Despite being aware that the products contained misappropriated trade secrets, ECPro has acquired, used, copied and disclosed Amimon's confidential and proprietary source code through the sale, marketing, service and/or distribution of Hollyland products.

51.     Defendants willfully and maliciously misappropriated Amimon's trade secrets in order to gain economic value from that information.

52.     As a direct and proximate result of Defendants' current and continued misappropriation of Amimon's trade secrets, Amimon will suffer imminent and irreparable harm.

53.     Unless enjoined by this Court, Defendants' acts of misappropriation will continue, and Amimon will continue to suffer irreparable harm.

54.     Amimon has no adequate remedy at law.

## COUNT II
## Trade Secret Misappropriation Under New York Law

55.     Amimon incorporates and re-alleges each and every allegation above as if fully set forth herein.

56.     Amimon is the owner of certain valuable trade secrets contained in and relating to low latency wireless high-definition audio-video transmission and as described herein. These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Amimon.

57.     Individuals connected to Hollyland and ECPro gained access to Amimon's trade secrets through improper means. Hollyland and ECPro thereafter improperly acquired and retained Amimon's trade secrets.

58.     Amimon took reasonable measures to maintain the secrecy of its trade secret information by requiring employees to maintain the confidentiality of all such information.

59.     The trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or their use, unless they were trained in their use.

60.     Hollyland and ECPro improperly acquired Amimon's trade secrets and have since improperly used and disclosed those trade secrets, including by incorporating them into products Hollyland and ECPro market and sell.

61.     In addition to the sale of new product, ECPro has access to and uses Amimon's misappropriated software for its service and repair business which includes, at least, circuit board replacements, software and firmware updates and chip reprogramming for Hollyland branded products sold throughout the United States. ECPro is aware that the code contained in the relevant Hollyland products is the result of misappropriated and modified MAC Source Code.

12

62.     Hollyland and ECPro have misappropriated Amimon's trade secrets, including Amimon's proprietary and confidential MAC Source Code, by acquiring, using, copying and/or disclosing the information described above, including by manufacturing, marketing, offering, selling and/or servicing in the United States products that comprise, embody, and/or incorporate the trade secrets described herein.

63.     ECPro is aware that the Amimon proprietary and confidential MAC Source Code was misappropriated. ECPro has access to the misappropriated and confidential software code. Despite being aware that the products contained misappropriated trade secrets, ECPro has acquired, used, copied and disclosed Amimon's confidential and proprietary source code through the sale, marketing, service and/or distribution of Hollyland products.

64.     Defendants willfully and maliciously misappropriated Amimon's trade secrets in order to gain economic value from that information.

65.     As a direct and proximate result of Defendants' current and continued misappropriation of Amimon's trade secrets, Amimon will suffer imminent and irreparable harm.

66.     Unless enjoined by this Court, Defendants' acts of misappropriation will continue and Amimon will continue to suffer irreparable harm.

67.     Amimon has no adequate remedy at law.

**COUNT III**
**Copyright Infringement**
**17 U.S.C. §§ 106**

68.     Amimon incorporates and re-alleges each and every allegation above as if fully set forth herein.

69.     The MAC Source Code contains a substantial amount of original material that is copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101 *et seq.*

70.     Without consent, authorization, approval, or license, Hollyland and ECPro knowingly, willfully, and unlawfully copied, prepared, published, and distributed Amimon's

copyrighted work, portions thereof, or derivative works and continues to do so. Hollyland's Cosmo, MOMA Legend products infringe Amimon's copyrights in the MAC Source Code, and Hollyland and ECPro are not licensed to do so.

71.     Hollyland and ECPro knowingly, willfully, and unlawfully distributed the infringing products and continue to do so without license from Amimon.

72.     Each sale of a Hollyland branded product containing Amimon's copyrighted source code or a derivative thereof constitutes a separate instance of copyright infringement.

73.     Defendants' direct and induced infringements are and have been knowing and willful.

74.     By this unlawful copying, use, and distribution, Hollyland and ECPro have violated Amimon's exclusive rights under 17 U.S.C. § 106.

75.     Hollyland and ECPro have realized unjust profits, gains and advantages as a proximate result of their infringement.

