UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMIMON INC. and AMIMON LTD,

                              Plaintiffs,

          – against –

SHENZHEN HOLLYLAND TECH CO. LTD,
and EC PRO VIDEO SYSTEMS,

                              Defendants.

**OPINION AND ORDER**

20 Civ. 9170 (ER)

Ramos, D.J.:

Amimon Inc. and Amimon Ltd (collectively, "Amimon") brought this suit against

Shenzhen Hollyland Tech Co. ("Hollyland") and EC Pro Video Systems ("EC Pro") alleging

trade secret misappropriation, copyright infringement, and unfair competition.  Doc. 37.  Before

the Court are Hollyland and ECPro's motions to dismiss the complaint.

For the reasons that follow, the motions are DENIED.

## I.      BACKGROUND

Amimon develops technology that enables wireless, near instantaneous video streaming.

Doc. 37 ¶ 11.  Its products are used in film production, news and sports broadcasting, drones, and

hospital operating rooms.  *Id.* ¶ 12.  Amimon develops both the hardware, such as transmitters

and receivers, and the software for these products.  *Id.* ¶ 11.  Amimon's software exists first as a

source code—a version of the software which is written in plain text and editable by a human

(the "Source Code").  *Id.* ¶ 16.  It is this modifiable version of the software that is the subject of

this case.  The Source Code is then compiled into a binary version of the software, which is

placed on the chipsets in the transmitters and receivers.  *Id.* ¶ 17.  Unlike the Source Code, the

binary version of the software is encrypted, and cannot be decompiled, reverse engineered,

decrypted, modified or reviewed to access the underlying Source Code.  *Id.*  Amimon provides

the chipsets with the binary version of the software to its customers; Amimon does not disclose, sell or distribute the underlying, modifiable Source Code.  *Id.* ¶¶ 17–18.  Amimon was granted a copyright registration by the United States Copyright Office for the Source Code software.  *Id.* ¶ 19.

Amimon alleges that as a leader in its industry, it spends 5 to 10 million dollars annually to research and develop new technologies, and that the information it develops derives considerable value from not being known outside of Amimon.  *Id.* ¶¶ 13, 38.  Furthermore, Amimon alleges that, in addition to obtaining copyrights for its work, it protects its developments by restricting access to confidential information only to select individuals who are subject to strict confidentiality and non-disclosure agreements.  *Id.* ¶ 39.

Hollyland is a Chinese corporation that, like Amimon, develops and sells video technology.  *Id.* ¶¶ 20–21.  EC Pro is a New York based company.  *Id.* ¶ 4.  As relevant to this case, EC Pro is Hollyland's U.S. distributor and exclusive service center.  *Id.* ¶ 20.

For reasons not set forth in the complaint, at an undetermined date, Amimon obtained one of Hollyland's products, called the Cosmo, and examined its chipset.  *Id.* ¶ 29.  The chipset contained within the Cosmo was one of Amimon's chipsets.[1]  *Id.* ¶ 30.  Amimon alleges that from its examination of the chipset, it determined that the source code on the chipset in the Cosmo product was an *almost* identical match to its own Source Code, but that it had been modified slightly.  *Id.* ¶ 31 (emphasis added).  Amimon never provided its chipsets or Source Code to Hollyland or ECPro for modification or otherwise.  *Id.*  In light of this discovery, Amimon alleges that because the only way to modify the binary code is by modifying the source

---

[1] In the Complaint, Amimon has included a photo of the Cosmo product's circuit board.  Doc. 37 ¶ 30.  The photo shows a chipset with "Amimon" on it.  *Id.*

code, the only way the code on Hollyland's product could be modified is through misappropriation of Amimon's Source Code.  *Id.* ¶ 35.  As Amimon explains:

> [T]he binary code on Amimon's chipsets cannot be decompiled, reverse engineered, decrypted, modified or reviewed.  Nevertheless, Amimon's investigation of the binary code on the chipsets used inside Defendants' products reveals the binary code to be substantially similar to Amimon's binary code, but with slight modifications.  The *only* way that the binary code on the Amimon chipsets in Defendants' products could possibly contain binary code which differs from that designed and distributed by Amimon is if Amimon's source code were obtained, modified, recompiled and reinstalled onto the accused products.  There exists only one way to modify and replace the *binary* code on Amimon's chipsets, which is for Defendants to have used Amimon's confidential, proprietary and copyrighted *source* code.

Doc. 44 at 5 n.3 (citations omitted).

In June 2019, Amimon filed a complaint against Hollyland and Beijing Huacheng Yuzhe Trading Co., Hollyland's China based distributor, in a Chinese court, alleging an infringement of its computer software copyright.  Doc. 67, Ex. 1.  That case is ongoing.  On November 4, 2020, Amimon filed the instant action against Hollyland and EC Pro in this Court for trade secret misappropriation under the Defend Trade Secrets Act ("DTSA") and New York Law, for violation of the Copyright Act, and for unfair competition for misappropriation of skills and expenditures.[2]  Doc. 11.  On February 15, 2021, Amimon filed a First Amended Complaint ("FAC").  Doc. 37.  Both Hollyland and EC Pro have filed motions to dismiss.

The original motion to dismiss was filed on March 17, 2021.  Doc. 41.  EC Pro's counsel sought to amend that motion to clarify that at that time it was only representing EC Pro, and therefore that the motion to dismiss only applied to EC Pro.  Counsel advised the Court that Hollyland had not yet been served under the Hague Convention as Hollyland had requested.  An

---

[2] The original complaint also listed Ikan International, LLC as a defendant.  Doc. 11.  However, that claim has since been resolved by stipulation between the parties.  Doc. 15.

amended motion to dismiss was filed on April 4, 2021.  Doc. 52.  In July 2021, EC Pro's counsel

advised the Court that Hollyland had been served under the Hague Convention, and so counsel

would now be representing Hollyland as well.[3]  Counsel requested leave to submit an additional

motion to dismiss on Hollyland's behalf.  That motion was filed on September 2, 2021.  Doc. 65.

