UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMIMON, INC. *and* AMIMON LTD.,

                    Plaintiffs,

               -against-

SHENZHEN HOLLYLAND TECH CO. LTD *and* EC
PRO VIDEO SYSTEMS INC.,

                    Defendants.

SHENZHEN HOLLYLAND TECH CO. LTD *and* EC
PRO VIDEO SYSTEMS INC.,

                 Counterclaim-Plaintiffs,

               -against-

AMIMON, INC., AMIMON, LTD. *and* VITEC
GROUP PLC,

                 Counterclaim-Defendants.

**<u>OPINION & ORDER</u>**

20-cv-9170 (ER)

<u>Ramos, D.J.</u>:

      Amimon Inc. and Amimon Ltd. (collectively, "Amimon") brought this suit against

Shenzhen Hollyland Tech Co. ("Hollyland") and EC Pro Video Systems ("EC Pro") (collectively,

"Defendants") in November 2020.  Complaint ("Compl."), Doc. 1.  Amimon alleged trade secret

misappropriation under federal and state law, copyright infringement, and unfair competition

against both defendants.  *Id.*; Amended Complaint ("Am. Compl."), Doc. 37 ¶¶ 41–87.  In short,

Amimon contends that Defendants engaged in various efforts to unlawfully take Amimon's video

transmission technologies and to use them as their own.  *See* Am. Compl. ¶¶ 11, 20–40.

      Defendants asserted numerous counter-claims for alleged antitrust violations, unfair

competition, fraud, trade libel, tortious interference, defamation, disparagement, bad faith, and

loss of business opportunity.  Amended Answer and Counter-claims ("Am. Answer"), Doc. 111 ¶¶ 126–210.  They set out eleven counter-claims in total. [1]  *Id.*

Before the Court are four motions filed by Amimon, including:  (1) a motion for preliminary injunction, Doc. 126; (2) a motion to dismiss defendants' second amended counter-claims, Doc. 127; (3) a motion to strike various affirmative defenses, Doc. 128; and (4) a motion to compel, Doc. 177.  Also before the Court is Hollyland and EC Pro's motion for partial summary judgment as to damages, Doc. 129.

For the reasons stated herein, Amimon's motion for preliminary injunction is DENIED; its motion to dismiss is GRANTED; its motion to strike is GRANTED in part and DENIED in part; and its motion to compel is GRANTED.  Defendants' motion for summary judgment is DENIED.

I.      BACKGROUND

   A.  Factual Background

The facts underlying this action are discussed in the Court's November 30, 2021, Opinion and Order denying Defendants' motions to dismiss the complaint.  *Amimon Inc. v. Shenzhen Hollyland Tech Co. Ltd.*, No. 20 Civ. 9170 (ER), 2021 WL 5605258 (S.D.N.Y. Nov. 30, 2021) ("*Amimon I*").  The facts are largely reproduced here, and they are supplemented by additional evidence produced throughout discovery.

---

[1] As set forth below, Defendants' third and eighth counter-claims are duplicative.  *Compare* Am. Answer ¶¶ 150–156 *with id.* ¶¶ 180–186.

### i. Technology at Issue

Amimon[2] develops technology that enables wireless, near instantaneous video streaming. Am. Compl. ¶ 11.  Its products are used in film production, news and sports broadcasting, drones, and hospital operating rooms.  *Id.* ¶ 12.  Amimon develops both the hardware, such as transmitters and receivers, and the software for these products.  *Id.* ¶ 11.  Amimon's software exists first as a source code—a version of the software which is written in plain text and is editable by humans.  *Id.* ¶ 16.  It is this modifiable version of the software, Amimon's "MAC Source Code," that is the subject of this case.  *Id.* ¶ 19.

After source code is produced, it is compiled into a binary version of the software, which Amimon then places in its chipsets, within transmitters and receivers.  *Id.* ¶ 17.  Unlike the source code, the binary version of the software is encrypted, and it cannot be decompiled, reverse engineered, decrypted, modified or reviewed to access the underlying source code without a proprietary "key."  *Id.*; *see also* Declaration of  Rafi Agiv ("Agiv Decl."), Doc. 126-3 ¶ 26.

When providing chipsets to customers, Amimon provides the binary version of its software, and it does not disclose, sell or distribute the underlying, modifiable MAC Source Code.  Am. Compl. ¶¶ 17–18.  Amimon's MAC Source Code is further protected by a copyright registration issued by the United States Copyright Office, No. TX0008882781.  *Id.* ¶ 19; Amimon's Rule 56.1 Statement of Undisputed Facts ("Pls.' Rule 56.1 Statement"), Doc. 148-1 ¶ 2.  Additionally, Amimon secures its developments by restricting access to confidential information to select individuals subject to strict confidentiality and non-disclosure agreements.

---

[2] Plaintiff Amimon Inc. is wholly owned by Vitec Group U.S. Holdings, Inc., which is wholly owned by Vitec Holdings Limited.  Rule 7.1 Corporate Disclosure Statement ("Corporate Disclosure Statement"), Doc. 6 at 1.  Vitec Holdings Limited is wholly owned by Vitec Investments Limited, which is wholly owned by Vitec Group Holdings Limited.  *Id.*  Vitec Group Holdings Limited is wholly owned by The Vitec Group PLC.  *Id.*  In June 2022, The Vitec Group PLC underwent a name change, and is now called Videndum PLC.  Doc. 183 at 2.

Am. Compl. ¶ 39.  It does not disclose, distribute, or sell its source code.  Declaration of Uri Kanonich ("Kanonich Decl."), Doc. 126-2 ¶ 25.

According to Amimon, its chipsets are unique and cutting edge due to "the functionality that allows for long range transmission."  *Id.* ¶ 20.  As relevant to the disputes before the Court, Amimon can control the range of transmission, and, by manipulating its software, it can regulate the range of distance over which its chipsets are capable of communicating with transmitters and receivers.  *Id.*  Accordingly, through the implementation of different versions of its software, Amimon offers various functionalities and distance capabilities within its various products.  *Id.* Critically, when Amimon sells chipsets to third parties, it only distributes them with a version of its software that enables "the entry tier level capabilities for distance transmission, limiting transmissions between transmitter and receiver to more than 100 meters distance between the two system components."  *Id* ¶¶ 22, 35.

Amimon alleges that, as a leader in its industry, it spends 5 to 10 million dollars annually to research and develop new technologies, and that the information it develops derives considerable value from being protected and remaining secret to those outside of Amimon.  Am. Compl. ¶¶ 13, 38.

### *ii.*  **Amimon's Investigation and the Parties' Dispute**

As relevant to the instant action, Amimon and Hollyland are competitors.  *Id.* ¶ 40. Hollyland is a Chinese corporation that, like Amimon, develops and sells video technology.  *Id.* ¶¶ 20–21.  EC Pro is Hollyland's U.S. distributor and exclusive service center.  *Id.* ¶¶ 4, 20.

After learning that Hollyland products offered for sale in the United States contained representations that they were capable of "zero latency" wireless transmission of audio-visual signals at a range of more than 1000 meters, Amimon obtained several of Hollyland's products

and examined their chipsets to see whether they improperly contained Amimon's intellectual property and trade secrets.[3]   Agiv Decl. ¶¶ 11–15; Am. Compl. ¶ 29.   Upon review by Amimon, "an exemplary zero-latency capable Hollyland product" did indeed contain one of Amimon's chipsets.[4]   Agiv Decl. ¶ 20.   According to Amimon, the code on the chipset in the Hollyland product was an almost identical match to its own code, but it had been modified slightly.   *Id.* ¶¶ 40, 41; Am. Compl. ¶ 31.   This was true despite the fact that Amimon never provided its chipsets or source code to Hollyland or EC Pro for modification or otherwise.   Am. Compl. ¶ 31.

> In light of this discovery, Amimon reasoned as follows:
>
> [I]f the software operating on the exemplar Hollyland product was an *authorized* version of MAC [software], the Hollyland product would still be capable of zero-latency wireless video transmission, but the functionalities which allow for the distance range capabilities exhibited by the exemplar Hollyland product would not be possible, as Amimon does not distribute an *authorized* version of MAC [software] capable of zero-latency wireless video transmission beyond 100 meters distance between transmitter and receiver to non-affiliated third parties.

Agiv Decl. ¶ 28 (emphasis in original).   In other words, given the fact that the Hollyland product is capable of zero-latency video transmission beyond a distance of 100 meters between the transmitter and the receiver, and taking into account that Amimon does not distribute authorized versions of its software with those capabilities, Amimon concluded that the Hollyland products contained "unauthorized software derived from misappropriated MAC Source Code and [were] encrypted using a misappropriated copy of Amimon's proprietary and confidential Amimon Key."   *Id.* ¶ 48.

Amimon notes that, during its investigation, it "was able to successfully decrypt" an image downloaded from a Hollyland product using its own, proprietary "key."   *Id.* ¶ 26–27.

---

[3] The date of this discovery is not provided.

[4] Amimon included a photo of the Cosmo product's circuit board.   Am. Compl. ¶ 30.   The photo shows a chipset labeled "Amimon" within the circuit board.   *Id.*; *see also* Agiv Decl. ¶ 20.

According to Amimon, "[t]he mere fact that the software from the [Hollyland] Flash Image was encrypted using Amimon's Key (evident from the fact the decryption was possible using Amimon's Key) underscores the unassailable fact that Defendants obtained and misappropriated Amimon's Key to encrypt the software running on the Amimon chipsets within Hollyland's zero-latency capable products." *Id.* ¶ 27.