76.     Hollyland and ECPro will continue to realize unjust profits, gains and advantages as a proximate result of their infringement as long as such infringement is permitted to continue.

77.     Amimon is entitled to an injunction restraining Hollyland and ECPro from engaging in any further such acts in violation of the United States Copyright laws. Unless Hollyland and ECPro are enjoined and prohibited from infringing Amimon's copyrights, inducing others to infringe Amimon's copyrights, and unless all infringing products and software are seized, Hollyland and ECPro will continue to intentionally infringe and induce infringement of Amimon's registered copyrights.

78.     As a direct and proximate result of Hollyland's and ECPro's direct and indirect willful copyright infringement, Amimon has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill. Amimon is entitled to recover from Hollyland and ECPro, in amounts to be determined at trial, the damages Amimon sustained and will sustain, and any gains, profits, and advantages obtained by Hollyland and ECPro as a result of their acts of infringement and use and publication of the copied materials.

## COUNT IV

### Unfair Competition – Misappropriation of Skills and Expenditures

79.     Amimon incorporates and re-alleges each and every allegation above as if fully set forth herein.

80.     Hollyland and ECPro retained a commercial advantage, and owned property that belonged exclusively to Amimon (developed with Amimon's skill, expenditures and labor), with respect to its Confidential Business Information and trade secrets, including, but not limited to the Amimon MAC Source Code and associated data.

81.     In particular, the MAC Source Code developed by Amimon required significant labor, skill, and expenditures over many years.

82.     Hollyland and ECPro misappropriated Amimon's proprietary Confidential Business Information and trade secrets, including but not limited to the Amimon MAC Source Code that was created as a result of Amimon's labor, skill and expenditures, and did so in bad faith.

83.     The misappropriation was for the purpose of directly and unfairly competing with Amimon's business.

84.     The misappropriation enabled the Defendants to mimic Amimon's business model to unfairly compete in Amimon's area of specialty.

85.     The misappropriation of Amimon's property as well as its labor, skill, and expenditures, was for the benefit of the Hollyland and ECPro and to the detriment of Amimon.

86.     As a direct, proximate and foreseeable result of Defendants' unfair competition, Amimon suffered damage to its business, the precise amount to be determined at trial, but not less than $10 million.

87.     Defendants' conduct was intentional, wanton, malicious, fraudulent and perpetrated in complete disregard for Amimon's rights.  As a consequence, Defendants should be liable to pay punitive damages in an amount to be determined at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Amimon demands a trial by jury on all issues raised by the Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Amimon prays for relief as follows:

1.      Award a temporary restraining order, preliminary injunction, and/or permanent injunction prohibiting Hollyland and ECPro and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from unfairly competing with Amimon by using Amimon's trade secrets.

2.      Award a temporary restraining order, preliminary injunction, and/or a permanent injunction restraining and enjoining Hollyland and ECPro from altering, destroying, or disposing of any evidence, in any form, relating to this action, including without limitation emails and paper and electronic documents, including current or archived electronic logs, metadata, and directories.

3.      Order Hollyland and ECPro to return all Amimon confidential and proprietary information in its possession and to cease and desist from its efforts to encourage employees and others non-disclosure and confidentiality agreements.

4.      Declare that Hollyland and ECPro have no rights or privileges to use Amimon's trade secrets.

5.      Award Amimon restitution in an amount to be determined at trial.

6.      Award Amimon damages in an amount to be determined at trial, including without limitation, Amimon's lost revenues and profits.

7.  Award Amimon punitive damages in an amount to be determined at trial.

8.  For an award of pre-judgment and post-judgment interest.

9.  Award Amimon attorneys' fees and costs.

10. Award Amimon any such other relief as the Court deems appropriate.


Dated:     New York, New York
           February 11, 201

                                    **ARMSTRONG TEASDALE LLP**


                                    */s/ Charles Palella*
                                    Charles Palella
                                    919 Third Ave., 37th Floor
                                    New York, NY 10022
                                    Tel: 212.209.4400
                                    cpalella@atllp.com

                                    David M. Magee, *pro hac vice*
                                    225 Franklin Street
                                    26th Floor
                                    Boston, MA 02110
                                    Tel: 617.217.2030
                                    dmagee@atllp.com

                                    ***Attorneys for Plaintiffs***