Hollyland adopts the arguments made in EC Pro's motion and, in addition, argues that the claims

against it should be dismissed for lack of personal jurisdiction, lack of subject matter jurisdiction,

*forum non conveniens*, and international comity.  Together, EC Pro and Hollyland have argued

that the case should be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to

state a claim.

## II.      HOLLYLAND'S MOTION TO DISMISS

### A.  Personal Jurisdiction

#### *1.  Legal standard*

"A plaintiff opposing a motion to dismiss under Rule 12(b)(2) for lack of personal

jurisdiction has the burden of establishing that the court has jurisdiction over the defendant."

*BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 2 Civ. 4695 (LTS), 2003 WL

21467544, at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels Lambert v. Fiddler Gonzalez &*

*Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)).  To meet this burden where there has been no

discovery or evidentiary hearing, the plaintiff must plead facts sufficient for a *prima facie*

showing of jurisdiction.  *Id.*  As the Court evaluates a Rule 12(b)(2) motion, it must construe all

of the plaintiff's allegations as true and resolve all doubts in its favor.  *Casville Invs., Ltd. v.*

---

[3] In a letter to the Court requesting a pre-motion conference, Counsel advised the Court that Hollyland had
"allegedly" been served, but that they were unable to confirm which date specifically because Amimon had not
submitted an affidavit of service.  Doc. 58.  Hollyland raises this lack of affidavit in its argument to dismiss for lack
of personal jurisdiction.  Doc. 66.  However, Hollyland does not contest actual service.

*Kates*, No. 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)).  "However, a plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would 'lack the factual specificity necessary to confer jurisdiction.'"  *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)).  As Rule 12(b)(2) motions are "inherently . . . matter[s] requiring the resolution of factual issues outside of the pleadings," courts may rely on additional materials outside the pleadings when ruling on such motions.  *John Hancock Prop. & Cas. Ins. Co. v. Universale Reinsurance Co.*, No. 91 Civ. 3644 (CES), 1992 WL 26765, at *1 n.1 (S.D.N.Y. Feb. 5, 1992); *accord Darby Trading Inc. v. Shell Int'l Trading and Shipping Co.*, 568 F. Supp. 2d 329, 334 (S.D.N.Y. 2008).

In diversity or federal question cases, personal jurisdiction is determined in accordance with the law of the forum in which the federal court sits.  *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (citing *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997)).  This determination involves a two-step analysis.  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).  In New York, the court must first determine whether personal jurisdiction is appropriate pursuant to the state's general jurisdiction statute, Civil Practice Law and Rules ("C.P.L.R.") § 301, or its long-arm jurisdiction statute, C.P.L.R. § 302(a).  If the Court's exercise of personal jurisdiction is deemed appropriate according to New York law, the second step is an evaluation of whether the court's exercise of personal jurisdiction comports with the Fifth Amendment Due Process Clause of the United States Constitution. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007).

2.  *Personal jurisdiction exists under C.P.L.R. 302(a)(1)*

C.P.L.R. § 302(a)(1) provides that a court "may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent [] transacts any business with the state or contracts anywhere to supply goods or services in the state."  N.Y. C.P.L.R. § 302(a)(1) (McKinney 2008).  "To establish personal jurisdiction under Section 302(a)(1), two requirements must be met:  (1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity."  *Medicrea USA, Inc. v. K2M Spine, Inc.*, No. 17 Civ. 8677 (AT), 2018 WL 3407702, at*4 (S.D.N.Y. Feb. 7, 2018) (quoting *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006).

Amimon has alleged that Hollyland works with EC Pro to import Hollyland's products to sell in New York and therefore, Hollyland transacted business within New York.  Doc. 70 at 4.  The Court agrees.  Amimon has alleged that Hollyland actively advertises and sells products that contain its Source Code.  Even though Hollyland itself may not have offices in New York or sell the products directly, its relationship with EC Pro and its purposeful efforts to sell its products in New York are sufficient to establish that it has transacted business within the state.  *See Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16-CV-1318 (GBD), 2017 WL 825482, at *10 (S.D.N.Y. Mar. 2, 2017) ("Thus, regardless of whether [a New York-based recurrent purchaser] was a 'dealer,' a 'reseller,' or simply a large-volume purchaser . . . [defendant's] sales to [recurrent purchaser] were purposeful contacts with New York.").  Amimon has further alleged that these contacts are what facilitate the sale of products containing its Source Code in New York.  Doc. 70 at 4.  Therefore, because Amimon's claims arise from these contacts, the second prong of C.P.L.R. § 302(a)(1) is also met.  *See Joint Stock Co.*, 2017 WL 825482, at *10.

6

Hollyland asserts that the "presence of a distributor in the absence of any other contacts with the forum, has been held not to be sufficient to acquire jurisdiction over a foreign corporation."  Doc. 66 at 4, and Doc. 73 at 3, 4 (citing *Jurlique, Inc. v. Austral Biolab Pty., Ltd.*, 590 N.Y.S.2d 235, 237 (N.Y. App. Div. 1992).  However, while the presence of a distributor is insufficient to establish *general* jurisdiction pursuant to C.P.L.R. § 301, contacts with a distributor may be considered in determining whether *specific* jurisdiction exists under C.P.L.R. § 302.  *See Mason Tayler Med. Prods. Corp. v. Qwikstrip Prods., LLC*, No 99-CV-01774 (SC), 2000 WL 432807, at *4 (W.D.N.Y. Apr. 14, 2000) (holding that the presence of a sales representative or distributor is not sufficient to establish personal jurisdiction under C.P.L.R. § 301, but that "[t]he plaintiff's necessary showing under section 302 is considerably less than that needed to establish defendant's doing business [under section 301]" (internal quotation marks and citation omitted)).  Thus, while Amimon's allegations that Hollyland acted through EC Pro in New York may not be sufficient to establish general jurisdiction under § 301, they are sufficient to establish specific jurisdiction under § 302(a)(1).[4]

Hollyland additionally states that Amimon has not yet filed an Affidavit of Service to indicate that Hollyland was served through the Hague.  Doc. 66 at 5 n.6.  However, Hollyland does not argue that it has not in fact been served, simply that no affidavit of service has been filed with the Court.  As Hollyland is not disputing actual service and has not cited any case as to