In June 2019, Amimon filed a complaint against Hollyland and Beijing Huacheng Yuzhe Trading Co.—Hollyland's China based distributor—in a Chinese court, alleging an infringement of its computer software copyright. Doc. 67, Ex. 1. The court held a hearing and ultimately entered judgment in favor of Amimon, thereby enjoining Hollyland from engaging in infringing activities in China.[5] *See* Kanonich Decl. ¶¶ 60–65; *see also id.*, Ex. 1 at 16–44. It specifically ordered Hollyland[6] to "immediately stop infringing on the modification, reproduction and distribution rights of Amimon MAC software from the effective date of this judgment." *Id.*, Ex. 1 at 25. The parties agree that the judgment is currently on appeal.

In relation to the Chinese litigation as well as the instant case, Vitec, Amimon's corporate parent, sent at least one cease and desist letter to a third party, asking that infringing Hollyland

---

[5] According to Defendants, "[t]he copyright in question for the current litigation is for the MAC Source Code version 4_x_24_9 build 1057, whereas the software comparison in the foreign litigation is version 4.2.19.1. build 809." Defendants' Memorandum of Law in Opposition to Motion for Preliminary Injunction ("Mem. in Opp'n Prelim. Inj."), Doc. 140 at 13 (citation omitted). In response, Amimon notes that "the same underlying facts of unauthorized modification and use of Plaintiffs' MAC Source Code were at issue in the Chinese litigation, even where the issues of law before the Chinese Court differ from those presented in the instant case. Further, the judgment from the Chinese litigation makes clear that 4.x.24.9 (the same source code asserted in the instant case) was in fact at issue in the Chinese litigation." Amimon's Reply Memorandum of Law in Support of Motion for Preliminary Injunction ("Reply Mem. in Supp. Prelim. Inj."), Doc. 147 at 6–7. The Court notes that the Chinese court referenced the 4.x.24.9 version throughout its judgment, *see generally* Kanonich Decl., Ex. 1 at 16–25, and further stated that "[i]n summary, Haoyiyuan Ltd. has infringed by producing and selling products containing software that is highly similar to the MAC software without the permission of the right holder, Amimon Ltd. The infringement is also committed by Huacheng Yuzhe Ltd.," *id.* at 23.

[6] Defendants note that "Haoyiyuan Ltd.," one of the defendants listed in the Chinese copyright action, is interchangeably known as defendant Hollyland. Mem. in Opp'n Prelim. Inj. at 15.

products not be sold given the alleged intellectual property violations.  *See, e.g.*, February 25, 2021 Cease and Desist Letter to Omega Broadcast & Cinema ("February 25 Cease & Desist"), Doc. 111-2 at 1–3.  In its letter to Omega Broadcast & Cinema ("Omega"), a reseller that is not a party in this litigation, Vitec asked that Hollyland products not be sold due to the alleged infringement, and it provided a schedule wherein it listed the infringing Hollyland products offered by Omega.  *Id.* at 2–3.  The schedule includes "Hollyland 300 PRO" and provides a link. *Id.* at 3.  Omega thereafter wrote to Vitec to clarify which Hollyland products contained Amimon's technology.  March 17, 2021 Letter from Omega ("March 17 Letter"), Doc. 111-8 at 2.[7]  The parties dispute the extent to which Vitec clarified that the infringing product was the Cosmo, rather than the 300 PRO, or other devices.  *See* note 7.

### B.  Procedural History

On November 4, 2020, Amimon filed the instant action against Hollyland and EC Pro for trade secret misappropriation under the Defend Trade Secrets Act ("DTSA") and New York law, violations of the Copyright Act, and unfair competition for misappropriation of skills and

---

[7] The Court notes that the correspondence between Vitec and Omega appears to be provided only in part.  *See* March 17 Letter.  Indeed, the exhibit contains only the text of the message from an Omega representative, Danielle Villarreal, to a Vitec representative, Fred Fellmeth.  *Id.*  However, in referencing the exhibit, Amimon discusses Vitec's further email communications with Omega, which, according to Amimon, make clear that, "in no uncertain terms, the weblink referenced in Schedule B to [the February 25 Cease and Desist] landed on a Hollyland Cosmo product which contains Amimon's chipset and software, irrespective of the inadvertent naming of the weblink and product by Omega on its website."  Memorandum of Law in Support of Motion to Dismiss ("Mem. in Supp. Mot. Dismiss"), Doc. 127-1 at 16.  According to Amimon, the email further stated that Hollyland's "Mars" product "is solely wifi and does not contain our chipset and accompanying technology.  I think my letter noted only the '300 pro' and the original link took you to that which I understand is a 'Cosmo' product with our chipset in it. . . .  We make no claim that the Mars products infringe, just the Cosmo as noted."  Reply Memorandum in Support of Motion to Dismiss ("Reply Mem. in Supp. Mot. Dismiss"), Doc. 146 at 3.  Defendants, on the other hand, insist that the February 25 Cease and Desist purposely and maliciously identified a product that contains no Amimon technology: the 300 PRO.  *See, e.g.*, Am. Answer ¶¶ 122, 138, 164, 165, 171, 198.  However, they concede that Vitec eventually told Omega that the MARS product was solely wi-fi enabled and did not contain Amimon technology. Memorandum of Law in Opposition to Motion to Dismiss ("Mem. in Opp'n Mot. Dismiss"), Doc. 143 at 11 ("The General Counsel's response was 'I believe that you are correct . . . the MARS product is solely Wi-Fi and does not contain our chipset and accompanying technology.").

expenditures.[8]  Compl.  Several months later, on February 15, 2021, Amimon filed a First Amended Complaint ("FAC").  Am. Compl.

Both Hollyland and EC Pro subsequently filed motions to dismiss, which the Court denied in its November 30, 2021, Opinion and Order.  *See generally Amimon I.*  Thereafter, Defendants filed a series of responsive pleadings between January 14, 2022, and March 1, 2022.[9] *See* Doc. 89; Doc. 90; Doc. 91; Doc. 99; Doc. 102; Doc. 111.  Approximately one month after Defendants filed the operative amended answer with counter-claims, Am. Answer, the Court held a pre-motion conference in anticipation of Amimon's instant motion for preliminary injunction, motion to dismiss Defendants' counter-claims, and motion to strike.  *See* Min. Entry dated Apr. 19, 2022.  The motions were fully briefed as of June 7, 2022.  *See* Doc. 150.

In December 2022, the Court held another pre-motion conference in anticipation of the parties' discovery motions.  *See* Min. Entry dated Dec. 21, 2022.  Amimon subsequently filed a motion to compel,[10] Doc. 177, which was fully briefed on February 10, 2023.  Doc. 181.

---

[8] The original complaint also listed Ikan International, LLC as a defendant.  Compl.; Am. Compl..  However, that claim was resolved by stipulation between the parties.  Doc. 15.

[9] Specifically, they filed an initial answer with counter-claims on January 14, 2022, Doc. 89; a third party complaint on January 19, 2022, Doc. 90; a combined answer with counter-claims and a third party complaint on January 21, 2022, Doc. 91; a combined amended answer with counter-claims and a third party complaint on January 26, 2022, Doc. 99; another combined amended answer with counter-claims and a third party complaint on February 1, 2022, Doc. 102; and one additional combined amended answer with counter-claims and a third party complaint on March 1, 2022, Doc. 111.  A number of these pleadings suffered from filing errors.

[10] As relevant here, Amimon's motion to compel relates to production requests made in early 2022.  Amimon contends that "Defendants served their first *and only* responses to [its] production requests on February 28, 2022, . . . [implying] that 'no responsive documents were produced by Defendants because a protective order had not been entered at the time the responses were served.'"  Memorandum of Law in Support of Motion to Compel ("Mem. in Supp. Mot. Compel"), Doc. 178 at 4.  The Court notes that it entered a stipulated protective order on March 25, 2022.  Stipulated Protective Order, Doc. 113.

II.    **MOTION FOR PRELIMINARY INJUNCTION**

The Court first considers Amimon's motion for preliminary injunction, Doc. 126, which is denied for the reasons set forth below.

### A. Legal Standard

A preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). "A party seeking a preliminary injunction must ordinarily establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest." *Demirayak v. City of New York*, 746 F. App'x 49, 51 (2d Cir. 2018) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)).

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983). "The movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (*per curiam*) (internal quotation marks and citation omitted).

As relevant here, the Second Circuit has made clear that a presumption of irreparable harm does not automatically arise upon the showing that a trade secret has been misappropriated. *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Rather, "[a] rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets." *Id.* And "[w]here a misappropriator seeks only to use those secrets—without further dissemination or irreparable

impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury." *Id.* at 118–119. That is because, once trade secrets are misappropriated, "the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge." *Id.* at 119.

In trade secrets cases where irreparable injury *has* been demonstrated, "a 'narrowly drawn' preliminary injunction that protects the trade secrets from further disclosure or use may be appropriate." *Id.* Critically, in all cases, "the relief should be 'narrowly tailored to fit specific legal violations' and avoid 'unnecessary burdens on lawful commercial activity.'" *Id.* (quoting *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)).

### B. The Factors Weigh Against Injunctive Relief at this Stage

At this stage in the proceedings, the Court denies Amimon's preliminary injunction motion.[11] *See* Memorandum of Law in Support of Motion for Preliminary Injunction ("Mem. in Supp. Prelim. Inj."), Doc. 126-1 at 3. Indeed, the Court cannot, at this stage, conclude that Amimon is likely to suffer irreparable harm in the absence of preliminary injunctive relief, and the applicable factors weigh against granting its motion.