---

[4] Amimon argues in a footnote that the Court may be able to establish general jurisdiction over Hollyland and alleges that EC Pro may be an "alter-ego" of Hollyland.  Doc. 70 at 5 n.4.  Since the Court finds that specific jurisdiction has been established, it does not consider whether general jurisdiction also exists.

why a lack of an affidavit of service is sufficient to warrant dismissal for lack of personal jurisdiction, the Court will not dismiss on this basis.[5]

   3.  *Due process*

   Due process requires that a defendant have "sufficient minimum contacts with the forum" to justify a court's exercise of personal jurisdiction, such that the "the assertion of personal jurisdiction over the defendant comports with traditional notions of fair play and substantial justice." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (internal quotation marks and citations omitted).  The due process inquiry has two parts:  (1) "the court must determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction," and (2) "the court must determine whether the assertion of personal jurisdiction is reasonable under the circumstances of the particular case." *Schottenstein v. Schottenstein*, No. 04 Civ. 5851 (SAS), 2004 WL 2534155, at *7 (S.D.N.Y. Nov. 8, 2004) (citing *Metro. Life*, 84 F.3d at 567).  "The import of the 'reasonableness' inquiry varies inversely with the strength of the 'minimum contacts' showing—a strong . . . showing by the plaintiff on 'minimum contacts' reduces . . . the weight given to 'reasonableness.'" *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (citing *Metro. Life*, 84 F.3d at 568–69).

   "The requisite 'minimum contacts' analysis 'overlaps significantly' with New York's § 302(a)(1) inquiry into whether a defendant transacted business in the State." *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 515 (S.D.N.Y. 2016) (citations omitted).  Since the Court holds that

---

[5] Hollyland makes additional arguments regarding the lack of jurisdiction.  These arguments are premised on a finding of personal jurisdiction based on a contractual relationship between Hollyland and Amimon, on EC Pro being Hollyland's agent, and Hollyland's attendance at a trade show in New York.  Because this Court finds that jurisdiction exists over Hollyland as a result of its *own* contacts in New York (as opposed to a specific contractual relationship with EC Pro, or through EC Pro as an agent), the Court need not address these arguments.

Hollyland's contacts with New York through EC Pro are purposeful and related to the cause of action so that Hollyland has sufficient minimum contacts under C.P.L.R. § 302(a)(1), the Court also finds that these contacts meet the due process requirements.  *See id.*

The reasonableness inquiry depends on five factors:  "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the most efficient resolution of the controversy; and (5) the interests of the state in furthering substantive social policies."  *Id.* (citing *Schottenstein*, 2004 WL 2534155, at *8).  Hollyland has not argued, nor does the Court independently find, that the exercise of personal jurisdiction over Hollyland is unreasonable.  Although litigating in New York may impose a burden on Hollyland, the burden is outweighed by the other factors.  Because the products were being sold in New York, the forum has an interest in the resolution of the dispute.  The action involves claims against not only Hollyland, but also EC Pro, so Amimon has an interest in New York as a forum, where Amimon is able to obtain jurisdiction over both defendants and efficiently resolve the controversy.

The exercise of personal jurisdiction over Hollyland therefore comports with notions of fair play and substantial justice.  Hollyland's motion to dismiss for lack of personal jurisdiction is denied.

### B.  Subject Matter Jurisdiction

Hollyland argues that Amimon has failed to state a claim for trade secret misappropriation, copyright infringement, and unfair competition because the alleged violations occurred overseas.  Doc. 66 at 5.  Because the DTSA, Copyright Act, and unfair competition laws do not apply extraterritorially, Hollyland argues, the Court does not have subject matter jurisdiction and the claims should be dismissed.  *Id.*  However, Amimon's claims do not pertain to extraterritorial actions, but rather Hollyland's appropriation and sale of Amimon's Source

Code *in the United States* through EC Pro.[6]  Hollyland's argument is premised on the notion that

it is a manufacturer located in China, and since EC Pro is the entity that is actually selling the

products in the United States, any of Hollyland's allegedly infringing actions occurred in China

only.  *See* Doc. 66 at 2.  This argument ignores the fact that Hollyland purposely established a

relationship with EC Pro to sell its products in the United States, presumably believing such an

action would be profitable.  Hollyland cannot reap the benefits of such a relationship and

simultaneously shield itself from any negative consequences.

 Because Hollyland is allegedly purposely shipping product that contains Amimon's

Source Code to the United States where it is being sold, the actions are not extraterritorial and

Hollyland's argument is unavailing.

### C.  Forum Non Conveniens

 The doctrine of *forum non conveniens* allows a court to dismiss an action "even if the

court is a permissible venue with proper jurisdiction over the claim."  *LaSala v. Bank of Cyprus*

*Pub. Co. Ltd.*, 510 F. Supp. 2d 246, 254 (S.D.N.Y. 2007) (quoting *Carey v. Bayerische Hypo-Und*

*Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004)).  "A decision to grant or deny a motion to

dismiss a cause of action under the doctrine of *forum non conveniens* lies wholly within the

broad discretion of the district court."  *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81

F.3d 1224, 1232 (2d Cir. 1996).  The Second Circuit has "outlined a three-step process to guide

---

[6] Hollyland primarily cites to cases focused on the extraterritorial application of the Copyright Act, but in all of these cases, the allegedly infringed product was being sold *outside* of the United States.  *See, e.g.*, *Energy Intel. Grp., Inc. v. Canaccord Genuity, Inc.*, No. 16 Civ. 8298 (JGK), 2017 WL 1967366 (S.D.N.Y May 11, 2017) (copyrighted publications sent from Canada to subscribers outside of the United States); *Roberts v. Keith*, No. 4 Civ. 100079 (LAP), 2009 WL 3572962 (S.D.N.Y. Oct. 23, 2009) (album release in the United Kingdom and Europe); *Levitin v. Sony Music Ent.*, 101 F. Supp. 3d 376 (S.D.N.Y. 2015) (the release of an infringing song outside the United States). That is not the case here.

the exercise of that discretion." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153

(2d. Cir. 2005) (citing *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) (en banc)).