Amimon argues that it will be irreparably harmed absent a preliminary injunction for several reasons. First, it contends that "it will be impossible to remedy the harm [it] will suffer to its reputation should Hollyland's careless deployment of the unauthorized software result in interception of the unencrypted or poorly encrypted video transmissions, implicating Amimon by

---

[11] Amimon specifically moves the Court to "enjoin Defendants' unauthorized use of Amimon's trade secrets in marketing, manufacturing, servicing, leasing and sale in the United States of any and all of their products which incorporate an Amimon chipset and software, including but not limited to products currently or previously marketed and/or sold in the United States under Cosmo, MOMA Legend, and Syscom brands, and including products and services related to such products." Mem. in Supp. Prelim. Inj. at 3.

way of its chipsets present within Hollyland's products" *id.*; and second, it argues that Defendants' "lack of safeguards to secure their own consumers' transmissions from possible interception" render it possible that Amimon's trade secrets will be disclosed to other persons, *id.* at 4. *See also id.* at 25–26 (reiterating the same arguments regarding irreparable harm). Amimon further alleges that it has "raised serious questions" as to the merits of its claim, *id.* at 19–24; the balance of hardships "tilts decidedly" in its favor, *id.* at 26–27; and the public interest favors granting relief, *id.* at 27.

Defendants challenge the motion on several grounds, including failure to demonstrate irreparable harm other than presumed injury, Mem. in Opp'n Prelim. Inj. at 7–9, and extensive delay in seeking the requested relief, *id.* at 8–10. They further argue that Amimon is not likely to succeed on the merits, *id.* at 11–13, 16–17; the Chinese court's ruling is irrelevant because it considered a different version of Amimon's software, *id.* at 13–15; the balance of the hardships weighs in its favor, *id.* at 17–18; and Amimon's declarants failed to properly execute their declarations, *id.* at 6–7.

The applicable factors do not warrant injunctive relief at this point in the litigation. Amimon will not suffer *irreparable* harm absent a preliminary injunction. Despite its contention about possible reputation and disclosure concerns, it simply has not shown that "there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets." *Wabtec Corp.*, 559 F.3d at 118. Rather, at this juncture, the record shows that this is a situation wherein Defendants seek "only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit." *Id.* at 118–119. Because the Second Circuit has made clear that "an award of

damages will often provide a complete remedy for such an injury," the requested injunctive relief is inappropriate here.

To be sure, Amimon has raised significant questions about Defendants' use of its technologies, and their appropriation of the MAC Source Code within various Hollyland products, particularly its zero-latency capable products. *See* Agiv Decl. ¶¶ 20–48. Indeed, the evidence suggests that Hollyland may have improperly used and altered Amimon MAC Source Code to profit from the technology. *See generally id.* However, the evidence does not show, at this stage, that Defendants are disseminating those secrets—the MAC Source Code—to a wider audience, or are otherwise irreparably damaging the code so as to render the harm cureless or irrecoverable. *Wabtec Corp.*, 559 F.3d at 118–119. Nor does Amimon show that any third party has attributed any defects contained within Hollyland products to Amimon, so as to create the reputational damage that it suggests.[12] Rather, the evidence suggests that Defendants are using those secrets in pursuit of profits. *Id.* at 119.

Because the Court concludes that Amimon will not be irreparably harmed absent injunctive relief at this stage of the litigation, it will not further analyze the remaining preliminary injunction factors. *Masel Supply Co. Corp.*, 719 F.2d at 45; *Pryor*, 481 F.3d at 66.

---

[12] Amimon has certainly alleged that users who open Hollyland's products *could* "believe the Infringing Product is using an authorized Amimon chipset and Amimon software, correlating any quality issues or defects as being at least in part, attributable to Amimon." Reply Mem. in Supp. Prelim. Inj. at 4. However, that harm is speculative at this juncture. *See DeBuono*, 175 F.3d at 234 ("The movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."). There is no evidence that commercial or industry users—rather than Amimon engineers—have made the reputational associations alleged by Amimon here.

### III.    MOTION TO DISMISS AMENDED COUNTER-CLAIMS

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Amimon further

moves to dismiss Defendants' counter-claims with prejudice.[13]  *See* Mem. in Supp. Mot. Dismiss

at 5; *see also* Fed. R. Civ. P. 15(a)(2) (delineating standard for granting leave to amend).  The

motion is granted as set forth below.

#### A.  Legal Standard

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to

"accept as true the facts alleged in the Complaint, drawing all reasonable inferences in favor of

the plaintiff" to determine whether plaintiff has properly stated a claim upon which relief can be

granted.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  But this requirement

does not apply to legal conclusions, recitals of the elements of a cause of action, bare assertions,

or conclusory allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681, 686 (2009) (citing *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007)).  Instead, to satisfy the pleading standard under

Rule 8, a complaint must contain sufficient factual matter to state a claim to relief that is

plausible—not merely possible—on its face.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at

570).

Only certain documents may be considered by a court reviewing a motion to dismiss:  the

scope of consideration is "limited to the factual allegations in plaintiff['s] amended complaint . . .

to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters

of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of

---

[13] Amimon moves for the dismissal of all of Defendants' counter-claims, including alleged antitrust violations, unfair competition, fraud, trade libel, tortious interference, defamation, disparagement, bad faith, and loss of business opportunity.  *See* Am. Answer ¶¶ 126–210.

which plaintiff[] had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*,
987 F.2d 142, 150 (2d Cir. 1993) (citation omitted).  A complaint is also deemed to include any
documents that "although not incorporated by reference, are 'integral' to the complaint." *L-7
Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation omitted).

### B.  Defendants Failed to Sufficiently State Their Counter-claims

Defendants asserted eleven counter-claims in their Amended Answer and Counter-claims.
Am. Answer ¶¶ 126–210.  The Court takes each in turn.

### i.  First Counterclaim:  Violations of the Sherman and Clayton Acts

Defendants first allege that Amimon violated federal antitrust laws by conspiring with
Vitec, its parent company, to conduct a "predatory monopolization and/or price fixing scheme."
*See id.* ¶ 133, 138.  It specifically alleges violations of Sections 1 and 2[14] of the Sherman Act, 15
U.S.C. §§ 1, 2, and Sections 15, 16, 18, 22, and 26 of the Clayton Act, 15 U.S.C. §§ 15, 16, 18,
22, 26.  *Id.* ¶¶ 126–139.

Section 1 of the Sherman Act "forbids contracts or conspiracies in restraint of trade or
commerce," and Section 2 "addresses the actions of single firms that monopolize or attempt to
monopolize, as well as conspiracies and combinations to monopolize." *Spectrum Sports, Inc v.
McQuillan*, 506 U.S. 447, 454 (1993).  "'In order to survive a motion to dismiss, a claim
under Sections 1 and 2 of the Sherman Act must allege a relevant geographic and product market

---

[14] The parties only briefed arguments as to Sections 1 and 2 of the Sherman Act, even though Defendants—
seemingly inadvertently—referenced Sections 3 and 4 in the header of their first counterclaim as well.  *See* Am.
Answer ¶¶ 126–139; Mem. in Supp. Mot. Dismiss at 8 n.4 ("Plaintiffs' understanding is that Defendants have
inadvertently referenced 15 U.S.C. §§ 3, 4, as these sections are unrelated to the issues in this litigation.  (Section 3
relates to conduct within United States territories and the District of Columbia, Section 4 relates to jurisdiction and
duties of United States Attorneys).  Plaintiffs reserve the right to respond in the event Defendants advise that they
are in fact asserting a cause of action under the sections.").  Because the parties do not make any arguments pursuant
to Sections 3 and 4, the Court does not analyze those sections here.  *See, e.g.*, Memorandum of Law in Opposition to
Motion to Dismiss ("Mem. in Opp'n Mot. Dismiss"), Doc. 143 at 25–30 (making arguments pursuant to Sections 1
and 2 of the Sherman Act only); *see also* Am. Answer ¶¶ 126–139.

in which trade was unreasonably restrained or monopolized.'" *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 575 (S.D.N.Y. 2007) (quoting *Xerox Corp. v. Media Sciences Int'l, Inc.,* 511 F. Supp. 2d 372, 382–83 (S.D.N.Y. 2007)).   "The relevant market for purposes of antitrust litigation is the 'area of effective competition' within which the defendant operates." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir.1999) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327–28 (1961)).

Additionally, Section 1 of the Sherman Act, as set forth in 15 U.S.C. § 1, specifically prohibits contracts or conspiracies "in restraint of trade or commerce among the several States, or with foreign nations."  The Supreme Court has reiterated on various occasions that Section 1 "was intended to prohibit only unreasonable restraints of trade." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (citation omitted).  As relevant to the instant case, Section 1 of the Sherman Act only reaches "unreasonable restraints of trade effected by a 'contract, combination . . . or conspiracy' between *separate* entities." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (emphasis in original).  "[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." *Id.* at 771.