First, "a court determines the degree of deference properly accorded the plaintiff's choice of

forum." *Id.*  Second, "it considers whether the alternative forum proposed by the defendants is

adequate to adjudicate the parties' dispute." *Id.*  And third, "a court balances the private and

public interests implicated in the choice of forum." *Id.*

　　*1.  Deference to Amimon's choice of forum*

　　A defendant who invokes *forum non conveniens* generally bears "a heavy burden" in

opposing a plaintiff's chosen forum.  *Sinochem Int'l. Co. Ltd. v. Malaysia Int'l Shipping Corp.*,

549 U.S. 422, 430 (2007).  When reviewing a *forum non conveniens* motion, courts start with "a

strong presumption" in favor of the plaintiff's forum choice.  *Norex*, 416 F.3d at 154 (quoting

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)).  "Usually, the greatest deference is

afforded a plaintiff's choice of its home forum, while 'less deference' is afforded a foreign

plaintiff's choice of a United States forum." *Id.* (citations omitted).  However, "the degree of

deference assigned to plaintiff's choice depends on the specific facts of the case and may be

viewed as operating along a 'sliding scale.'" *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329

F.3d 64, 71 (2d Cir. 2003).  The Second Circuit in *Iragorri* explained the sliding-scale analysis:

> [T]he greater the plaintiff's or the lawsuit's bona fide connection to the United States and
> to the forum of choice and the more it appears that considerations of convenience favor
> the conduct of the lawsuit in the United States, the more difficult it will be for the
> defendant to gain dismissal for *forum non conveniens*. . . .  On the other hand, the more it
> appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping
> reasons . . . the less deference the plaintiff's choice commands[.]

*Iragorri*, 274 F.3d at 71–72.  In short, courts give greater deference to a plaintiff's chosen forum

when that choice is motivated by convenience and give less deference when the plaintiff is

merely seeking a tactical advantage.  When applying this sliding-scale analysis, courts are guided by *Iragorri*'s convenience and forum shopping factors.  *Norex*, 416 F.3d at 154–55.  *Iragorri*'s convenience factors are:  "(1) the convenience of the plaintiff's residence in relation to the chosen forum, (2) the availability of witnesses or evidence to the forum district, (3) the defendant's amenability to suit in the forum district, (4) the availability of appropriate legal assistance, and (5) other reasons relating to convenience or expense."  *Id.* at 155 (quoting *Iragorri*, 274 F.3d at 72).  Conversely, *Iragorri*'s forum shopping factors are:  "(1) attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, (2) the habitual generosity of juries in the United States or in the forum district, (3) the plaintiff's popularity or the defendant's unpopularity in the region, or (4) the inconvenience and expense to the defendant resulting from litigation in that forum."  *Id.* (quoting *Iragorri*, 274 F.3d at 72).

Some deference should be given to Amimon's chosen forum.  Weighing strongly in favor of deference is the fact that the cause of action underlying Amimon's claim occurred in New York, meaning that at least some witnesses and evidence is available in the forum district, and New York offers a forum where jurisdiction exists over both defendants.  *Id.* at 155–56 ("'[A] plaintiff's choice of the defendant's home forum' will not, by itself, warrant a presumption of convenience but, when such a choice is 'made to obtain jurisdiction over defendant[,] . . . substantial deference would still be generally appropriate.'" (quoting *Pollux*, 329 F.3d at 74)).

Complicating the forum analysis is the ongoing litigation in China.  Hollyland argues that since Amimon has already initiated a lawsuit in China against Hollyland pertaining to copyright infringement of the same Source Code, this additional litigation is indicative of forum shopping with the goal of securing a favorable district.  *See* Doc. 66 at 2.  It is not insignificant that there is ongoing litigation in China.  However, Amimon has focused this lawsuit on activity that occurred

12

in New York, has included Hollyland's New York-based distributor, EC Pro, as a defendant, and has brought claims under U.S. and New York law. "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 478 (S.D.N.Y. 2006) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). Therefore, because this lawsuit includes allegations of violations of U.S. and New York law, the balance is not strongly in favor of Hollyland and the Court gives some deference to Amimon's choice of forum.

   2.  *Adequate alternative forum*

   The Court's deference to Plaintiff's forum choice does "not necessarily preclude *forum non conveniens* dismissal." *Norex*, 416 F.3d at 157. Rather, it "simply recalibrate[s] the balance for purposes of the remaining analysis." *Id.* To be successful on a motion to dismiss on *forum non conveniens* grounds, "a movant must demonstrate the availability of an adequate alternative forum." *Id.* (citation omitted). In order for an alternative forum to be adequate, it must satisfy two requirements. First, all defendants must be amenable to service of process in the alternative forum. *Norex*, 416 F.3d at 157; *Rio Tinto PLC v. Vale S.A.*, No. 14 Civ. 3042 (RMB), 2014 WL 7191250, at *13 (S.D.N.Y. Dec. 17, 2014) (for an alternative forum to be adequate, "a court must satisfy itself that the litigation may be conducted elsewhere against *all defendants*" (citing *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998)) (emphasis added)). And second, the alternative forum must permit litigation of the subject matter of the dispute. *Norex*, 416 F.3d at 157.

   It is clear that Hollyland is amenable to service of process in China. What is less clear is whether EC Pro would be. Hollyland has provided no information about whether EC Pro would be subject to jurisdiction in China, stating only that "Plaintiff and Defendants have consented to

jurisdiction in China." Doc. 66 at 11. However, Hollyland is unable to consent on EC Pro's behalf and EC Pro itself has not consented to jurisdiction in China.