In their first counterclaim, Defendants allege that Amimon and Vitec conducted a "predatory monopolization and/or price fixing scheme," that "will effectively restrain, eliminate, and suppress competition in the zero-latency audio/video wireless transmission market."  Am. Answer ¶¶ 133, 137, 138.  However, Vitec is Amimon's corporate parent, as Defendants themselves admit in asserting their first counterclaim.  Corporate Disclosure Statement; *see also* Am. Answer ¶ 138 ("Vitec Group owns 100% of the shares of Amimon . . . .").  Accordingly, Defendants failed to plausibly state a claim against Amimon pursuant to Section 1 of the

Sherman Act as a matter of law.  Fed. R. Civ. P. 12(b)(6); *Iqbal*, 556 U.S. at 678.  That allegation is therefore dismissed.

Defendants also allege a violation of Section 2 of the Sherman Act.  Am. Answer ¶¶ 126–139.  To demonstrate attempted monopolization pursuant to Section 2, a plaintiff must prove that (1) the defendant engaged in predatory or anticompetitive conduct; (2) the defendant had a specific intent to monopolize; and (3) there is a "dangerous probability" of achieving monopoly power.  *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 578 (S.D.N.Y. 2011) (quoting *McQuillan*, 506 U.S at 456).  To determine whether there is "dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Id.* (citations omitted).

In this case, Defendants claim that "[n]otwithstanding the fact that the instant lawsuit is centered in New York City, the wireless video transmission marketplace is nationwide."  Am. Answer ¶ 129 (stating that "Amimon/Vitec and/or Hollyland as manufacturers compete for similar customers nationwide thereby affecting, not only the New York market, but the interstate market as well.  Based upon the fact that New York City has a large broadcast/film industry Upon [sic] information and belief, Amimon/Vitec seeks to monopolize the New York Market as well as the national market").  However, as Amimon points out, Defendants "fail to allege facts sufficient to define a relevant product market."  Mem. in Supp. Mot. Dismiss at 11.  Indeed, "Defendants appear to equivocate between defining the product market as:  the 'wireless video transmission market' (*Id.* at ¶ 129) or the 'WHDI market,' (*Id.* at ¶ 121) or the 'zero latency wireless transmission of high-quality audio/video signals over long distances' market (*Id.* at ¶ 126)." *Id.*; *see also Arista Records LLC*, 532 F. Supp. 2d at 575.

Additionally, Defendants have not stated sufficient facts to show that there is a dangerous probability that Amimon will achieve monopoly power. *See Sandoz, Inc.*, 813 F. Supp. at 578. Their allegations consist of threadbare recitals and conclusions. For example, Defendants state the following:

> The proof is in Amimon and/or Vitec's own promotional material see, Exhibit "5". In that Exhibit, Amimon states that there is "one standard, all devices". Such a statement, in and of itself, suggests monopolization. The Exhibit "5" also asserts that Amimon is the administrator of WHDI technology. Here defendants take administrator to mean supervisor or boss. Again, such statement means that Amimon exerts control in the market.

Am. Answer ¶ 127. Contrary to Defendants' arguments, however, those facts do not come close to showing a significant risk that Amimon will exert monopoly power. Indeed, the accusations consist of one-sided characterizations that cherry-pick words to create an anticompetitive narrative. But none of the facts asserted actually tend to show that Amimon engaged in anticompetitive conduct—with specific intent to do so—and that it is dangerously close to seizing and maintaining monopoly power. *See Sandoz, Inc.*, 813 F. Supp. at 578. Accordingly, Defendants' Section 2 allegation cannot survive Amimon's motion to dismiss.

Finally, Defendants bring allegations pursuant to various sections of the Clayton Act.[15] Am. Answer ¶¶ 126–139. Section 7 of the Clayton Act, as amended by 15 U.S.C. § 18, prohibits the acquisition, direct or indirect, of stock or other share capital by any person engaged in commerce where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. In other words, it prohibits transactions of stocks that may lessen competition in a product or geographic market. *See United States v. Phila. Nat'l*

---

[15] As Amimon points out, Sections 15, 16, 22 and 26 of Title 15 of the United States Code do not form the basis of independent causes of action. Mem. in Supp. Mot. Dismiss at 17 n.6; Reply Mem. in Supp. Mot. Dismiss, Doc. 146 at 7; *see also* 15 U.S.C. §§ 15, 16, 22, 26. The Court does not analyze them here.

*Bank*, 374 U.S. 321, 355–56 (1963).  As Amimon notes, "Defendants' allegations are absent any facts to support that Amimon acquired any stock, and accordingly, Defendants fail to state a claim for liability against Plaintiffs arising under the Clayton Act."  Mem. in Supp. Mot. Dismiss at 17; Am. Answer ¶¶ 126–139.  Accordingly, the Clayton Act allegations are also dismissed. Fed. R. Civ. P. 12(b)(6).

Amimon requests that the dismissal of the first counterclaim, which sets out the Sherman and Clayton Act violations, be made with prejudice, as "Defendants were made aware of [their] shortcomings," and their claims nevertheless fail as a matter of law.  Mem. in Supp. Mot. Dismiss at 9, 11, 17.

Pursuant to Rule 15, the Court "should freely give leave" to amend a pleading "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  It is "within the sound discretion of the district court to grant or deny leave to amend."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007); *see also Gayle v. Larko*, No. 18 Civ. 3773 (ER), 2019 WL 4450551, at *4 (S.D.N.Y. Sept. 17, 2019).  Importantly, leave is unwarranted where "the problem with . . . [the] claims is 'substantive' and, thus, 'better pleading will not cure it.'"  *Larko*, 2019 WL 4450551, at * 4 (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

The Court agrees with Amimon's contentions regarding the futility of any further amendment to Defendants' first counterclaim.  Not only have Defendants had various opportunities to amend their pleading, but they have similarly been notified about the deficiencies of their allegations, and have nevertheless failed to adequately amend them. Furthermore, for the reasons set forth above, the record shows that "better pleading will not cure" the deficiencies here.  *Larko*, 2019 WL 4450551, at * 4.  Accordingly, the dismissal of the first counterclaim shall be with prejudice.

### ii.  Second Counterclaim:  Violation of the Donnelly Act

The second counterclaim alleges that Amimon violated the Donnelly Act, New York

General Business Law § 340 *et seq.*, which provides that any contract made for the purpose of

unlawfully restraining competition is void.  *See* Am. Answer ¶¶ 140–149.  Defendants reallege

their antitrust allegations and claim that Amimon and Vitec have engaged in conduct to "price[]

out" smaller companies like Hollyland.  *Id.* ¶¶ 146–148.

The Donnelly Act is known as the "little Sherman Act."  *Anheuser-Busch, Inc. v. Abrams*,

520 N.E.2d 535, 539 (1988) (internal quotation marks and citation omitted).  It "should generally

be construed in light of federal precedent, and given different interpretation only where state

policy and differences in statutory language justify such deviation."  *Lennon v. Phillip Morris*

*Cos.*, 734 N.Y.S.2d 374, 379 (citing *X.L.O. Concrete Corp. v. Rivergate Corp.*, 634 N.E.2d 158,

161 (1988)).  To sufficiently state a violation of the Donnelly Act, a party must:  (1) allege

conspiracy or a reciprocal relationship between two or more legal or economic entities, (2)

identify the relevant market affected, and (3) describe the nature and effect of the alleged

conspiracy and the manner in which economic impact of that conspiracy restrains trade in the

market.  *Capitaland United Soccer Club Inc. v. Cap. Dist. Sports & Ent. Inc.*, 238 A.D.2d 777,

779 (1997).  Importantly, "[a] parent corporation and its wholly-owned subsidiaries are

considered a single entity under antitrust principles, and therefore, cannot engage in

anticompetitive acts" pursuant to the Donnelly Act.  *N. Atl. Utilities, Inc. v. Keyspan Corp.*, 307

A.D.2d 342, 343 (2003) (citation omitted).

As described above, Vitec is Amimon's corporate parent.  *See* Corporate Disclosure

Statement.  Accordingly, as with the Sherman Act allegations, Defendants failed to plausibly

state a claim against Amimon pursuant to the Donnelly Act.  Fed. R. Civ. P. 12(b)(6); *Iqbal*, 556

U.S. at 678.  The second counterclaim is therefore dismissed with prejudice for the same reasons articulated in regard to Defendants' federal antitrust allegations; indeed, given this legal deficiency, any amendment would be futile as to this claim.  *Larko*, 2019 WL 4450551, at * 4.

### iii.  Third Counterclaim:  Unfair Competition

In their third counterclaim, Defendants allege that Amimon damaged their reputation by making false and misleading statements about their business.  Am. Answer ¶¶ 150–156. Defendants contend that the instant lawsuit itself makes up part of the defamatory "campaign" that supports its unfair competition claim.  *Id.* ¶ 154 ("[Amimon] published defamatory statements in the form of a letter campaign and by instituting [the] unsupported legal action which may have result [sic] in broad sweeping judgments concerning the quality of [Defendants'] business, causing damage to [Defendants'] reputation.").  Additionally, Defendants tie their unfair competition claim to allegations related to communications between Vitec and Omega, wherein Vitec outlined the infringing products sold by Omega.  *Id.* ¶¶ 152, 154; *see also* February 25 Cease and Desist; March 17 Letter.

New York's unfair competition law requires a showing that a defendant made "misleading or untruthful statements . . . for the purpose of commercial advertising or promoting a party's goods, services, or commercial activities."  *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 383 (2d Cir. 2000); *see also Globe Cotyarn Pvt. Ltd. v. Next Creations Holdings LLC*, No. 18 Civ. 04208 (ER), 2019 WL 498303, at *6 (S.D.N.Y. Feb. 8, 2019).