Even were EC Pro to consent to jurisdiction in China, the question of whether China would permit litigation of the subject matter of the dispute is even hazier. In the FAC, Amimon asserts claims for trade secret misappropriation under the federal Defend Trade Secrets Act and New York law, copyright infringement under the U.S. Copyright Act, and unfair competition under New York law. The underlying facts Amimon states to support these claims concern the sale of products containing its Source Code in New York. In other words, Amimon has asserted claims for violations that occurred in the United States under U.S. laws. Hollyland states that China would permit litigation of this subject matter because it is a member of a number of international copyright conventions. Doc. 73 at 6 & nn.5–6. Hollyland states that Chinese courts regularly hear and decide cases involving foreign law, citing China's International Copyright Treaties Implementing Rules as support. Doc. 73 at 6 & n.6. However, aside from these broad statements that Chinese courts adjudicate cases involving foreign law, Hollyland does not provide any specific information as to how a Chinese court would permit litigation of the specific U.S. and New York law violations at issue in this dispute. Hollyland argues that "there is no assumption[] that the Chinese courts would *not* adjudicate such a matter." Doc. 73 at 6 (emphasis added). But the burden is on Hollyland to affirmatively show that the Chinese courts *would* adjudicate such a matter.

Hollyland argues that Amimon must have believed China was an adequate alternative because Amimon already has a case pending there concerning a copyright infringement of the same Source Code. According to the translated version of that complaint that Hollyland submitted as an exhibit to its motion, Amimon has asserted a claim for copyright infringement

under China's Copyright Law for the infringement of Amimon's Source Code in China.  Doc. 67, Ex. 1 at 2.  Hollyland argues that because many of the facts between the Chinese and U.S. lawsuits overlap, and because Amimon has asserted a copyright infringement claim in both, China is clearly an adequate alternative.  However, the fact that China is an adequate forum to adjudicate whether Hollyland violated Chinese law does not inherently mean it is an adequate forum to evaluate whether Hollyland violated U.S. law.  *See, e.g.*, *Halo Creative & Design Ltd. v. Comptoir Des Indes Inc.*, 816 F.3d 1366, 1371 (Fed. Cir. 2016) ("It cannot be assumed that a foreign court would adjudicate an intellectual property dispute where the alleged infringement occurred elsewhere, and the case otherwise has little or no connection to the chosen forum.").

It is the responsibility of the party moving for *forum non conveniens* to prove that an adequate alternative is available.  *Norex*, 416 F.3d at 157.  Hollyland has not shown that both defendants are amenable to service of process, nor that China is an adequate alternative to address the U.S.-based laws at issue before the Court here, and because it has not proffered any other alternative forum, the Court finds that no adequate alternative exists.  Because the Court determines that no adequate alternative exists, there is no need to evaluate the public and private interests and Hollyland's motion to dismiss for *forum non conveniens* is denied.  *Id.* ("If the movant fails to [demonstrate the availability of an adequate alternative forum], the *forum non conveniens* motion must be denied regardless of the degree of deference accorded plaintiff's forum choice.").

### D.  International Comity

International comity has been defined as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation."  *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).  Whether to dismiss a case on international comity grounds lies within the discretion of the district court.  *See Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240,

246 (2d Cir. 1999). The application of comity varies depending on whether a party seeks

recognition of a foreign judgment that has become final or of a pending parallel proceeding that

has yet to reach a final judgment. *Klonis v. Nat'l Bank of Greece, S.A.*, 487 F. Supp. 2d 351,

354–55 (S.D.N.Y. 2006). "In the context of parallel proceedings in a foreign court, a district

court should be guided by the principles upon which international comity is based: the proper

respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial

efficiency." *Royal & Sun All. Ins. Co. v. Century Int'l Arms, Inc*., 466 F.3d 88, 94 (2d Cir. 2006).

"The mere existence of parallel foreign proceedings does not negate the district courts' 'virtually

unflagging obligation . . . to exercise the jurisdiction given them.'" *Id.* at 92 (quoting *Colo. River

Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). The Second Circuit has

articulated several nonexclusive factors that courts should consider in making this determination,

including: the connection between litigation and the United States, the similarity of the parties

and issues; the adequacy of the alternate forum, the order in which actions were filed, the

interests of judicial economy, and the convenience and potential prejudice to the parties. *Id.* As

there is no exceptional circumstance that warrants the dismissal due to international comity,

Hollyland's request is denied.

To begin, there is a direct connection between this litigation and the United States, as the

cause of action pertains to the sale of products in New York, and Amimon has filed claims under

federal and New York state laws. Furthermore, though the parties and issues are similar, there

are some substantive differences. EC Pro is not a party to the litigation in China, and the only

claim in that litigation appears to be for Chinese copyright infringement; there is no trade secret

misappropriation claim, and at no point does Hollyland suggest that Amimon has sought relief

under U.S. law in the Chinese court. It is true that the action in China was filed prior to the one

here, and the issue concerns copyright infringement. Hollyland suggests that were Amimon to succeed in its China-based litigation, it would obtain one of its desired goals of forcing Hollyland to halt production of the infringing product. However, here Amimon seeks not only injunctive relief, but also restitution and damages for the infringement. Even if Hollyland succeeds in its China-based litigation, that would only address the issue of injunctive relief. Furthermore, due to the differences in applicability of law, even if Amimon fails in China under China's copyright restrictions, it may succeed in New York under U.S. law. New York's exercise of jurisdiction would in no way conflict with or undermine the outcome of the litigation in China.

Hollyland's request to dismiss due to international comity is denied.

## III.   HOLLYLAND AND EC PRO'S MOTION TO DISMISS

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to "accept as true the facts alleged in the Complaint, drawing all reasonable inferences in favor of the plaintiff" to determine whether plaintiff has properly stated a claim upon which relief can be granted. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). But this requirement does not apply to legal conclusions, recitals of the elements of a cause of action, bare assertions, or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681, 686 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007)). Instead, to satisfy the pleading standard under Rule 8, a complaint must contain sufficient factual matter to state a claim to relief that is plausible—not merely possible—on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).

Only certain documents may be considered by a court reviewing a motion to dismiss: the scope of consideration is "limited to the factual allegations in plaintiff['s] amended complaint . . . to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of

which plaintiff[] had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citation omitted).  A complaint is also deemed to include any documents that "although not incorporated by reference, are 'integral' to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation omitted).