Defendants fail to sufficiently state an unfair competition claim.  *Iqbal*, 556 U.S. at 678. Indeed, their allegations consist of bare assertions and conclusory allegations regarding Amimon's purported "false and misleading statements about [their] business."  *Id.*; *see* Am. Answer ¶¶ 122, 150–156.  In fact, the very exhibits that Defendants attach to their amended

complaint contradict those bare assertions.  For example, where Defendants state that "Vitec sent out the defamatory and false statements in bad faith," apparently in reference to cease and desist communications with third parties, Defendants' exhibits show that Vitec's communications were tailored and limited to the copyright at issue in this case, and they included clarifications as to the narrow scope of the request.  *Compare* Am. Answer ¶¶ 122, 152 *with* February 25 Cease and Desist; *see also* Reply Mem. in Supp. Mot. Dismiss at 3; Mem. in Opp'n Mot. Dismiss at 11. Additionally, to the extent that the February 25 Cease and Desist letter improperly listed the Hollyland 300 PRO as an infringing product, the record shows that Vitec went on to correct the mistake and identify the infringing products.  Reply Mem. in Supp. Mot. Dismiss at 3; Mem. in Opp'n Mot. Dismiss at 11.  Furthermore, Defendants assert no facts showing that Amimon's pleadings in this litigation, or any of Vitec's communications with third parties, were purposely misleading and/or untruthful *in order to* benefit Amimon's commercial activities.  Am. Answer ¶¶ 118–124, 150–156; *see also Nadel*, 208 F.3d at 383.  To the contrary, those documents show that Amimon and/or Vitec sought to protect its intellectual property.  *See generally* Am. Answer; February 25 Cease and Desist.

Additionally, as Amimon notes, "Defendants are required to plausibly plead improper motive and bad faith by *Plaintiffs* in support of their claim for Unfair Competition."  Mem. in Supp. Mot. Dismiss at 21 (emphasis added).  But here, the exhibits provided by Defendants show that the communications at issue were made by *Vitec*, rather than Amimon.  *See* February 25 Cease and Desist.  Nor do Defendants allege any facts showing that the purported false statements were "widely disseminated," beyond that mere conclusory statement.  Am. Answer ¶ 155.  Accordingly, the Court concludes that Defendants failed to sufficiently plead their unfair competition claim.  *Iqbal*, 556 U.S. at 678.

While the Court recognizes that Defendants "have had ample opportunity to correct the deficiencies plaguing their pleading" as to this counterclaim, it is not dismissed with prejudice at this juncture.  Mem. in Supp. Mot. Dismiss at 23; Fed. R. Civ. P. 15(a)(2); *see also Larko*, 2019 WL 4450551, at * 4.  However, should Defendants seek leave to amend their pleading as to the unfair competition claim, the Court notes that they will face a high bar in demonstrating that "justice so requires" leave at this stage in the proceedings, and considering the record documents already analyzed by the Court here.  Fed. R. Civ. P. 15(a)(2).

### *iv.* Fourth Counterclaim:  Fraud on the Copyright Office

In their fourth counterclaim, Defendants allege "fraud on the Copyright Office."  Am. Answer ¶¶ 157–162.  In short, they claim that Amimon failed to timely register its copyright with the United States Copyright Office, and, accordingly, the Court should determine that the copyright is void.  *Id.* ¶¶ 158–159, 161 ("Upon information and belief[,] had the Copyright Office known of the proliferation and disclosure of the chipset and/or software [it] would likely have caused the refusal of the copyright as a trade secret.").

As Amimon points out, fraud on the Copyright Office is not an affirmative cause of action.  Mem. in Supp. Mot. Dismiss 23–24; *Esbin & Alter, LLP v. Zappier*, No. 08 Civ. 313 (RWS), 2011 WL 940228, at *2 (S.D.N.Y. Mar. 17, 2011) ("But 'there is no precedent supporting the use of a claim for fraud on the Copyright Office as an affirmative cause of action, rather than as a defense to a copyright certificate's validity.'") (quoting *Kwan v. Schlein*, No. 05 Civ. 459 (JCF), 2008 WL 4755345, at *2 (S.D.N.Y. Oct. 30, 2008)); *Lin's Waha Int'l Corp. v. Tingyi (Cayman Islands) Holding Corp.*, No. 17 Civ. 773 (AMD), 2018 WL 6573482, at *5 (E.D.N.Y. Dec. 13, 2018).

Given this authority, the claim cannot survive Amimon's motion to dismiss because, most simply, Defendants failed to state a plausible claim.  Fed. R. Civ. P. 12(b)(6).  Since "better pleading will not cure" the deficiencies here, the claim is dismissed with prejudice.  *Larko*, 2019 WL 4450551, at *4.

### *v.*  Fifth Counterclaim:  Trade Libel

Defendants' fifth counterclaim asserts that Vitec's communications with third parties improperly listed a specific product, the 300 PRO, which "contains no technology owned by Amimon and/or Vitec."  Am. Answer ¶ 165.  It also references two additional products:  the MOMA Legend,[16] which is "not sold in the United States," and the COSMO, "which is the focus of the instant lawsuit."  *Id.*  According to Defendants, "[t]he false statements have caused damage to the reputation and goodwill [of Defendants,] which has been earned by Hollyland and/or EC Pro through the years."  *Id.* ¶ 167; *see also id.* ¶ 122 (alleging that "Vitec, along with Amimon . . . unfairly attempted to quash competitors in the marketplace by sending out cease and desist letters to resellers and retailers of the Hollyland 300 PRO . . . .").

Under New York law, "[t]rade libel . . . is an action to recover for words or conduct which tend to disparage or negatively reflect upon the condition, value or quality of a product or property."  *Angio–Med. Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274 (S.D.N.Y. 1989) (citation omitted).  Like defamation, trade libel stems from injurious false statements made to third parties.  *Ruder & Finn Inc. v. Seaboard Suf. Co.*, 422 N.E.2d 518, 522 (1981).  "However, whereas defamation (in the commercial context) entails a statement that 'impugns the basic integrity or creditworthiness of a business,' trade libel is based on statements 'confined to

---

[16] This product is spelled in different ways by the parties:  Amimon calls it the "MOMA Legend," while Defendants refer to it as the "MOMA Ledgend."  *Compare* Am. Compl. ¶ 27 *with* Am. Answer ¶ 165.

denigrating the quality of a business' *services* [*or products*].'" *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 291 (S.D.N.Y. 2016) (citation omitted).  To state a claim for trade libel, a plaintiff must adequately plead "(1) falsity of the statement, (2) publication to a third person, (3) malice (express or implied), and (4) [ ] special damages." *Angio–Med. Corp.*, 720 F. Supp. at 274 (citation omitted); *accord Computech Int'l, Inc. v. Compaq Computer Corp.*, No. 02 Civ. 2628 (RWS), 2002 WL 31398933, at *5 (S.D.N.Y. Oct. 24, 2002).

As with their unfair competition claim, Defendants' allegations amount to bare assertions and conclusory allegations regarding Amimon's purported "false statement[s] of fact" regarding Hollyland products and corresponding "disparagement."  *See* Am. Answer ¶¶ 164–167.  Nor have they pleaded sufficient facts to show:  (1) that the statements were made by Amimon; (2) that the statements were made with malice; or (3) that they are entitled to special damages.  *Id.*; *see also* Am. Answer ¶¶ 118–124.  Accordingly, Defendants' trade libel claim is dismissed.

The claim is dismissed without prejudice; however, should Defendants seek leave to amend their pleading as to the unfair competition claim, the Court notes that they will face a high bar in demonstrating that "justice so requires" leave at this stage in the proceedings.  Fed. R. Civ. P. 15(a)(2).

### *vi.* Sixth Counterclaim:  Tortious Interference With Contractual Relations

Defendants' sixth counterclaim asserts that Amimon "purposely sent disparaging letters to those in privity with [Defendants]" in order to "cause a breach of the contract[s] between [Defendants] and its [sic] business partners," including Amazon.  Am. Answer ¶¶ 169–170.  Defendants add that the alleged acts "were done without justification."  *Id.*  ¶ 171.

24

"Under New York law, the elements of tortious interference with contract are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 401 (2d Cir. 2006) (internal quotation marks and citations omitted).

Defendants failed state sufficient facts to state a claim to relief that is plausible here. *See Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 570). The allegation sets out insufficient facts regarding Amimon's knowledge of Defendants' contract with Amazon or other business partners, any breach of contract by Amazon or one of the business partners, and Amimon's intentional procurement of any such alleged breach. *See* Am. Answer ¶¶ 118–124, 168–173. Nor do Defendants assert facts showing that Amimon, rather than Vitec, sent the letters at issue here. Critically, that Amazon "no longer deal[s] with [Defendants] in the *same manner*" does not render the tortious interference claim plausible, *id.* ¶ 199 (emphasis added), particularly where there are no facts asserted regarding an actual breach of contract, *see id.* ¶¶ 118–124, 168–170.

The counterclaim is therefore dismissed. *See* Fed. R. Civ. P. 12(b)(6). It is not dismissed with prejudice; however, the Court reiterates that Defendants will be tasked with showing that "justice so requires" leave at this stage in the proceedings. Fed. R. Civ. P. 15(a)(2).

### *vii.* **Seventh Counterclaim: Defamation**

In their seventh counterclaim, Defendants assert that, by making false and misleading statements to third parties and in the instant litigation, and by "widely disseminat[ing]" those statements, Amimon damaged their reputation. Am. Answer ¶¶ 174–179; *see also* Mem. in Opp'n Mot. Dismiss at 20–21; Reply Mem. in Supp. Mot. Dismiss at 10.