### A. Trade Secret Misappropriation

"To state a claim for misappropriation under the DTSA, a plaintiff must allege that it possessed a trade secret that the defendant misappropriated." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (citing 18 U.S.C. § 1836(b)(1)).  The elements for stating a claim of misappropriation of trade secrets under New York law "are fundamentally the same" as those sustaining a claim under the DTSA.  *Id.* (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)).  If a complaint sufficiently alleges a claim under the DTSA, it also sufficiently pleads misappropriation of trade secrets under New York law.  *Id.* (citation omitted).

#### 1. *Possession of a Trade Secret*

The DTSA defines trade secrets as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes."  18 U.S.C. § 1839(3).  Though the Second Circuit has not articulated a specificity requirement for pleading a trade secret, and it is "not necessary to disclose every detail of an alleged trade secret in a complaint," the district courts routinely require that the allegations must "specify the general contours of a trade secret" without merely restating the elements of one.  *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 448 (S.D.N.Y. 2019) (citations omitted); *Lawrence v. NYC Med. Prac., P.C.*, No. 18 Civ. 8649 (GHW), 2019

WL 4194576, at *4 (S.D.N.Y. Sept. 3, 2019) (citation omitted); *Medidata Sols., Inc. v. Veeva Sys. Inc.*, No. 17 Civ. 589, 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018).

Courts consider several factors as "guideposts," which need not all be alleged, in discerning whether information qualifies as a trade secret, including

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (citation omitted).

Though the question of whether proprietary information qualifies as a trade secret is ordinarily a question of fact not resolvable on a motion to dismiss, courts dismiss claims involving trade secrets where they are not actually secret or there is no discernible economic value from them not being generally known.  *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 465 (S.D.N.Y. 2020); *see also ExpertConnect, L.L.C. v. Fowler*, No. 18 Civ. 4828, 2019 WL 3004161, at *5 (S.D.N.Y. July 10, 2019).

Amimon has alleged sufficient facts to suggest that its Source Code is a trade secret. Amimon alleges that it does not disclose, sell, or distribute its Source Code.  Instead, it sells an encrypted, compiled version that cannot be decompiled, reverse engineered, or decrypted to discern the underlying Source Code.  Doc. 37 ¶¶ 17–18.  Furthermore, Amimon alleges it obtained a copyright to protect its Source Code.  *Id.* ¶ 19.  Amimon has alleged that it has taken measures to guard the secrecy of the information and that the Source Code is not easily "properly acquired or duplicated by others."  *See Iacovacci*, 437 F. Supp 3d at 380.

Defendants' argument that Amimon's allegations are contradictory is easily dismissed. Amimon has alleged that its trade secret is the modifiable Source Code. The Source Code is one version of the software, which is then encrypted and compiled as the binary code that exists on the chipsets sold by Amimon. Doc. 37 ¶ 17. While the binary code that is sold cannot be modified, the Source Code can be. *Id.* ¶¶ 16–18. Amimon is not alleging that the binary code was modified, but rather that defendants obtained the Source Code and modified that version of the software. This is not a contradictory allegation.

Defendants further argue that Amimon did not provide sufficient specificity to identify the trade secret allegedly misappropriated. This is also easily dismissed. Amimon specifically identified the trade secret as the Source Code for its zero-latency transmission software. Doc. 44 at 10. This is far more specific than a "general categor[y] of confidential information." *See Elsevier Inc. v. Dr. Evidence, LLC*, No. 17-cv-5540 (KBF), 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23, 2018). In fact, in *Elsevier* the court specifically states that "[w]hile it is not necessary to disclose every detail of an alleged trade secret in a complaint, [the plaintiff] could have explained that its 'interpretation of data' or 'process to assess the quality of evidence' relies on a specific, proprietary algorithm developed at a certain time and which no one else owns." *Id.* This is essentially the level of specificity that Amimon has alleged.

Defendants additionally argue that Amimon has not alleged that its Source Code has any economic value to Amimon or their competitors. Docs. 42, 53 at 9. Although one of the factors courts consider in determining whether something is a trade secret is "the value of the information to the business and its competitors," this is only one factor; as discussed previously, not all factors must be alleged in order to determine that information is a trade secret. *See Iacovacci*, 437 F. Supp 3d at 380. Furthermore, Amimon has alleged that as a leader of the video

transmission industry, it spends 5 to 10 million dollars annually to research and develop new technologies.  Doc. 37 ¶ 13.  Although Amimon has failed to allege specifically how much it spent on the Source Code in question, or the current value of the Source Code, in light of the other information provided, Amimon has alleged sufficient facts to plausibly assert that the Source Code is a trade secret.

   *a. Hollyland's additional argument*

   In Hollyland's brief, it submits various exhibits to show that the Source Code was publicly available and therefore not a trade secret.  *See* Doc. 66 at 23–25.  However, while Hollyland will have the opportunity in the future to contest the validity of Amimon's assertion that the Source Code is a trade secret, at this point in the litigation process the Court may not rely on extraneous evidence submitted to rebut the allegations in the FAC.  *See Brass*, 987 F.2d at 150.

   *2. Misappropriation*

   Under the DTSA, "a party must show an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty."  *Medidata Solutions*, 2018 WL 6173349, at *4 (citations omitted).  Improper means includes "inducement of a breach of duty to maintain secrecy," like a contractual agreement not to disclose information.  *Id.* (citations omitted).

   Amimon has alleged that defendants have misappropriated Amimon's Source Code, altered it slightly, and installed it as a new binary code without authorization on Amimon chipsets.  Doc. 37 ¶ 22.  Defendants argue that Amimon has not alleged any details regarding the precise acquisition of the Source Code, including how it was acquired, who the individuals were,

or how they had access to Amimon's Source Code; Amimon has only claimed that the Source

Code has been acquired.  Doc. 47 at 7.  Furthermore, EC Pro argues that Amimon has not

explained how EC Pro "knew" that any trade secrets were being used in the products.

Although Amimon does not make these specific allegations, the facts it does provide are

sufficient to plausibly conclude that Hollyland and EC Pro misappropriated Amimon's Source

Code.  Amimon has alleged that while its Source Code can be modified, the compiled binary

version that exists publicly cannot.  Doc. 37 ¶¶ 16–17.  It has alleged that it does not disclose,

sell or distribute its Source Code, nor is it disclosed in any patent filing or technical publication.