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) (quoting *Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002)).  Under New York law, a defamation claim must allege "(1) a false statement about the [complainant]; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'"[17] *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 411 (S.D.N.Y. 2009) (alterations in original) (quoting *Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009)).

As relevant here, and as noted by Amimon, New York law provides that "statements made by parties, attorneys, and witnesses in the course of a judicial or quasi-judicial proceeding are absolutely privileged, notwithstanding the motive with which they are made, so long as they are material and pertinent to the issue to be resolved in the proceeding." *Lipin v. Hunt*, No. 14 Civ. 1081 (RJS), 2015 WL 1344406, at *8 (S.D.N.Y. Mar. 20, 2015) (internal quotation and citation omitted); *Doe v. Baram*, No. 20 Civ. 9522 (ER), 2021 WL 4847076, at *4 (S.D.N.Y. Oct. 15, 2021).

Defendants failed to plausibly state their defamation claim.  Fed. R. Civ. P. 12(b)(6).  The statements made by Amimon in the instant litigation are covered by New York's litigation privilege.  And as already stated herein, Defendants failed to plead sufficient facts to show that the statements made to third parties—by Amimon—were false and/or otherwise negligently

---

[17] "A statement is *per se* defamatory when it 'tend[s] to injure another in his or her trade, business or profession.'" *ABKCO Music, Inc. v. Sagan*, No. 15 Civ. 4025 (ER), 2016 WL 2642224, at *3 n.4 (S.D.N.Y. May 6, 2016) (alteration in original) (quoting *Stern v. Cosby*, 645 F. Supp. 2d 258, 273 (S.D.N.Y. 2009)); *Wexler v. Allegion (UK) Ltd.*, 374 F. Supp. 3d 302, 310 n.7 (S.D.N.Y. 2019).

made.  Defendants' clearest allegation about false statements made to third parties notes that such statements were made about "the qualities of [Defendants'] commercial activities."  Am. Answer ¶ 176.  However, in the portion of the pleading dedicated to Defendants' defamation argument, Defendants do not state *which* specific statements made to third parties were false, nor does it articulate *who* those statements were asserted to.  *See* Am. Answer ¶¶ 174–179.

Defendants thus failed to state their defamation claim, which is dismissed without prejudice.

### *viii.* Eighth Counterclaim:  Unfair Competition

Defendant's eighth counterclaim is duplicative of its third cause of action.  *Compare* Am. Answer ¶¶ 150–156 (alleging unfair competition under New York State law through false and misleading statements) *with id.* ¶¶ 180–186 (alleging unfair competition under New York State law through false and misleading statements).  *See* Mem. in Supp. Mot. Dismiss 34; Mem. in Opp'n Mot. Dismiss at 21.  In their briefing, Defendants acknowledge as much and indicate their intent to withdraw the claim.  Mem. in Opp'n Mot. Dismiss at 21.  Accordingly, the Court will not consider it here.

### *ix.* Ninth Counterclaim:  Disparagement

Defendants' ninth counterclaim alleges that, by making "false and misleading statements about [their] business," Amimon caused damage to their reputation.  Am. Answer ¶¶ 187–189.  They add that Amimon acted with knowledge that their conduct would deceive "persons who saw the negative statements about [their] business," statements which were "widely disseminated."  *Id.* ¶ 189–190.  Furthermore, Defendants assert that Amimon "published defamatory and false comments in bad faith."  *Id.* ¶ 204.  Although Defendants do not articulate who made the alleged statements, what those statements were, or what made them false within the ninth counterclaim

27

itself, *see id.* ¶¶ 187–206, the Court considers that the counterclaim realleges and incorporates the allegations set forth throughout the Amended Answer, *id.* ¶ 187, and will consider Defendants' allegations that Amimon made false statements in the instant litigation and to Omega as discussed above.  *See, e.g.*, Am. Answer ¶¶ 122, 152, 165.

"To recover for disparagement of goods, the plaintiff must show that the defendant published an oral, defamatory statement directed at the quality of a business's goods and must prove that the statements caused special damages." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002).

As Amimon points out, "[a]s with their other causes of action[], Defendants' counterclaim for disparagement is absent any facts to support naked assertions and conclusory allegations.  There are no allegations relating to what disparaging statements were made, when they were made, to whom they were made, or any other facts necessary to state a claim for disparagement."  Mem. in Supp. Mot. Dismiss at 34.  Rather, to the extent that Defendants rely on the February 25 Cease and Desist, the record seems to show that statements made by Vitec, Amimon's parent, were made in good faith pursuant to its efforts to protect its copyright.  *See* February 25 Cease and Desist at 1–3.  And where there was confusion regarding the products included in the letter, the record shows that Vitec promptly clarified the narrow scope of the cease and desist request.  Reply Mem. in Supp. Mot. Dismiss at 3; Mem. in Opp'n Mot. Dismiss at 11.

As with its other claims, Defendants' disparagement counterclaim fails to set out sufficient facts to render its allegations plausible.  *Iqbal*, 556 U.S. at 678.  It is dismissed without prejudice.

### *x.* Tenth Counterclaim:  Bad Faith and/or Frivolous Causes of Action

The tenth counterclaim sets out allegations for "bad faith and/or frivolous causes of action."  Am. Answer ¶¶ 206–210.

As Amimon points out, however, there is no cause of action for Bad Faith and/or Frivolous Causes of Action.  Mem. in Supp. Mot. Dismiss at 37; Reply Mem. in Supp. Mot. Dismiss 11 ("Defendants do not dispute or even address Plaintiffs' assertion that there exists no affirmative cause of action for bad faith/frivolous cause of action.  Rather, Defendants' Opposition contains references to Fed. R. Civ. P[.] 11, a procedural remedy for addressing frivolous actions, as opposed to a basis for an affirmative cause of action.").

Defendants nevertheless argue that Amimon acted in by faith by pursuing a preliminary injunction "after being informed of the erroneous inclusion of Hollyland products which do not infringe."  Mem. in Opp'n Mot. Dismiss at 22–23.  They cite Rule 11 in support of their contentions.  *Id.* at 23.  However, to make arguments pursuant to the Rule's provisions, Defendants must make an independent motion as set forth therein.  *See* Fed. R. Civ. P. 11.

Defendants' tenth counterclaim is thus dismissed with prejudice.  Any leave to amend would be fruitless here given that "the problem with . . . [the] claims is 'substantive' and, thus, 'better pleading will not cure it.'"  *Larko*, 2019 WL 4450551, at * 4 (citing *Cuoco*, 222 F.3d 99 at 112).

### *xi.* Eleventh Counterclaim:  Tortious Interference With Prospective Economic Advantage

The eleventh and final counterclaim asserts that Amimon tortiously interfered with Defendants' prospective economic advantage.  Am. Answer ¶¶ 190–203.  They claim that "based upon the anticompetitive behavior of [Amimon]," their customer relationships were intentionally harmed and/or destroyed.  *Id.* ¶¶ 191–192.  In support of those contentions, Defendants state that

"[o]n information and belief Amimon and/or Vitec has knowingly and intentionally interfered with Hollyland and/or EC Pro's business and contractual relationships with its customers." *Id.* ¶ 196. They add the following:

> 198.  Amimon and/or Vitech [sic], by and through its employees and/or agents, unfairly interfered with Hollyland and/or EC Pro's business relationships with customers and expected customers by improperly sending out false intimidating 'cease and desist' letters regarding the 300 PRO product line.  Thereby disparaging the [Defendants'] reputation and products.  Amimon and/or Vitech's [sic] actions were designed deliberately to harm Hollyland and/or EC Pro.
>
> 199.  Solely by way of example customers such as Omega and Amazon no longer deal with [Defendants] in the same manner, requiring Hollyland to go into damage control.

*Id.* ¶¶ 198–199.

To state a claim for tortious interference under New York law, a party must allege:  "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch*, 449 F.3d at 400 (internal quotation marks and citations omitted).  Courts dismiss tortious interference claims that fail to allege any one of these elements.  *See, e.g.*, *Fifth St. Fin. Corp. v. Toll*, 2013 WL 3757037 (ER), at *4–6 (S.D.N.Y. July 17, 2013) (dismissing tortious interference claim where elements were inadequately pled).

Here, Defendants note that they had, and continue to have, relationships with Omega and Amazon, though they suggest that those relationships have been damaged.  Am. Answer ¶ 199 ("Solely by way of example customers such as Omega and Amazon no longer deal with [Defendants] in the same manner, requiring Hollyland to go into damage control.").  Defendants also allege that Amimon and Vitec knew of their relationship with Omega, and that they

intentionally interfered with it by sending out the cease and desist letter.[18]  *Id.* ¶ 198.  However, beyond their conclusory allegations, Defendants provide no facts supporting the contention that Vitec's communications were done "solely out of malice," or that "dishonest, unfair, or improper means" were used in sending the February 15 Cease and Desist letter or subsequent communications.  *Kirch*, 449 F.3d at 400; *see also* February 25 Cease and Desist.  And as already discussed herein, the record shows that Vitec clarified the scope of its request by excluding non-infringing products.  Reply Mem. in Supp. Mot. Dismiss at 3.

The eleventh counterclaim is dismissed without prejudice.