*Id.* ¶ 18.  After examining one of the Hollyland products that was being sold by EC Pro, it

discovered that the product had a compiled version of the Source Code that had been slightly

modified.  *Id.* ¶ 31.  Taken as a whole, these factual allegations are sufficient, even if minimally

so, to plausibly allege that defendants have misappropriated Amimon's trade secret.

### B.  Copyright Infringement

To state a claim for copyright infringement, a plaintiff must allege that "(1) [the]

defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a

substantial similarity exists between the defendant's work and the protectible elements of

plaintiff's."  *Ritani, LLC v. Aghajayan*, 880 F. Supp. 2d 425, 441–42 (S.D.N.Y. 2012); *see also*

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010).

Furthermore, courts in the Second Circuit have held that a plaintiff must allege "(1) which

specific original works are the subject of the copyright claim, (2) that the plaintiff owns the

copyrights in those works, (3) that the copyrights have been registered in accordance with the

statute, and (4) by what acts during what time the defendant infringed the copyright."  *Kelly v.*

*L.L. Cool J.*, 145 F.R.D. 32, 36 (S.D.N.Y. 1992).

Amimon's FAC adequately alleges a copyright infringement claim.  Defendants argue that Amimon has not alleged evidence of defendants accessing Amimon's Source Code, and therefore Amimon has not pled sufficient facts to rise above mere speculation that defendants "actually copied" the Source Code.  Docs. 42, 53 at 15–16.  Proof of access to the copyrighted work is a way that a plaintiff can provide indirect evidence that the defendant actually copied the work when direct evidence of copyright infringement is not available.  *See Boisson v. Banian, Ltd*, 273 F.3d 262, 267 (2d Cir. 2001) (citing *Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 140 (2d Cir.1992)).  Importantly, this is evidence that must be provided in order for a plaintiff to successfully *prove* a copyright infringement claim, rather than withstand a motion to dismiss. *See Jorgensen v. Epic/Sony Records*, 351 F.3d 46 (2d Cir. 2003) (appeal of summary judgment decision).[7]  As discussed *supra*, Amimon has alleged that the copyrighted Source Code exists on the chipsets that Hollyland is selling through EC Pro, and that Amimon never provided the chipsets or Source Code to Hollyland or EC Pro.  Doc. 37 ¶ 31.  These allegations are sufficient to allege that defendants actually copied Amimon's copyrighted Source Code.

Relatedly, defendants argue in the reply that Amimon failed to meet the fourth prong of *Kelly,* because it only asserts that there must have been a conspiracy or a meeting of unknown parties, but does not allege specific acts or a specific time when the defendants infringed on the copyright.  Doc. 47 at 8.  However, for the same reasons just discussed, Amimon's allegations

---

[7] All of the cases cited by Defendants to support this argument were determinations made on the facts, not on the pleadings:  *Jamison Bus. Sys., Inc. v. Unique Software Support Corp.*, No. CV 02-4887 (ETB), 2005 WL 1262095 (E.D.N.Y. May 26, 2005) (Rule 52 motion); *Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992) (review of turn-over order); *Bus. Trends Analysts, Inc. v. Freedonia Grp., Inc*., 887 F.2d 399 (2d Cir. 1989) (appeal from trial court ruling on the merits); *Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 210 F. Supp. 2d 147 (E.D.N.Y. 2002) (decision after trial).

regarding the similarities between its Source Code and that on the chipsets sold by EC Pro are

sufficient at this point in the proceeding.

Defendants further argue that Amimon has failed to allege "sufficient similarity" between

its copyrighted Source Code and their own.  Quoting *Peter F. Gaito Architecture, LLC v. Simone*

*Development Corp.*, defendants argue that "a copyright infringement claim must be dismissed

where 'plaintiffs have failed to allege that a substantial similarity exists between [defendants']

work and the protectable elements of [plaintiff's].'"  Docs. 42, 53 at 14 (quoting 602 F.3d 57 (2d

Cir. 2010)).  However, that case was one where "the works in question [were] attached to [the]

plaintiff's complaint" and so it was "entirely appropriate for the district court to consider the

similarity between those works in connection with a motion to dismiss, because the court [had]

before it all that [was] necessary in order to make such an evaluation."  *Peter F. Gaito*

*Architecture*, 602 F.3d at 64.  The court specifically acknowledged "that there can be certain

instances of alleged copyright infringement where the question of substantial similarity cannot be

addressed without the aid of discovery or expert testimony."  *Id.* at 65 (citing *Computer Assocs.*

*Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 713 (2d Cir. 1992)).  Unlike *Peter F. Gaito Architecture*,

where the claim was for infringement of design for a mixed-use development of a parcel of land,

*Computer Assocs. Int'l*, similar to this case, was about infringement of a computer software

program.  982 F.2d 693.  Amimon has not provided the underlying Source Code or the source

code found on the chipset Amimon examined at this time, nor is Amimon required to provide

this information to withstand a motion to dismiss.  *See Rosenberg v. Metropolis, Inc.*, No. 18

Civ. 4830 (AKH), 2018 WL 11226075, at *2 (S.D.N.Y. Oct. 17, 2018) ("Although a plaintiff

must identify with particularity the copyrightable elements of [its program] that it contends were

infringed in order to prevail on its claim, it need not plead such detail at [the motion to dismiss]

stage of the litigation." (quoting *Software For Moving, Inc. v. Frid*, No. 9 Civ. 4341 (DLC), 2010 WL 2143670, at *3 (S.D.N.Y. May 27, 2010))).  Since "a motion to dismiss does not involve consideration of whether a plaintiff will ultimately prevail on the merits, but instead solely whether the claimant is entitled to offer evidence in support of [its] claims," and additional evidence is necessary to determine whether a substantial similarity exists between the two source codes, the motion is denied.[8]  *Peter F. Gaito Architecture*, 602 F.3d at 65.