## IV.   MOTION TO STRIKE AFFIRMATIVE DEFENSES

Amimon also moves to strike several of Defendants' affirmative defenses.  *See* Memorandum of Law in Support of Motion to Strike ("Mem. in Supp. Mot. Strike"), Doc. 128-1; *see also* Am. Answer ¶¶ 89–110.  Specifically, Amimon moves to strike Defendants' second, eighth, and ninth defenses as immaterial and impertinent, Mem. in Supp. Mot. Strike at 6–7; and the third, sixth, ninth, and twenty-third defenses as insufficiently alleged, *id.* at 7–12.  The motion is granted in part as set forth below.

### A.  Legal Standard

"An affirmative defense is an 'assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true.'"  *Tradewinds Airlines, Inc. v. Soros*, No. 08 Civ. 5901 (JFK), 2013 WL 6669422, at *2 (S.D.N.Y. Dec. 17, 2013) (quoting Black's Law Dictionary 482 (9th ed. 2009)).  Under Rule 12(f) of the Federal

---

[18] As previously noted, the record shows that Vitec, rather than Amimon, sent the February 15 Cease and Desist letter.

Rules of Civil Procedure, the Court may strike any "insufficient defense or any redundant, immaterial, impertinent or scandalous matter" of its own accord or on motion by a party.

Motions to strike, however, are generally disfavored, *City of New York v. FedEx Ground Package Sys., Inc.*, No. 13 Civ. 9173 (ER), 2017 WL 633445, at *2 (S.D.N.Y. Feb. 14, 2017), and "courts should not tamper with the pleadings unless there is a strong reason for so doing," *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). Accordingly, a motion to strike a defense "will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense." *William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d Cir. 1984) (internal quotation marks omitted), *vacated and remanded on other grounds*, 478 U.S. 1015 (1986).

Courts in this Circuit typically apply a stringent three-part test to motions to strike: "(1) there must be no question of fact that might allow the defense to succeed; (2) there must be no substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of the defense." *See, e.g.*, *FedEx*, 2017 WL 633445, at *3 (internal quotation marks and citation omitted); *Specialty Mins., Inc. v. Pluess-Stauger AG*, 395 F. Supp. 2d 109, 111 (S.D.N.Y. 2005) (same). When considering the first and second prongs, courts apply a similar legal standard as that applicable to a motion to dismiss under Rule 12(b)(6): they must determine the "sufficiency of a defense . . . solely upon the face of the pleading" and "accep[t] as true all well-pleaded factual allegations and dra[w] all reasonable inferences in the [non-moving party's] favor." *Coach, Inc. v. Kmart Corps.*, 756 F. Supp. 2d 421, 425 (S.D.N.Y 2010) (internal quotation marks and citation omitted). In other words, a motion to strike "is not intended to furnish an opportunity for the determination of disputed and substantial questions of law." *Cnty.*

*Vanlines Inc. v. Experian Info. Sols., Inc.*, 205 F.R.D. 148, 153 (S.D.N.Y. 2002) (internal quotation marks and citation omitted).

The third prong of the test requires denial of a motion to strike if there is no showing of prejudice. Such prejudice may be found, for example, when inclusion of the "legally insufficient defense would needlessly increase the time and expense of trial or duration and expense of litigation." *FedEx*, 2017 WL 633445, at *3 (internal quotation marks omitted). Mere assertions of prejudice by the moving party are insufficient to satisfy this prong. *Cnty. Vanlines*, 205 F.R.D. at 153.

### B.  Amimon's Materiality and Pertinence Arguments

In their second and eighth affirmative defenses, Defendants contend that Amimon's "Amended Complaint fails to establish copyright infringement" or any of its elements, Am. Answer ¶ 90, and that it also "fails to establish" the elements of its Defend Trade Secrets Act ("DTSA") claim, *id.* ¶ 96. Amimon argues that "these affirmative defenses relate to issues upon which this Court has previously ruled," and are thus immaterial and impertinent. Mem. in Supp. Mot. Strike at 6.

In is November 30, 2021, Opinion and Order, the Court ruled that Amimon did, in fact, sufficiently "establish" the elements of those claims for the purpose of stating a claim in the complaint. *Amimon I*, 2021 WL 5605258, at *9–13; *see also* Mem. in Supp. Mot. Strike at 6 ("In each instance, these affirmative defenses relate to issues upon which this Court has previously ruled. Specifically, this Court entered an Order denying Defendants' motion to dismiss Plaintiffs' claims arising under copyright infringement and the DTSA, finding that Plaintiffs have, in fact, sufficiently established the elements of copyright infringement and DTSA necessary to overcome a motion to dismiss."); *Koch v*, 699 F.3d at 145.  Of course, as Defendants note, that does not mean that Amimon "has established all the elements of its case beyond plausibility," nor that "the

Court has decided that those elements have been proven." Memorandum of Law in Opposition to Motion to Strike ("Mem. in Opp'n Mot. Strike"), Doc. 137 at 8–9. But it does mean that Defendants' arguments have already been considered at this stage in the proceedings. *See Amimon I*, 2021 WL 5605258, at *9–13.

Additionally, and as relevant here, "[i]f an argument can at most negate an element of the plaintiff's claim, it is not appropriately considered an affirmative defense." *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 650 (S.D.N.Y. 2022); *see also* Fed. R. Civ. P. 8(b)(2)–(4) (enumerating acceptable affirmative defenses). Rather, it is treated as a specific denial. *Gentile*, 597 F. Supp. 3d at 650; Fed. R. Civ. P. 8(b); Wright & Miller, 5 Federal Practice and Procedure Civil § 1269 (2d ed. 1990) ("In attempting to controvert an allegation in the complaint, a defendant occasionally may label his denial as an affirmative defense rather than as a specific denial. [ . . . ] If the defendant has included affirmative defenses that were previously included as denials, the court can choose either to strike these defenses as redundant or to treat the defenses as denials."). Here, Defendants clearly denied the allegations set out in Amimon's copyright infringement and DTSA claims. Am. Answer ¶¶ 41–54; 68–78. Accordingly, the Court will strike the second and eighth affirmative defenses.

To be sure, as Amimon recognizes, "[t]here is no dispute that Plaintiffs maintain a burden to prove their case to establish that Defendants' conduct meets the elements required for copyright infringement and DTSA . . . ." Reply Memorandum in Further Support of Motion to Strike, ("Reply Mem. in Supp. Mot. Strike"), Doc. 145 at 3–4. The Court reiterates that it does not here conclude that Amimon has *proven* those claims in order to secure judgment in its favor. Nor does Amimon's motion to strike even ask the Court to determine as much. *See id.*; *see generally* Mem. in Supp. Mot. Strike. Rather, Amimon's motion argues that Defendants'

affirmative defenses were previously set forth and brought before the Court.  Mem. in Supp. Mot. Strike; Reply Mem. in Supp. Mot. Strike.   And because the Court concludes that the second and eighth affirmative defenses are indeed duplicative, both of Defendants' motion to dismiss arguments and of the denials set out in Defendants' amended answer, they will be stricken.

In regard to Defendants' ninth affirmative defense, which argues that "[a]ny and all purported claims asserted by Plaintiff are barred by the doctrines of waiver, acquiescence and/or Estoppel," Am. Answer ¶ 97, Amimon argues that "the acquiescence defense is illogical" given that Defendants disavow having any relationship with Amimon.[19]  Mem. in Supp. Mot. Strike at 7.  Amimon underscores that "Defendants plead that they are not in privity with Plaintiffs, have no contract with Plaintiffs, were/are not licensees of the Plaintiff, and are not bound by any type of shrink wrap agreement."  *See id.* (quoting Am. Answer ¶ 105).  In response, Defendants argue that there are questions of fact regarding whether Amimon "sat on its rights," despite possibly knowing about the sale of the infringing devices at issue here.  Mem. in Opp'n Mot. Strike at 10. They add that "[a]t this stage of the lawsuit, enough information is not known about how long the allegedly infringing devices were in the market, when Plaintiff knew about the sale of the devices, etc."  *Id.*

"The defense of acquiescence is available when a plaintiff has responded to a defendant's actions with implicit or explicit assurances upon which the defendant relied."  *Empresa Cubana Del Tabaco v. Culbro Corp.*, 213 F. Supp. 2d 247, 276 (S.D.N.Y. 2002) (internal quotation marks omitted); *see also Johnson & Johnson v. Actavis Grp. hf*, No. 06 Civ. 8209 (DLC), 2008 WL

---

[19] Amimon's motion to strike for immateriality and impertinence applies only to the acquiescence portion of Defendants' ninth affirmative defense.  Mem. in Supp. Mot. Strike at 6.

228061, at *9 (S.D.N.Y. Jan. 25, 2008) (holding that "the defense of acquiescence embodies active consent" on the part of the plaintiff).

Here, the Court agrees with Defendants that there are remaining questions of fact that might allow the defense to succeed.  Indeed, the date of Amimon's discovery regarding the infringing Hollyland products remains unclear at this stage of the proceedings.  *See* Agiv Decl. 3 ¶¶ 11–15; Am. Compl. ¶ 29.  And, if Amimon knew about the conduct for some period of time and did nothing to stop it, it is possible that Defendants acted under the presumption that there was implied consent.  Accordingly, Amimon's motion is denied as to the ninth affirmative defense.  *FedEx*, 2017 WL 633445, at *3.