### C.  Statute of Limitations

In Hollyland's brief in support of its motion, it argues that the statute of limitations for Amimon to bring a misappropriation or copyright infringement claim has expired.  Doc. 66 at 21. While courts cannot ordinarily decide a statute of limitations defense on a motion to dismiss, "courts in this district have made an exception where (1) the complaint facially shows noncompliance with the limitations period, and (2) the affirmative defense clearly appears on the face of the pleadings."  *Essex Cap. Corp. v. Garipalli*, No. 17 Civ. 6347 (JFK), 2018 WL 6618388, at *2 (S.D.N.Y. Dec. 18, 2018) (citing *Tesla Wall Sys., LLC v. Related Cos., L.P.*, 17 Civ. 5966 (JSR), 2017 WL 6507110, at *6 (S.D.N.Y. Dec. 18, 2017)); *see also McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (statute of limitations bar warrants 12(b)(6) dismissal "if the defense appears on the face of the complaint").  "Where a plaintiff's 'claims are time-barred on the face of its own complaint, [plaintiff] has the burden of pleading facts sufficient to establish that the statutes of limitations should be tolled.'"  *Essex Cap.*, 2018 WL 6618388, at *2

---

[8] To the extent defendants argue Amimon is required to provide access to the complete copyright to adequately plead a copyright infringement claim, they are incorrect.  Defendants argue that "[a]lleging a registered copyright only fulfills the precondition that it holds a registered copyright."  Doc. 47 at 9.  But this is precisely the point—all that is required of a plaintiff at the pleadings stage is to allege that it holds a registered copyright, not to provide the copyright itself.  *See Kelly*, 145 F.R.D. at 36.  At a later point, Amimon will have to provide the copyrighted material in order to determine if an infringement has occurred.  However, that is an analysis for a later date and not necessary to survive a motion to dismiss.

(quoting *VoiceOne Commc'ns, LLC v. Google Inc.*, No. 12 Civ. 9433 (PGG), 2014 WL

10936546, at *7 (S.D.N.Y. Mar. 31, 2014)).

A party cannot bring a claim under the DTSA "later than 3 years after the date on which

the misappropriation with respect to which the action would relate is discovered or by the

exercise of reasonable diligence should have been discovered."  18 U.S.C. § 1836(d).  The statute

of limitations to bring a trade secrets misappropriation claim under New York state law is also

three years.  *See* N.Y. C.P.L.R. § 214(4); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907

N.E.2d 268 (N.Y. 2009); *Andrew Greenberg, Inc. v. Svane, Inc.*, 830 N.Y.S.2d 358 (N.Y. App.

Div. 2018).  The statute of limitations for a copyright infringement claim, likewise, is three years.

17 U.S.C. § 507(b).

Hollyland argues that the statute of limitations to bring either a trade secret or copyright

infringement claim began when Hollyland was issued a patent in China in 2016, for a product

that used Amimon's chipset as a component.  Doc. 66 at 21.  Citing *Zirvi v. Flatley*, Hollyland

argues that "[t]he existence of a patent application or a public patent puts parties on notice of

their existence and therefore starts the clock on the limitations period."  433 F. Supp. 3d 448, 459

(S.D.N.Y. 2020).  Since it has been five years since the patent was filed and issued, Hollyland

argues that Amimon's claim is outside the three-year statute of limitations for its trade secret

misappropriation and copyright infringement claims.

Hollyland's argument is lacking for a number of reasons.  To begin, Hollyland has once

again conflated the chipset with the Source Code.  Hollyland's alleged patent is for a device that

incorporated Amimon's chipset.  Doc. 66 at 4.  But Amimon has not alleged misappropriation

and copyright infringement of its *chipset*, but rather of the underlying *Source Code* that is then

put on the chipset.  *See* Doc. 44 at 10.  Furthermore, for a claim to be dismissed due to a statute

of limitations, the claim must clearly be time-barred on the face of the complaint.  *Essex Cap.*

*Corp.*, 2018 WL 6618388, at *2.  Amimon has not alleged any facts to suggest that the claim is

time-barred.  Rather, Hollyland has raised a new factual question of whether the existence of its

patent is sufficient to begin the tolling of the statute of limitations.  This is not the appropriate

stage in the proceeding to determine whether Hollyland's patent starts the clock for the statute of

limitations.  *See Zirvi*, 433 F. Supp. 3d at 459 (finding that there were "multiple events that the

plaintiffs themselves described in the Complaint that triggered the statute of limitations").

Because it is not obvious on the face of Amimon's complaint that the statute of limitations has

tolled, the motion is denied.

### D.  Unfair Competition – Misappropriation of Skills and Expenditures

Amimon's final claim is for unfair competition due to misappropriation of skills and

expenditures.  Doc. 37 ¶¶ 79–87.  Defendants argue that the unfair competition claim is

duplicative of the trade secrets claim because both are based on the same set of facts.  Docs. 42,

53 at 17.  Defendants cite to *Uni-Systems, LLC v. U.S. Tennis Ass'n, Inc.*, which dismissed an

unfair competition claim without prejudice on the basis that it was duplicative of a

misappropriation of trade secrets claim.  350 F. Supp. 3d 143 (E.D.N.Y. 2018).  Although one

approach in the Second Circuit has been to dismiss unfair competition claims when they are

duplicative, another has been to simply analyze the claims together.  *See Bancorp Servs., LLC v.*

*Am. Gen. Life Ins. Co.*, No 14 Civ. 9687 (VEC), 2016 WL 4916969, at *10 (S.D.N.Y. Feb. 11,

2016) ("Courts often analyze misappropriation of trade secret and confidential information and

unfair competition claims together.").  Rather than dismiss the claim outright, the Court will

follow the latter approach and consider the claims together.

**IV.      CONCLUSION**

For the foregoing reasons, Hollyland and EC Pro's motions are DENIED.  The parties are directed to attend a telephonic initial pretrial conference on December 15, 2021, at 3:30 PM.  The parties are to dial (877) 411-9748 and enter access code 3029857# when prompted.  The Clerk of the Court is respectfully directed to terminate the motions, Doc. 41, 52, and 65.

It is SO ORDERED.

Dated:      November 30, 2021
New York, New York

_____
Edgardo Ramos, U.S.D.J.