### ii. Amimon's Sufficiency Arguments

In regard to Defendants' third, sixth, ninth, and twenty-third affirmative defenses,[20] Amimon argues that Defendants failed to show the requisite bad faith and/or fraud.  Mem. in Supp. Mot. Strike at 7.  Defendants contend that they did indeed make the requisite showing as to bad faith and/or fraud, and they otherwise argue that Amimon failed to show that it is prejudiced by the inclusion of these affirmative defenses.  Mem. in Opp'n Mot. Strike at 11–20; *see also FedEx*, 2017 WL 633445, at *3 (concluding that a motion to strike should be denied if the moving party will not be prejudiced by the inclusion of the affirmative defense).

As set forth above, motions to strike are generally disfavored, *FedEx*, 2017 WL 633445, at *2, and they should not be granted "unless it appears to a certainty that plaintiffs would succeed despite *any state of the facts* which *could be proved* in support of the defense," *Envicon*

---

[20] The third affirmative defense asserts fraud on the copyright office, Am. Answer ¶ 91; the sixth affirmative defense raises unclean hands, *id.* ¶ 94; the ninth affirmative defense raises waiver, acquiescence, and estoppel, but Amimon moves to strike the estoppel defense, *id.* ¶ 97; *see also* Mem. in Supp. Mot. Strike at 8–9; and the twenty-third affirmative defense raises malicious litigation arguments, Am. Answer ¶ 110.

*Equities Corp.*, 744 F.2d at 939 (emphasis added).  While it is true that several of the defenses at issue here rely on sparse allegations, Mem. in Supp. Mot. Strike at 7–12, the Court cannot conclude at this stage that there exists *no* set of facts which could be proved in their support. Accordingly, Amimon's motion is denied as to these affirmative defenses.

## V.   MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants move for partial summary judgment limiting copyright statutory damages and attorney's fees in this matter pursuant to 17 U.S.C. § 412.  Memorandum of Law in Support of Motion for Summary Judgment ("Mem. in Supp. Mot. Summ. J."), Doc. 131 at 4.  Because there remain genuine disputes of material fact as to the basis for the damages and fees at issue here, the motion is denied.

### A.  Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotation marks omitted). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

### B.  Summary Judgment is Inappropriate Here

According to Defendants, Amimon "filed a Copyright Registration form purportedly in anticipation of this litigation, and just prior to bringing this lawsuit." Mem. in Supp. Mot. Summ. J. at 4. They argue that Amimon is thus "barred from asserting copyright statutory damages based on the timing of the filing of [Amimon]'s copyright registration," *id.*, and they underscore the bright-line rule "precluding an award of statutory damages when the alleged infringement occurs before the effective date of the copyright registration, *id.* at 6 (citing *Fischer v. Forrest*, 968 F.3d 216, 220 (2d Cir. 2020) (concluding that § 412 "precludes statutory damages or attorneys' fees" for infringement that takes place prior to copyright registration)).

As relevant here, 17 U.S.C. § 412 provides that copyright registration holders may not avail themselves to statutory damages under two conditions:  (1) where infringement of an unpublished work commenced before the effective date of the registration, and/or (2) where infringement of copyright commenced after first publication of the work and before the effective

date of its registration, unless the registration is made within three months after initial

publication.

In its opposition, Amimon contends that "Defendants' Motion lacks even elementary

adherence to the procedural requisites of [Rule 56] necessary to ensure that no genuine dispute of

material fact exists . . . ."  Memorandum of Law in Opposition to Motion for Summary Judgment

("Mem. in Opp'n Mot. Summ. J."), Doc. 148 at 7.  It emphasizes that, while it does not challenge

the date of the effective copyright registration, there are disputes as to publication and the date

upon which infringement began.  *Id.* at 8.

The Court agrees that genuine disputes of material fact remain as to the availability of

statutory damages.  *Compare* Mem. in Supp. Mot. Summ. J at 9–10 *with* Mem. in Opp'n Mot.

Summ. J., Doc. 148 at 7–10.  Indeed, while it is true that the copyright registration documents

show that the effective date of registration is June 1, 2020, two key facts are uncertain at this

stage:  (1) the date when the infringement allegedly began and (2) the published or unpublished

status of the MAC Source Code.  *See* Agiv Decl. 3 ¶¶ 11–15; Am. Compl. ¶ 29;  Mem. in Opp'n

Mot. Summ. J. at 8–9.

Contrary to Defendants' contentions, "[t]he copyright registration and accompanying file"

do not resolve these issues.  Mem. in Supp. Mot. Summ. J at 9; *see also* Copyright Registration,

Doc. 130-1 at 2–19; Copyright Informational Brochure, Doc. 130-2; Correspondence Regarding

Special Handling of Copyright Registration, Doc. 130-3.  Indeed, while it is true that the text of

17 U.S.C. § 412 "does not require a date when infringement commenced," Reply Memorandum

in Support of Motion for Summary Judgment ("Reply Mem. in Supp. Mot. Summ. J.") at 10, the

statute *does* make clear that statutory damages are only precluded where infringement of an

unpublished work commenced *before the effective date of the registration*.  Consequently, in

order to show, as a matter of law, that statutory damages are unavailable here, Defendants were tasked with providing evidence that infringement began before June 1, 2020.  That evidence was not provided.

For all these reasons, the Court cannot, at this stage, determine that Amimon is barred from pursuing statutory damages.  *See Liberty Lobby, Inc.*, 477 U.S. at 249 ("[I]t is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").  Defendants' motion for summary judgment is thus denied.

## VI.   MOTION TO COMPEL

Amimon moves to compel Defendants to produce complete answers, responses, and production in accordance with their written discovery requests.  Mem. in Supp. Mot. Compel at 3.  Amimon specifically requests proper responses to its production and interrogatory requests. *See id.* at 4–8.

### A.  Legal Standard

Federal district courts have broad discretion in deciding motions to compel.  *See Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 488 (2d Cir. 1999).  The scope of discovery is generally limited to any "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  The information sought need not be admissible at trial as long as the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  *Id.*  Relevance "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that

could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)).

"The party resisting discovery bears the burden of showing why discovery should be denied." *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009).  "General and conclusory objections as to relevance, overbreadth, or burden are insufficient to exclude discovery of requested information."  *Melendez v. Greiner*, No. 01 Civ. 7888 (SAS) (DF), 2003 WL 22434101, at *1 (S.D.N.Y. Oct. 23, 2003).

### B.  Defendants Must Produce the Discovery Requested by Amimon

After a careful review of the record and the parties' discovery communications, the Court grants Amimon's motion to compel.  The record makes clear that Defendants have improperly failed to timely produce documents pursuant to the provisions of Rule 34, despite the Court's entry of a protective order that Defendants requested prior to providing complete responses.  *See* Stipulated Protective Order; *see also* Mem. in Supp. Mot. Compel at 4.

At the same time, Defendants' arguments in opposition to Amimon's discovery requests are conclusory and insufficient.  *See* Memorandum of Law in Opposition to Motion to Compel ("Mem. in Opp'n Mot. Compel"), Doc. 175.  They contend that Amimon's motion is unjustified given two circumstances:  their purported "continued cooperation with Plaintiffs," and the extension of the deadlines for the completion of discovery.  *Id.* at 4, 6–25.

However, these arguments are belied by the record and are otherwise unresponsive to Amimon's arguments.  For example, the record shows that where Defendants indicated that they would supplement production once a protective order was in place, *see, e.g.*, Objections and Responses to First Request for Production, Doc. 168-2 ¶ 23, no such production took place after the entry of the order, *see* Stipulated Protective Order; *see also* Reply Memorandum in Support of Motion to Compel ("Reply Mem. in Supp. Mot. Compel"), Doc. 180 at 11.

Additionally, that the discovery deadlines have been extended does not resolve the issues raised in Amimon's motion. As Amimon puts it, "[r]egardless of whether the deadline for the parties to substantially complete document production expired on December 14, 2022, or was extended by agreement to some date thereafter, the deadline is wholly unrelated to Defendants' obligations under Rule 34." Reply Mem. in Supp. Mot. Compel at 10. Indeed, "the [] deadline offers no safe haven for Defendants to evade compliance with the deadlines under Rule 34 for production of documents responsive to Plaintiffs' targeted discovery requests served over one year ago," particularly where those responses are necessary for conducting depositions ahead of the close of fact discovery. *Id.* For all of these reasons, Amimon's motion to compel is granted.

Amimon requests that the Court award costs and fees associated with making its motion to compel. *Id.* at 13; *see* Fed. R. Civ. P. 37(a)(5)(A) (noting that if a motion to compel is granted, the Court must require the party whose conduct necessitated the motion to pay reasonable expenses incurred in making the motion, but only after giving the party an opportunity to be heard). The Court grants the request in light of the circumstances and Defendants' ample opportunity to be heard. Fed. R. Civ. P. 37(a)(1)–(5); *see* Mem. in Supp. Mot. Compel at 21 (requesting costs and attorney's fees pursuant to Rule 37); *see generally* Mem. in Opp'n Mot. Compel (failing to address Amimon's Rule 37 arguments).

## VII.   CONCLUSION

For the reasons stated herein, Amimon's motion for preliminary injunction is DENIED; its motion to dismiss the counter-claims is GRANTED; its motion to strike certain affirmative defenses is GRANTED in part and DENIED in part; and its motion to compel is GRANTED. Further, Defendants' motion for summary judgment is DENIED.

The parties are directed to appear for a telephonic status conference on April 12, 2023, at 10:30 AM.  The parties are to dial (877) 411-9748 and enter access code 3029857#.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 126, 127, 128, 129, and 177.

It is SO ORDERED.

Dated:   March 13, 2023
         New York, New York

_____
        Edgardo Ramos, U.S.D.J.