UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMIMON INC. *and* AMIMON LTD,

Plaintiffs,

– *against* –

SHENZHEN HOLLYLAND TECH CO. LTD,
*and* EC PRO VIDEO SYSTEMS,

Defendants.

**OPINION & ORDER**

20 Civ. 9170 (ER)

Ramos, D.J.:

Amimon Inc. and Amimon Ltd. (collectively, "Amimon") brought this suit against

Shenzhen Hollyland Tech Co. ("Hollyland") and EC Pro Video Systems ("EC Pro") (collectively,

"Defendants") in November 2020. Doc. 1. Amimon alleged trade secret misappropriation under

federal and state law, copyright infringement, and unfair competition against both defendants.

*Id.*; Doc. 37 ¶¶ 41–87. In short, Amimon contends that Defendants engaged in various efforts to

unlawfully take Amimon's video transmission technologies and to use them as their own. *See id.*

¶¶ 11, 20–26.

Four years later, the parties remain embroiled in discovery disputes, repeatedly grasping

for Court intervention as opposed to untangling their disputes through cooperation. *Cf. Family

Dollar Stores, Inc. v. United Fabrics Int'l, Inc.*, No. 11 Civ. 2574 (CM) (JCF), 2012 WL

1123736, at *9 (S.D.N.Y. Apr. 4, 2012) ("Both the Federal Rules of Civil Procedure and our

Local Rules encourage cooperation among counsel to efficiently resolve discovery disputes

without intervention from the court.") In this latest round of discord, the Court considers three

motions: (1) Defendants' motion to compel Amimon to produce discovery, Doc. 299, (2)

Amimon's motion for spoliation sanctions against Hollyland, Doc. 335, and (3) Amimon's

motion for sanctions against Hollyland for its failure to produce its sales director at a deposition, Doc. 337.

For the reasons stated herein, Defendants' motion to compel is GRANTED in part and DENIED in part, and each of Amimon's motions for sanctions is GRANTED in part and DENIED in part.

## I.    BACKGROUND

The Court assumes familiarity with the factual allegations and procedural history, which have been discussed in four previous opinions. *Amimon, Inc. v. Shenzhen Hollyland Tech Co.*, No. 20 Civ. 9170 (ER), 2024 WL 3862147, at *1 (S.D.N.Y. July 25, 2024); *Amimon, Inc. v. Shenzhen Hollyland Tech Co.*, No. 20 Civ. 9170 (ER), 2024 WL 3534403, at *1–5 (S.D.N.Y. July 25, 2024); *Amimon, Inc. v. Shenzhen Hollyland Tech Co.*, No. 20 Civ. 9170 (ER), 2023 WL 2478159, at *1–5 (S.D.N.Y. Mar. 13, 2023); *Amimon, Inc. v. Shenzhen Hollyland Tech Co.*, No. 20 Civ. 9170 (ER), 2021 WL 5605258, at *1–2 (S.D.N.Y. Nov. 30, 2021). The relevant details are reproduced here for convenience, and they are supplemented by additional evidence produced throughout discovery.

### A.  Factual Overview

#### 1.  *The Underlying Dispute*

Amimon develops technology that enables wireless video streaming. *Amimon*, 2024 WL 3534403, at *1. The company's products are used in film production, news and sports broadcasting, drones, and hospital operating rooms. *Id.* Amimon develops both the hardware, such as transmitters and receivers, and the software for these products. *Id.* Amimon's software exists first as a source code—a version of the software that is written in plain text and is editable by humans. *Id.* It is this modifiable version of the software, Amimon's "MAC Source Code,"

(the "Source Code") that is the subject of this case. *Id.* After the Source Code is produced, it is compiled into a binary version of the software that Amimon places in its chipsets, within transmitters and receivers. *Id.* Additionally, Amimon uses a proprietary key (the "Encryption Key") to encrypt its binary files. *Amimon*, 2023 WL 2478159, at *2.

Amimon and Hollyland are competitors. *Amimon*, 2024 WL 3534403, at *1. Hollyland is a Chinese corporation that develops and sells video technology. *Id.* EC Pro is Hollyland's U.S. distributor and exclusive service center. *Id.*

Before this lawsuit began, Amimon learned that Hollyland products for sale in the United States contained certain representations about their transmission capacities. *Id.* Amimon obtained several Hollyland products and examined their chipsets. *Id.* It discovered that a Hollyland product contained one of Amimon's chipsets. *Id.* According to Amimon, the code on the Hollyland product's chipset was almost an identical match to Amimon's code but had been modified slightly. *Id.* Amimon had never provided its chipsets or source code to Hollyland or EC Pro. *Id.* Amimon concluded that the Hollyland products contained unauthorized software derived from misappropriated MAC Source Code. *Id.*

### 2. *Procedural History*

In November 2020, Amimon brought this action against Hollyland and EC Pro for trade secret misappropriation, copyright violations, and unfair competition for misappropriation of skills and expenditures. *Id.* Defendants filed motions to dismiss, which the Court denied in November 2021. *Amimon*, 2021 WL 5605258.

On March 1, 2022, Defendants asserted numerous counterclaims for alleged antitrust violations, unfair competition, fraud, trade libel, tortious interference, defamation,

disparagement, bad faith, and loss of business opportunity.  Doc. 111 ¶¶ 126–203.  Amimon filed

a motion to dismiss these counterclaims, which the Court granted on March 13, 2023.  Doc. 187.

The Court held conferences to discuss discovery disputes on July 12, 2023 and September

6, 2023.  The parties thereafter engaged in a dispute concerning the locations for various

depositions.  *See* Docs. 262, 263.  Additionally, on October 26 and October 31, 2023, Plaintiffs

and Defendants respectively requested leave to file motions for contempt.  Docs. 264, 269.  On

November 16, 2023, the Court held a conference to address these requests for leave as well as

the "continuing saga of where the depositions will be taken."  *See* Doc. 275 at 3–7.

On December 29, 2023, Amimon filed a motion for sanctions based on Defendants'

failure to comply with the Court's discovery orders.  Doc. 280.  The Court granted in part and

denied in part that motion on July 25, 2024.  *Amimon*, 2024 WL 3534403, at *10.

On March 21, 2024, Defendants filed the instant motion to compel Amimon to produce

its Source Code, Encryption Key, and other discovery.  Doc. 299.  On May 17, 2024, Defendants

requested that fact discovery be extended and Amimon be forced to produce its Source Code.

Doc. 321.  On May 29, 2024, Amimon requested leave to file a motion for sanctions arising from

Hollyland's spoliation of software and hardware materials.  Doc. 324; *see also* Doc. 345-3.  On

May 30, 2024, Amimon requested leave to file a motion for sanctions based on Hollyland's

failure to produce its sales director for his deposition.  Doc. 328.  The Court held a conference on

June 5, 2024, in which these various requests were discussed.  *See* Doc. 333.[1]  The Court granted

Amimon leave to file its two motions for sanctions, *id.*, and Amimon did so on June 26, 2024,

Docs. 335, 337.

---

[1] The transcript of the June 5, 2024 conference, Doc. 333, incorrectly states that the conference was held on June 7, 2024.

### B. Amimon's Trade Secret, Source Code, and Encryption Key

On January 28, 2022, Defendants served discovery requests on Amimon. Doc. 272 at 1. Interrogatory No. 1 requested: "Please identify, with specificity (by product, file and line of code, where appropriate) all of the alleged trade secrets and any confidential or proprietary information that plaintiff alleges or contends Defendants misappropriated or slightly altered, including but not limited to as alleged in ¶ 22, of the Complaint." *Id.* On February 28, 2022, Amimon answered: "Plaintiffs state that the trade secrets and confidential or proprietary information Defendants misappropriated include Plaintiffs' source code Version: 4_x_24_9_Build 1057 which is registered with the United States Copyright Office at Registration No. TX0008882781, any binary created therefrom, or any derivative thereto." *Id.*

On October 30, 2023, Defendants' expert conducted a software inspection at the New York City office of Amimon's counsel pursuant to the Protective Order in this matter. Doc. 272 at 1. According to Amimon, the materials made available for that inspection consisted of:

> Plaintiffs' trade secret binary file created from Plaintiffs' source code Version: 4 x 24 9 Build 1057, as well as binary files from exemplary Accused Products manufactured by Hollyland . . . . The materials made available for inspection were the same materials analyzed to determine that the Hollyland-manufactured products containing Amimon Chipsets contain binary files showing the hallmark signs of being derived from Plaintiffs' source code Version: 4 x 24 9 Build 1057, but notably exhibit differences which underscore the binary files are derivative source code which has been modified and manipulated.

*Id.* at 1–2. On October 31, 2023, Defendants filed a letter requesting leave to file a motion for contempt. Doc. 269. Defendants complained that they had been provided only with binary code, which is unreadable to humans, and not with Amimon's Source Code or Encryption Key. *Id.* Amimon responded that, "the only source code materials relevant to the claims and defenses in this litigation are those portions of Plaintiffs' trade secrets contained in its binary file derived

from Plaintiffs' source code Version: 4_x_24_9_Build 1057, the US Copyright deposit for TX 8-882-781, and the binary files from the Accused Products." Doc. 272 at 2.

At its November 16, 2023 conference, the Court asked Amimon to confirm whether it "provided to [Defendants] or made available to them all of the documents that plaintiffs relied on in conducting their analysis that infringement occurred." Doc. 275 at 32:5–7. Amimon answered in the affirmative. *Id.* at 32:8. The Court also asked why Amimon had not provided Defendants with its Source Code, given Defendants only had access to 50 pages—which they acquired on their own from the Copyright Office—out of roughly 6,000 pages of Source Code. *Id.* at 36:5–14. Amimon responded that the Source Code is the "crown jewels" of its company, and in any event, Defendants have been adamant "that they have no source code of their own." *Id.* at 36:15–20, 37:11–12. Therefore, Amimon explained, it would not be possible to compare Amimon's Source Code with Defendants' anyway. *Id.* at 36:24–37:5. Amimon also reiterated: "What's relevant is the derivative binary, which we identified as our trade secret in this case and which we provided to them. We provided their own binary output back to them for comparison against ours. All of that was provided to them on the 30th of October." *Id.* at 37:18–22. Amimon noted it provided the binary in viewable form, such that Defendants' expert did not have to decrypt it to analyze and compare it. *See id.* at 41:7–12. The Court ultimately declined to grant leave for Defendants to file their motion for contempt, and it directed the parties to engage in additional discussions. *Id.* 42:14–21. The Court also instructed Defendants:

> I will leave it up to you, if you believe that an additional motion to compel is appropriate, but that motion has to be based on specific requests where plaintiffs determined that they would not turn over the materials, that the materials exist and that, for whatever reason, they have determined that it should not be turned over. OK?

*Id.* 47:1–6.

6

The parties met and conferred on November 29, 2023.  Doc. 309 at 1.  In a follow-up email to Defendants on December 1, 2023, Amimon reiterated its belief that Defendants had "failed to articulate any factual or legal basis for discovering Plaintiffs' source code[.]"  Doc. 309-1 at 3.  Nonetheless, Amimon offered "to produce a subset of the source code in the interest of avoiding motion practice on this issue (unnecessarily increasing the parties litigation costs) and avoid the need for Court intervention (unnecessarily resulting in expenditure of Court resources)."  *Id.*  In accordance with that offer, on December 13, 2023, "Amimon produced its copyrighted source code Version: 4_x_24_9_Build 1057, with only very limited redactions of highly sensitive lines of code."  Doc. 309 at 5.

Amimon claims that Defendants did not review these Source Code materials.  *Id.*  In fact, at Defendants' March 26, 2024 deposition of Rafi Agiv—formerly Amimon's Software Team Leader and Director of Software Development, who "wrote substantial portions of Amimon's source code and analyzed the infringing Hollyland products to support the allegations within Amimon's [First Amended Complaint]"—Defendants "asked no questions related to Amimon's code or its analysis of Hollyland Products."  *Id.* at 6 and n.2.  On March 21, 2024, Defendants filed the instant motion to compel Amimon to identify its trade secret, produce its Source Code and Encryption Key, and produce other discovery.  Doc. 299.  Amimon filed its opposition to the motion to compel on April 12, and Defendants filed their reply on April 19.  Docs. 309, 314.  On May 6, 2024, Defendants finally requested to inspect the Source Code that Amimon had provided on December 13, 2023.  Doc. 322 ¶ 6.  Defendants performed the Source Code inspection on May 16, 2024.  *Id.* ¶ 7.

On May 17, 2024, with their motion to compel pending, Defendants requested that fact discovery be extended and Amimon be forced to produce its Source Code.  Doc. 321.  The Court

discussed this request at its June 5, 2024 conference. *See* Doc 333. There, Defendants argued that Amimon produced the Source Code with numerous redactions, and in a way that had "no organization at all" and did not allow Defendants to perform "an abstraction filtration test or any test on the copyright work." *Id.* at 9:9–11, 8:17–20. As to the redactions, Amimon explained that, in the approximately 98 percent of the source code that it produced on December 13, 2023, it redacted "[l]ess than 2 percent of the total pages," meaning the redacted portions comprised "less than probably one percent of the information . . . out of the entirety of the source code that was produced." *Id.* at 6:16–23. As to the organization of the software, Amimon confirmed there was "no shuffling" of the files, and the way the Source Code was produced was "how it's kept. It's how it's compiled. It's how it's run." *Id.* at 12:10–13. Amimon also reiterated its belief from the November 16, 2023 conference that the Source Code was of no use to Defendants without any source code of their own to compare it with, noting:

> Why they need the source code I can't understand, your Honor, and this goes to the spoliation issue. I haven't heard any cognizable reason from them why they need to inspect the source code other than, we want to run it through an open source search engine on the internet to find if there's open source code. Complete fishing expedition.

*Id.* at 10:5–11.[2] In any event, Amimon stated, "we've given them encrypted binaries; we've given them unencrypted binaries; we've given them the source code. They have all the tools that they need to do the analysis that was done to determine that they were infringing our trade secrets." *Id.* at 11:13–17.

---

[2] However, whereas in the November 16, 2023 hearing, Amimon expressed skepticism over Defendants' insistence that they had none of their own source code, in the June 5, 2024 hearing, Amimon expressed its belief that Defendants spoliated that evidence. Doc. 333 at 10:5–11. Amimon's request for leave to file a motion for sanctions based on Hollyland's spoliation of evidence, Doc. 324, was also discussed, and granted, at the June 5, 2024 conference. Amimon filed its motion for spoliation sanctions on June 26, 2024. Doc. 335.

### C. Destruction of Chipsets and Electronic Data

#### 1. *The Beijing IPC Case*

On June 29, 2019, prior to the start of the instant civil action, Amimon initiated a copyright infringement claim against Hollyland and another defendant, Beijing Huacheng Yuzhe Trading Co., Ltd., in the Beijing Intellectual Property Court ("Beijing IPC"). Docs. 336 at 1; 345-1. In its complaint, Amimon requested various forms of relief from the Beijing IPC, including the following:

> To order both Defendants to forthwith remove the unauthorized MAC software preinstalled in all of their media, chips, motherboards, "MOMA Legend 2000" and other products in their inventory, *or* destroy all of their chips, motherboards, "MOMA Legend 2000" and other products preinstalled with the unauthorized MAC software in their inventory[.]

Doc. 345-1 at 1 (emphasis added). On December 18, 2021, the Beijing IPC entered judgment against the defendants, finding they engaged in infringement "by producing and selling products containing software that is highly similar to the MAC software without permission of the right holder, Amimon." Doc. 336 at 1. The Beijing IPC granted several forms of relief; in part, it ordered Hollyland to cease its infringement, issue a public apology, compensate Amimon for financial loss, and compensate Amimon for reasonable expenses. *Id.* at 2; Doc. 336-1 at 10.[3] The Beijing IPC declined, however, to order Hollyland to "destroy the products containing the infringing software," as Plaintiffs had proposed, explaining that "the responsibility to stop the rancidity [was] sufficient to protect [Amimon's rights]." Docs. 336 at 2, 336-1 at 9. Hollyland appealed the judgment of the Beijing IPC on approximately January 12, 2022. Doc. 344 ¶ 6.

---

[3] In the Beijing IPC Judgment, Hollyland is referred to as "Shenzhen Haoyiyuan Technology Co. Ltd." Doc. 336-1.

2. *The Destruction of Evidence*

On November 2, 2020, while the Beijing IPC action was still being litigated, Amimon filed the instant civil action in the U.S., alleging similar claims. *Id.* ¶ 3. On January 14, 2022, Hollyland answered Amimon's first amended complaint. *See* Doc. 91 at 37. Amimon served its first interrogatories and requests for production on January 28, 2022. Doc. 178 at 2. These included requests for communications, documents, and things related to Amimon's chipsets and Source Code. *See* Doc. 336 at 3.

"In January or early February 2022," then-unbeknownst to Amimon, "Hollyland's Senior Executive in charge of its Strategy Department, Vincent Ma, directed employees to destroy materials in Hollyland's possession relating to Amimon's technologies," in particular, "the technical information file, the technology file, the WHDI development kit, the test tooling and test software, the Mac firmware" (hereinafter, the "Spoliated Materials"). Doc. 336 at 3; *see also* Doc. 344 ¶ 6. "[A]round the same time it was destroying the Spoliated Material[s], [Hollyland] also destroyed all chipsets it had in its possession which contained Amimon's technologies" (hereinafter, the "Amimon Chipsets"). Doc. 336 at 6.

Hollyland alleges that Chinese Counsel advised Hollyland to destroy materials "to comply with the judgment in the Beijing Intellectual Property Court." Doc. 345 ¶ 7. Hollyland did not ask Amimon for permission to destroy any materials, nor did it provide notice to Amimon that it had done so. Doc. 336 at 3.

3. *Protracted Discovery Disputes*

On February 28, 2022, Hollyland responded to Amimon's first discovery requests. *Id.* at 6. In its responses, it denied the existence of several categories of requested documents, and it did not produce any documents. *Id.* at 6–7. For example, Request No. 13 requested

"[d]ocuments and things that refer, relate to, or evidence the uncompiled and compiled Source Code for software or firmware installed and/or operating on the Amimon Chipset included in the [Hollyland] devices." Doc. 336 at 3. Hollyland stated in its response, "[T]he Request cannot be complied with since Defendants have no such Source Code documents and things." *Id.* at 4.

Amimon now alleges, and Hollyland does not dispute, that Hollyland previously "had the exact documents and things Amimon has been seeking to obtain since January 2022," but "Hollyland deliberately destroyed those Spoliated Materials at the same moment in time it [was] being asked to produce them in this litigation." *Id.* at 5. In Hollyland's February 28, 2022 responses, it did not provide any disclosure of destroyed, transferred, or otherwise disposed-of documents; Hollyland "instead remained silent" in response to Amimon's instructions that such disclosures be provided.[4] *Id.* at 4.

The parties thereafter engaged in almost a year of back-and-forth on Hollyland's purportedly deficient responses to Amimon's January 28, 2022 discovery requests, and on February 10, 2023, Amimon moved to compel Defendants to provide complete responses. Doc. 177. The Court granted the motion on March 13, 2023. *Amimon*, 2023 WL 2478159, at *21. In doing so, the Court explained: "The record makes clear that Defendants have improperly failed to timely produce documents pursuant to the provisions of Rule 34, despite the Court's entry of a protective order that Defendants requested prior to providing complete responses." *Id.* The Court also granted Amimon's request for costs and fees associated with the motion. *Id.*

---

[4] Specifically, Amimon's discovery requested that "[i]f a document requested was, but is no longer, in the possession, custody, or control of [Hollyland], [Hollyland] should state whether the document: (1) is missing or lost; (2) has been destroyed; (3) has been transferred, voluntarily or involuntarily, to others; or (4) has otherwise been disposed of. For each instance, explain the circumstances surrounding such disposition, the date or approximate date of such disposition, and the names and residences and business addresses of those persons with knowledge of such circumstances." Doc. 336 at 4 (alterations in original).

Thereafter, Hollyland "continued to assert, without explanation, that the documents and things responsive to these requests [did] not exist and [were] not in Hollyland's possession." Doc. 336 at 4. On April 7, 2023, Amimon asserted that Defendants were failing to comply with the Court's motion to compel order. Doc. 200. The Court held a conference on April 12, 2023, and admonished the parties to abide by the rules of discovery.

In June 2023, Amimon sought leave to move for contempt. Doc. 234.[5] Amimon explained:

> Defendants have remained steadfast in their refusal to supplement even basic responses to certain interrogatories (*e.g.*, failing to identify all products manufactured by Hollyland, including for third-parties, as requested by Interrogatory No. 1), to provide documents evidencing or sufficient to calculate Hollyland's costs to manufacture each of the offending product models, to provide information identifying offending products manufactured for third-parties, and to provide threshold financial data related to the offending products to allow [Amimon] to calculate damages from sales of the offending products—all of which documents and information were compelled by the Court's Order.

*Id.* at 3. Defendants again disagreed with Amimon's account of events, asserting that they had produced "all the documents" in their possession. Doc. 235 at 3. The Court held additional discovery conferences on July 12, September 6, and November 16, 2023. At the November 16, 2023 conference, Amimon argued that it was still missing full categories of documents. Doc. 275 at 13:19–20, 14:6. The Court ultimately instructed Defendants:

> I said this before, turn those documents over.
>
> Well, here's the thing. They've asked for leave to file a motion to hold you in contempt. I'm going to let them file the motion, but you can avoid it. Right? This is now the third time that we're here talking about the documents, the Vaxis documents, the MOMA documents, the [Cine Gear] documents. I believe I've told you in no uncertain terms in the past you

---

[5] While Amimon initially styled its request as a "motion for contempt," *see, e.g.*, Doc. 234, the motion it ultimately filed made clear that Amimon sought evidentiary sanctions and attorney fees pursuant to Federal Rule of Civil Procedure 37, Doc. 281 at 14.

> have to turn them over.  I don't care where they're sold.  I don't care who
> they're sold to.  I don't care.  Turn them over.

*Id.* at 22:14–23.  Additionally, in response to counsel for Defendants' assertion that he did not

"see the relevance," of certain discovery requests, *id.* at 24:21, the Court repeated:  "Absolutely

it is relevant.  I've found that it is relevant.  I've determined that it is relevant.  I've told you to

turn over the documents.  I'm telling you now for the third or fourth time to turn over the

documents," *id.* at 24:25–25:3.  Defendants promised to "do an extensive search" and "turn over

what we have."  *Id.* at 22:25–23:1; *see also id.* at 25:5–6.  The Court ordered Defendants to

produce the documents within one month and stated that Amimon could move for contempt by

December 29, 2023, if necessary.  *Id.* at 25:7–26:17.

On December 29, 2023, Amimon filed a motion for sanctions based on Defendants'

failure to comply with the Court's discovery orders.  Doc. 280.  Amimon asserted that "[d]espite

the expiration of the deadline, Defendants failed to . . . produce all responsive documents to

those requests[.]"  Doc. 281 at 6–7.  On July 25, 2024, the Court granted in part and denied in

part Amimon's motion.  *Amimon*, 2024 WL 3534403.  The Court denied the request for

evidentiary sanctions but concluded that Amimon was entitled to reasonable attorney fees and

costs in connection with its efforts to obtain certain documents from Defendants.  *Id.* at *10.  As

part of its relief, the Court directed Defendants to "represent by August 8, 2024, whether they

have additional . . . documents and must describe the search process they have undertaken to

locate such documents."  *Id.* at *10.

Separately, the Court acknowledged that Defendants included a baseless, throwaway

request for sanctions in their opposition papers, noting:

> Finally, continuing what has become an unfortunate pattern, Defendants tack on to the
> conclusion of their brief multiple requests for sanctions of their own, without any
> corresponding explanation or legal justification.  Defendants first assert that Amimon

13

> should be sanctioned for bringing a "frivolous motion." This request is baseless. As the discussion above illustrates, Amimon's motion—which the Court grants in part—is not at all frivolous. Remarkably, Defendants also "ask the Court to grant an adverse inference to [Amimon's] trade secret claims." This request comprises a single throwaway sentence at the end of Defendants' brief . . . . This is not the only occasion that Defendants have wasted the Court's time with a patently meritless request for sanctions.

*Id.* at *9 (internal citations omitted). The Court thereby admonished Defendants that "future requests along these lines—that is, requests for sanctions that are completely unwarranted and unsupported—will result in sanctions against Defendants." *Id.* at *10.

### 4. Revelation of the Destruction of Evidence

On May 1, 2024, Amimon conducted a Rule 30(b)(6) deposition of Hollyland. Doc. 336 at 8. At that deposition, Amimon "learned for the first time" that "Hollyland not only had the exact documents and things Amimon has been seeking to obtain since January 2022, but that Hollyland deliberately destroyed those Spoliated Materials at the same moment in time it [was] being asked to produce them in this litigation." *Id.* at 5. Hollyland also testified at the deposition that "around the same time it was destroying the Spoliated Material, it also destroyed all chipsets it had in its possession which contained Amimon's technologies," the Amimon Chipsets. *Id.* at 6.

### D. Andrew Wu's Deposition

Andrew Wu served as Director of Sales for Hollyland "at all times relevant to the claims in this case." Docs. 338 ¶ 3, 347-1. Although Wu was located in China, he was, by Hollyland's account, "in charge of the business in the U.S." Doc. 338 ¶ 21. Wu had "management and control over Hollyland's U.S. sales team located in China tasked with fulfilling orders placed by U.S. customers and retailers," including for the sale of the "accused products" in this case. Doc. 338 ¶ 4. In its February 28, 2022 response to Amimon's interrogatories, Hollyland identified Wu and Hollyland Vice President Vincent Ma as the only two individuals that were "involved in the design, development, marketing and manufacturer [sic] of each of the accused products." *Id.* ¶ 1.

On March 16, 2023, Amimon served Hollyland with a Rule 30(b)(1) deposition notice for Andrew Wu. *Id.* ¶ 5. Hollyland's counsel accepted the notice. Doc. 338 at 1. Amended notices were served on March 29 and April 3, 2023, to accommodate Wu's availability, and "the parties negotiated rescheduling of the deposition" to occur at the end of April 2023. *Id.* ¶ 5. For reasons not provided on the record, the April 2023 deposition did not take place. On August 11, 2023, Amimon provided another notice of deposition, in which it referred to Wu as Hollyland's "party-witness." Doc. 346 ¶ 1. In a September 13 email, Amimon confirmed Wu's deposition would take place on October 25, 2023. *Id.* ¶ 2.

However, after meeting and conferring on September 27, October 5, and October 23, 2023, the parties failed to come to an agreement as to where Wu's deposition—as well as other noticed depositions—should take place. *See* Doc. 261. On October 25, 2023, Amimon filed a letter requesting that the Court require "that all depositions of party witnesses and Rule 30(b)(6) depositions of parties" take place in New York City. *Id.* at 1. In that letter, Amimon argued why, despite "Hollyland's corporate designee (Vincent Ma) and US Sales representative (Andrew Wu)" being typically located in China, Amimon noticed their depositions to be conducted in New York. *Id.* at 2. Defendants filed a letter "in opposition to [Amimon's] request that all depositions occur in New York" on October 26. Doc. 263. The Court held a conference on November 16, 2023, in which it ordered that "the depositions be conducted in California and that those depositions take place as soon as reasonably possible upon discussion amongst attorneys as to when the witnesses may be available." Doc. 275 at 9:16–20. Upon the parties' request, the Court added that the depositions should be completed by the "middle of February." *Id.* at 47:7–16.

On December 18, 2023, Amimon issued a new notice of deposition for Wu to be deposed on January 26, 2024.  Doc. 346 ¶ 4.  On December 21, 2023, Hollyland responded:

> Karl, please amend your Deposition Notice for Andrew [Wu].  He is not a party witness.  He is a non-party witness. . . . Additionally, based on Andrew's work schedule, he needs to be deposed on January 24, 2023.  Vincent Ma will follow on 25 and 26. . . . Let's meet and confer regarding the discovery schedule on Friday 4:30pm.(12/22/23).  Unless you have accepted Defendants terms for the schedule.

*Id.* ¶ 5.  On December 22, Amimon responded that they could meet-and-confer that same day.

*Id.* at ¶ 6.  In that email, Amimon also stated that there may be an opportunity for settlement, and it suggested rescheduling all fact witness depositions for March 2024 to allow for settlement discussions.  *Id.*[6]

On February 26, 2024, Amimon communicated with Hollyland to request dates for Hollyland's 30(b)(6) deposition, as well as Wu and Ma's depositions.  Doc. 338 ¶ 8.  On March 8, Hollyland responded that Wu and Ma would be in the United States between April 13 and 17 for a trade show, and thus available for depositions around those dates.  *Id.* ¶ 9.  In a March 11 email to Amimon, Hollyland confirmed that Wu and Ma could be deposed on April 20 and April 21, 2024, in Los Angeles, noting "Hollyland and Andrew Wu are confirmed.  Andrew [Wu] will be Saturday and Vincent [Ma] will be Sunday."  Doc. 348-1.  However, Hollyland emailed again the following day, March 12, writing:

> Karl, the dates for depositions of Hollyland must be altered.  The date for Andrew Wu is April 11, 2024 in NYC.  The Date for Vincent Ma is May 1, 2024 in L.A..  The alteration of the dates is based upon a change of schedule involving our client.  This change is being made less than 24 from the prior confirmation.  Please advise.of your availability.

---

[6] The record does not explicitly state whether Hollyland assented to Amimon's suggestion.  Hollyland states only that "Plaintiff's counsel cancelled the depositions which had been scheduled by the parties in January[.]"  Doc. 346 at 14.

*Id.*  Amimon responded on March 13 that it was not available to depose Wu on April 11.  Doc. 346 ¶ 10.

Also on March 13, 2024, Wu informed Hollyland's counsel that he wished to hire his own counsel.  *Id.* ¶ 11; Doc. 347 ¶ 3.  On March 14, Hollyland emailed Amimon that Wu would be "available April 10 in New York," and added, "Again Andrew is not a party witness as he is an employee of Hollyland and not an officer."  Doc. 332-4.  Amimon responded that same day, "April 10 will not work on our end.  Please provide an alternate date."  *Id.*  On March 15, Hollyland responded:

> Karl, we provided the Plaintiffs with several dates of availability for Mr. Wu,, and Plaintiffs stated that none of the dates were good for Plaintiffs.  We remind you that Andrew is not a party or officer to the instant lawsuit.  He is a Chinese Citizen.  Based upon Plaintiffs unavailability on the dates proffered by Defendants, Rule 45 is applicable.

*Id.*

On March 16, Amimon responded to Hollyland that its "unilateral cancellation of the confirmed April 20, 2024 deposition, followed by its refusal to provide alternative dates and disregard for its course of conduct related to Mr. Wu's deposition, was exemplary of bad faith and in direct contradiction of the Court's order that Hollyland present Mr. Wu for deposition in-person in California."  Doc. 338 ¶ 13.  On April 1, Amimon again wrote to Hollyland, informing it of its plan to move forward with Wu's deposition on April 20, 2024, in accordance with its last amended notice of deposition.  *Id.* ¶ 14.  On April 7, Hollyland wrote to Amimon:

> With respect to the deposition of Mr. Wu, you have been continually advised that after Defendants offered Mr. Wu on several occasions and Plaintiffs continually backed out of conducting his deposition, that Mr.Wu is not a party witness that he is a citizen of China and is not in the United States.  To schedule a deposition knowing full well the above facts you schedule it at your own expense and peril.  Rule 45 became applicable after your failure to depose Mr. Wu when Defendants made him available.

Doc. 346 ¶ 16.  On April 9, Amimon doubled down, stating:

> We have properly noticed the deposition [of Mr. Wu], which Notice was accepted by counsel and confirmed for April 20, 2024 in Los Angeles. That defense counsel unilaterally cancelled the deposition thereafter without providing any alternative dates (in a transparent effort to obfuscate Amimon's ability to obtain testimony of Mr. Wu) offers no refuge from the fact that the Notice was properly served and accepted by counsel. If an alternative date/time is provided, we will amend the deposition notice. Otherwise, we will document Mr. Wu's failure to appear for the deposition as noticed.

Doc. 338 ¶ 15 (alteration in original).

At an April 12 meet-and-confer, Hollyland argued that "its prior acceptance of the deposition notice and confirmation of the April 20, 2024 deposition should be disregarded because it considers Mr. Wu a non-party witness who should be served under Rule 45." *Id.* ¶ 16. Amimon responded that Wu was a managing agent and thus subject to a Rule 30(b)(1) deposition,[7] and in any event, the Court's November 16, 2023 Order required Wu to appear for a deposition in California. *Id.* Amimon also "warned that if Hollyland intended to maintain its refusal to produce Mr. Wu for deposition, it had the option to request a protective order from the Court, but absent a protective order, Hollyland would risk potential sanctions for failing to appear" on April 20. *Id.*

On April 13, Hollyland again refused to agree to present Wu on April 20, absent a Rule 45 subpoena. Doc. 346 ¶ 18. In an April 15 email, Amimon again warned Hollyland that it was incurring fees and costs in preparation for the April 20 deposition, given Hollyland had not provided alternative dates for the deposition nor sought a protective order. Doc. 338 ¶ 17. Amimon stated it was giving Hollyland "ample opportunity to avoid sanctions," and reiterated that Hollyland's counsel had accepted multiple amended deposition notices for Wu over the course of the preceding year. *Id.*

---

[7] Under Rule 30(b)(1), a party's "managing agent" can be deposed upon written notice, as opposed to a subpoena. *See United States v. Afram Lines (USA), Ltd.*, 159 F.R.D. 408, 413 (S.D.N.Y. 1994).

Although Wu was in the United States on April 20, 2024, he did not attend the noticed deposition. *Id.* ¶ 19. Amimon and its court reporter appeared as they planned, and the court reporter provided an *Affidavit Re Nonappearance* to certify Wu's absence. Doc. 338 ¶¶ 18–19.

## II.    MOTION TO COMPEL

Defendants move to compel Amimon to (1) produce its Source Code and its full copyrighted work, (2) produce its Encryption Key, (3) "immediately identify with reasonable particularity the trade secrets it claims were misappropriated by the defendants," identify "the details of all trade secrets and confidential information alleged to have been misappropriated," and identify "all documents and things which relate or contain the Plaintiffs' source code and other software which the Plaintiffs has asserted as it's [sic] trade secrets," and (4) produce a printout from an October 30, 2023 discovery inspection (the "Printout"). Doc. 300 at 21–22. Defendants additionally request the Court authorize them to "reverse engineer Plaintiffs' trade secret; or be precluded from asserting any trade secrets [Amimon] has failed to sufficiently disclose . . . and/or preclude all copyright claims wherein the entire copy of the work under copyright protection is not disclosed." *Id.* at 22.

### A.  Legal Standards

Federal district courts have broad discretion in deciding motions to compel. *See Grand Central Partnership, Inc. v. Cuomo*, 166 F.3d 473, 488 (2d Cir. 1999). The scope of discovery is generally limited to any "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "The

party resisting discovery bears the burden of showing why discovery should be denied." *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009).

Under Rule 37(a)(1), "a party may move for an order compelling disclosure or discovery," and the movant must include with his motion to compel "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make . . . discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). One may move to compel a discovery response if a party "fails to answer an interrogatory submitted under Rule 33," or "fails to produce documents or . . . fails to permit inspection . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iii), (iv).

Defendants nowhere mention Rule 26 in their moving brief, and they mention Rule 37 only once, to argue that "[t]he Plaintiffs purposeful refusal to provide defense counsel with exculpatory material is sanctionable pursuant to Rule 37 and has extended the expense and costs of this litigation." Doc. 300 at 7. Rule 26 is referenced for the first time in their reply, and only briefly. *See* Doc. 314 at 1, 2. The Court agrees with Amimon that Defendants' motion is governed by Rule 37.

The Court is additionally guided by its explicit instruction to Defendants, in the November 16, 2023 conference, that they could file a motion to compel only if "based on specific requests where plaintiffs determined that they would not turn over the materials, that the materials exist and that, for whatever reason, they have determined that it should not be turned over." Doc. 275 at 47:3–6. Defendants have not heeded this instruction on a number of their requests.

### B. Discussion

#### 1. *The Source Code*

In their moving papers, Defendants represent to the Court that Amimon has failed to produce its Source Code, stating that "[o]nly the binary code (object code) has been produced by the Plaintiffs in Discovery. The Source Code is not produced even though there is a Protective Order in place." Doc. 300 at 14. Amimon makes clear in its opposition that it "produced (at least four months ago) the exact materials . . . which Defendants now seek to compel by way of their Motion." Doc. 309 at 6. Specifically, on December 13, 2023, Amimon produced to Defendants 98 percent of its "copyrighted source code Version: 4_x_24_9_Build 1057, with only very limited redactions of highly sensitive lines of code." *Id.* at 3, 6; Doc. 333 at 6:16–17. Astonishingly, Defendants struggle to admit that they received the Source Code even in response to Amimon's explicit statements otherwise. In their reply, they attempt to pivot, simply restating their argument with an added caveat: "Plaintiffs have failed to produce the Source Code *in it's* [sic] *entirety*." Doc. 314 at 2 (emphasis added). Defendants flagrantly fail to show that Amimon "determined that they would not turn over" the Source Code in response to Defendants' "specific requests," as required by this Court in the November 16, 2023 conference, Doc. 275 at 47:3–6, and by Rule 37(a)(3)(B). If Defendants' evasiveness were not enough, Defendants apparently did not inspect the Source Code until May 16, 2024, after briefing on this motion was fully complete. Doc. 322 ¶ 7.[8] The Court is persuaded that Defendants "have all the tools that they

---

[8] Amimon discussed the timing of the May 16 inspection in a letter filed with the Court on May 20, 2024, in which Amimon opposed Defendants' request for an extension of fact discovery. Doc. 322. Amimon additionally mentioned at the June 6, 2024 conference that Defendants inspected the materials produced on December 13, 2023 on May 16, 2024, and Defendants did not contest that fact. *See* Doc. 333 at 7:4.

need" to mount a defense, Doc. 333 at 11:15, and it finds no basis for compelling the production of any additional Source Code or Amimon's "full copyrighted work."  Doc. 314 at 7.

    *2.  The Key*

Defendants additionally argue that they need Amimon's Encryption Key as they "cannot read or understand the binary code."  Doc. 300 at 14.  The Court declines to compel discovery of the Encryption Key.

To date, "Defendants have failed to direct the Court to any formal discovery request seeking production of Amimon's Key," having only informally requested it.  Doc. 309 at 7, 8.  Defendants' request therefore ignores the Court's specific instructions that they file a motion to compel only if "based on specific requests where plaintiffs determined that they would not turn over the materials . . . ."  Doc. 275 at 47:3–6.  Defendants' request fails to pass muster under Rule 37 for the same reason:  they do not show that Amimon has failed "to produce documents" or "permit inspection" of materials requested under Rule 34.  Fed. R. Civ. P. 37(a)(3)(B)(iv).

Moreover, Defendants' statement that "Plaintiffs have encrypted their binary [code] so that it cannot be accessed or viewed without the key" ignores that Amimon produced the binaries from its own Source Code as well as the binary files from Hollyland products in decrypted form.  Docs. 300 at 14, 309 at 7.  Defendants' purported suspicions that Amimon might tamper with or alter the binaries it produces are merely conclusory.  *See* Doc. 300 at 20–21.  In any event, to allay any concerns, Amimon suggests that it could again "perform[] the collection, decryption, and comparison of its own binary file against the binary file taken from the Hollyland MOMA product in front of an independent notary" as it did in the Beijing litigation.  Doc. 309 at 7, 8.  And there is no indication that Amimon would be unable to similarly decrypt the binaries of third-party manufacturers, which Defendants claim they need to analyze in order to show "that if

independant [sic] third parties are using the same software as Defendants, then it was not created by Defendants as Plaintiffs accused." Doc. 314 at 5. The Court declines to compel Amimon to produce its Encryption Key.

### 3. The Trade Secrets

Defendants accuse Amimon of failing to identify the purported trade secrets with "sufficient particularity," as required by law. Doc. 300 at 9. Accordingly, Defendants move to compel Amimon to "immediately identify with reasonable particularity the trade secrets it claims were misappropriated by the defendants," identify "the details of all trade secrets and confidential information alleged to have been misappropriated," and identify "all documents and things which relate or contain the Plaintiffs' source code and other software which the Plaintiffs has asserted as it's [sic] trade secrets." Doc. 300 at 21–22. Defendants additionally request the Court authorize them to reverse engineer Plaintiffs' trade secrets, or preclude Amimon from asserting any trade secrets it has failed to sufficiently disclose, or preclude all copyright claims wherein the entire copy of the work under copyright protection is not disclosed. Id.

Defendants point to various of Amimon's statements and argue that Amimon's "description of the trade secret varies on the record throughout this litigation," and therefore argue that Amimon "attempts to shift the goal post." Doc. 300 at 9, 11. Amimon responds that in February 2022, it timely responded to Defendants' Interrogatory No. 1, which requested that Amimon specifically identify the trade secrets and all allegedly misappropriated information. Doc. 309 at 6. Amimon responded:

> Plaintiffs state that the trade secrets and confidential or proprietary information Defendants misappropriated include Plaintiffs' source code Version: 4_x_24_9_Build 1057 which is registered with the United States Copyright Office at Registration No. TX0008882781, any binary created therefrom, or any derivative thereto.

23

*Id.* The Court is satisfied that Amimon's response to Defendants' Interrogatory No. 1 adequately identifies its trade secrets for the purposes of this motion to compel.

Defendants additionally argue that "Plaintiffs imply that the trade secret is the source of an endless number of derivative works," and therefore Defendants do not have notice of what they have allegedly infringed. Doc. 300 at 10. However, Defendants recognize that the Source Code serves as "the *building block*" for new iterations of software, with "an unlimited number of binaries [that] can be generated from the same source code." *Id.* (emphasis added); Doc. 314 at 4. Therefore, Defendants cannot reasonably expect Amimon to specifically predict the myriad ways Defendants may have modified the allegedly misappropriated source code in order to meet the "sufficient particularity" standard.

Further, in addition to adequately answering Defendants' Interrogatory No. 1, Amimon has produced to Defendants 98 percent of Amimon's Source Code as well as binaries from that Source Code, as just discussed. Amimon additionally produced Defendants' own binary files back to them so Defendants could compare their own binary output against Amimon's. *See* Doc. 275 at 37:18–22. Specifically, Amimon made available for inspection "Plaintiffs' trade secret binary file created from Plaintiffs' source code Version: 4_x_24_9_Build 1057, as well as binary files from exemplary Accused Products manufactured by Hollyland." *Id.* at 1–2. Amimon states:

> The materials made available for inspection were the same materials analyzed to determine that the Hollyland-manufactured products containing Amimon Chipsets contain binary files showing the hallmark signs of being derived from Plaintiffs' source code Version: 4_x_24_9_Build 1057, but notably exhibit differences which underscore the binary files are derivative source code which has been modified and manipulated.

*Id.* At this stage, Defendants clearly have sufficient notice of what Amimon claims Defendants infringed—particularly in light of the protracted discovery disputes that have hampered progress

in this case, as well as Defendants' apparent failure to even review the Source Code produced to them before filing this motion. *See InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 662 (9th Cir. 2020) ("[D]iscovery provides an iterative process where requests between parties lead to a refined and sufficiently particularized trade secret identification.").

The Court thus does not compel Amimon to produce additional "details of all trade secrets and confidential information alleged to have been misappropriated," and "all documents and things which relate or contain the Plaintiffs' source code and other software which the Plaintiffs has asserted as it's [sic] trade secrets." Doc. 300 at 21–22. The Court also declines to authorize the Defendants to reverse engineer Amimon's trade secret, or preclude Amimon from asserting any trade secrets it has failed to sufficiently disclose, or preclude all copyright claims wherein the entire copy of the work under copyright protection is not disclosed, as these appear to be premised on Defendants not possessing the information they now admit they have. *Id.*

### 4. *The Printout*

Finally, Defendants request that the Court compel Amimon to produce a "printout from the October 30, 2023, Discovery inspection." *Id.* at 22. In particular, Defendants argue:

> Plaintiffs' attorneys stated that once the Protective Order was in place the MAC Source Code would be revealed. On October 30, 2023, Defendants['] Coun[sel] and Jennifer Lansden went to the Plaintiffs' attorney's office pursuant to the Protective Order. Plaintiffs failed to provide the Source Code and/or a Decryption Key.

*Id.* at 7. Amimon responds:

> Amimon produced a password protected .pdf of the printout on December 7, 2023, alongside the explicit instruction that the password to access the .pdf would follow under separate cover upon written confirmation from Defendants that the file would only be **viewed and accessed** by outside counsel and expert Jennifer Lansden, which representation Defendants have refused to provide. Amimon merely requires the requested confirmation from Defendants to transmit the password.

Doc. 309 at 4 (emphasis in original). Defendants reply that Amimon is attempting to add additional conditions to the Protective Order between the parties that was so ordered by this Court, and "Plaintiffs know only signatories of the Protective Order can view confidential or highly confidential source code materials." Doc. 314 at 6.

Here, as an initial matter, Defendants have heeded the Court's instruction that in moving to compel, they point to "specific requests where plaintiffs determined that they would not turn over the materials, that the materials exist and that, for whatever reason, they have determined that it should not be turned over." Doc. 275 at 47:3–6.

As to the merits of the request, the Court agrees with Defendants that they are not legally required to provide written confirmation as to who they will show the Printout to, in addition to complying with the Protective Order. The Protective Order clearly provides that a producing party may designate Protected Materials as "Confidential," "Highly Confidential – Outside Counsel's Eyes Only," or "Highly Confidential Source Code – Outside Counsel's Eyes Only," and that "Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order," as subsequently detailed for each designation. Doc. 231-1 §§ 2.12, 7.1–7.4. The Protective Order additionally provides the procedures by which the parties may challenge confidentiality designations.

Given Defendants are already legally required to comply with the Protective Order, and that the designation presumably assigned to the document limits review only by outside counsel and experts, Amimon is not entitled to withhold Protected Materials from Defendants on the sole basis that they have declined to provide additional written confirmation that they will do so. Amimon is also not entitled to unilaterally impose additional restrictions on Protected Materials beyond those provided for in the Protective Order.

26

The Court orders Amimon to produce the requested printout to Defendants without additional password protection, or to provide Defendants the password.  Amimon may designate the printout as Protected Material to the extent permitted by the Protective Order; Defendants are required to comply with the respective viewing restrictions, and they are permitted to challenge the designation, as the Protective Order provides.  However, based on the current record and Defendants' scant arguments in support of the imposition of sanctions,[9] the Court declines to sanction Amimon for the fact that it has not produced the Printout to date.

## III.    MOTION FOR SPOLIATION SANCTIONS

### A.  Legal Standards

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  The court's authority to impose sanctions for spoliation comes from the Federal Rules of Civil Procedure and the court's inherent powers.  *Port Authority Police Asian Jade Society of N.Y. & N.J. Inc. v. Port Authority of N.Y. & N.J.*, 601 F. Supp. 2d 566, 569 (S.D.N.Y. 2009) (citing *West*, 167 F.3d at 779). "Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses and for the spoliation of evidence." *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (internal citation omitted); *see also Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) ("The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial

---

[9] Defendants make only two, brief arguments that sanctions would be warranted:  (i) "The Plaintiffs [sic] purposeful refusal to provide defense counsel with exculpatory material is sanctionable pursuant to Rule 37 and has extended the expense and costs of this litigation," Doc. 300 at 7; and (ii) "It is Plaintiffs that should be sanctioned for failure to comply with Fed. R. Civ. P. 37,"  Doc. 314 at 3.

judge, and is assessed on a case-by-case basis."); *Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees & Restaurant Employees Int'l Union*, 212 F.R.D. 178, 219 (S.D.N.Y. 2003) ("There are no specific requirements for the imposition of sanctions under Rule 37; rather, the decision is left to the sound discretion of the trial court.").

An adverse inference instruction is "an extreme sanction and should not be given lightly." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) ("*Zubulake IV*"). A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Chin v. Port Authority*, 685 F.3d 135, 162 (2d Cir. 2012) (citing *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

Regarding the first prong, in *Kronisch v. United States*, the Second Circuit established that a party's obligation to preserve evidence arises when it has notice that the evidence is relevant to litigation. 150 F.3d 112, 126 (2d Cir. 1998). Notice occurs "most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." *Id.*

Once a party's obligation to preserve evidence has been established, the court must evaluate the second prong, the "culpable state of mind" of the party against whom the adverse inference is sought. Spoliation sanctions are not limited to cases where the evidence was destroyed willfully or in bad faith, but may also be imposed when a party negligently loses or

destroys evidence. *Adorno v. Port Authority*, 258 F.R.D. 217, 227 (S.D.N.Y. 2009) (citing *Zubulake IV*, 220 F.R.D. at 220); *see also Glover v. Costco Wholesale Corp.*, 153 F. App'x 774, 776 (2d Cir. 2005) (summary order) (noting that the culpability requirement is satisfied by a showing that the evidence was destroyed either knowingly or negligently).

Under the framework set forth by the Second Circuit, the showing of relevance required to satisfy the third prong depends on the nature of the opposing party's culpability. If evidence is found to have been destroyed in bad faith, that alone is sufficient circumstantial evidence from which a reasonable trier of fact could conclude that the missing evidence was unfavorable to the party against whom sanctions are sought. *Residential Funding Corp.*, 306 F.3d at 109. Similarly, in certain circumstances, a showing of gross negligence will support the same inference. *Orbit One Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 439 (S.D.N.Y. 2010).

In the absence of bad faith or gross negligence, the court cannot infer that the evidence would have been harmful to the party accused of spoliation. *Id.* (citing *Zubulake IV*, 220 F.R.D. at 221). When the evidence is found to have been destroyed through ordinary negligence, the party seeking sanctions must instead prove through the introduction of extrinsic evidence that the evidence in question was relevant. *See Usavage v. Port Authority*, 932 F. Supp. 2d 575, 590 (S.D.N.Y. 2013); *Adorno*, 258 F.R.D. at 229. In the context of a request for an adverse inference instruction, the concept of "relevance" encompasses not only the ordinary meaning of the term, but also that the destroyed evidence would have been favorable to the movant. *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004) ("*Zubulake V*").

Under Rule 37(e), "[i]f electronically stored information [("ESI")] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it," the ESI "cannot be restored or replaced through additional

discovery," and either "the party acted with the intent to deprive another party of the information's use in the litigation," or the Court finds "prejudice to another party from loss of the information," the Court may impose sanctions on the violating party.  Fed. R. Civ. P. 37(e), 37(e)(1)–(2).  To prove a violation of Rule 37(e), the moving party must first show that the nonmoving "party failed to take 'reasonable steps' to preserve [ESI] 'that should have been preserved in the anticipation or conduct of litigation.'"  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 494 (S.D.N.Y. 2022) (alteration in original) (quoting Fed. R. Civ. P. 37(e)).  Next, the moving party must show that the lost evidence cannot "be restored or replaced through additional discovery."  Fed. R. Civ. P. 37(e).  Then, the moving party can show "prejudice to another party from loss of the information," or that "the party acted with the intent to deprive another party of the information's use in the litigation."  Fed. R. Civ. P. 37(e)(1), (2).  If an "intent to deprive" is found, the moving party need not show prejudice, because "[s]ubdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information."  Fed. R. Civ. P. 37(e) Advisory Committee's Note to 2015 Amendment.

In the instant case, Hollyland does not dispute that it destroyed the Spoliated Materials and Amimon Chipsets while this litigation was already pending (first prong).  Instead, Hollyland argues that it lacked a "culpable state of mind" in destroying them (second prong), and that "the [S]poliated [M]aterials are relevant only to the Defendants," not to Amimon (third prong).  Doc. 344 at 5.

### B. Discussion

### 1. *Applicability of Rule 37(e) to the Spoliated Materials*

Hollyland argues against the imposition of sanctions, in part on the bases that it did not destroy the electronic Spoliated Materials with an "intent to deprive" Amimon of evidence, and the spoliation did not prejudice Amimon, either of which must be satisfied under Rule 37(e).

However, the Court agrees with Amimon that Rule 37(e), which typically applies to spoliation of electronically stored information ("ESI"), does not apply in the instant case given 37(e) governs only "situations where 'a party failed to take reasonable steps to preserve' electronically stored information; not to situations where, as here, a party intentionally deleted the Spoliated Materials[.]"  Doc. 349 at 5 (quoting *Hsueh v. New York State Dep't of Financial Services*, No. 15 Civ. 3401 (PAC), 2017 WL 1194706, at *3–4 (S.D.N.Y. Mar. 31, 2017)).  The Committee Notes to the 2015 Amendment to Rule 37 explain that Rule 37(e) "applies only if the information was lost because the party failed to take reasonable steps to preserve the information."  Fed. R. Civ. P. 37(e) Advisory Committee's Note to 2015 Amendment.  This is because Rule 37(e) was designed to address the unique "continued exponential growth" in ESI, and the resultant "excessive effort and money" that litigants must expend on preservation "in order to avoid the risk of severe sanctions if a court finds they did not do enough."  *Id.  See also Hsueh*, 2017 WL 1194706, at *4; *Cat3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 495 (S.D.N.Y. 2016).

Here, where Hollyland concedes it deleted the Spoliated Materials, the electronic information was indisputably not "lost" based on a failure to adequately preserve ESI.  Accordingly, Rule 37(e) does not apply, and the Court will exercise its inherent authority to control litigation in imposing sanctions for spoliation.  *West*, 167 F.3d at 779.

2.  *State of Mind and Relevance*

As discussed earlier, only Hollyland's state of mind and the relevance of the destroyed evidence to Amimon are at issue in the instant motion for spoliation sanctions.  This motion presents an unusual posture, whereby Hollyland admits it purposefully destroyed the evidence during the pendency of this litigation, yet it disclaims culpability on the basis that Amimon previously requested that the Beijing IPC order the destruction of MAC software or products containing that software.

The Court is unconvinced by Hollyland's argument that it lacked the culpable state of mind required for spoliation because it was acting "at the behest" of Amimon.  Doc. 344 at 5, 13.  Although Amimon had included the destruction of "unauthorized MAC software pre-installed in [Hollyland's] inventory of . . . products" *or* of the "products pre-installed with unauthorized MAC software" as a proposed form of relief in its June 2019 pleading in the Beijing proceeding, the Beijing IPC explicitly declined to order any such destruction in its December 2021 judgment against Hollyland.[10]  Doc. 336 at 2 and n.2.  Therefore, as a threshold matter, Amimon cannot be estopped from arguing that Hollyland improperly destroyed the evidence because the "judicial acceptance" prong of judicial estoppel is not met.[11]  *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 170 (2010) (the doctrine of judicial estoppel applies where a "party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the

---

[10] Hollyland misleadingly states that "[t]he decision of the Beijing Intellectual Property Court included Plaintiffs' language in the Court's judgement."  Doc. 344 at 9.  The Beijing IPC discussed Amimon's request for the destruction of hardware *only* in describing Amimon's complaint.  *See* Doc. 345-4.  It never incorporated Amimon's request into its final judgment, in fact explaining that destruction was unnecessary given "the responsibility to stop the rancidity [was] sufficient to protect [Amimon's rights]."  Docs. 336 at 2, 336-1 at 9.

[11] Given judicial estoppel is inapplicable here, the Court makes no determination as to whether judicial estoppel could extend to the Beijing IPC ruling based on international comity, as Hollyland argues.  *See* Doc. 344 at 16–17.

second court was misled").  Moreover, there was never an actual request from Amimon to

Hollyland to destroy any evidence, much less a judicial order, for Hollyland to reasonably claim

"reliance" on or "compliance" with.  Doc. 344 at 10, 18.  *Cf. Int'l Business Machines Corp. v.*

*BGC Partners, Inc.*, No. 10 Civ. 128 (PAC), 2013 WL 1775373, at *2 (S.D.N.Y. Apr. 25, 2013).

　　　Hollyland's claim that it was "merely abiding by the wishes of the Plaintiff," Doc. 344 at

14, is further brought into question by Hollyland's broader reaction to the Beijing IPC's

judgment, which it appealed.  Amimon asserts that Hollyland "could not be bothered to comply

with the remainder of Amimon's requested relief (notably ordered by the Beijing IPC as part of

its Judgment)" pending appeal.  Doc. 336 at 17.  Hollyland does not contest this, other than in

noting that "Defendants have ceased to produce or sell the alleged infringing products for years

as early as 2021."  Doc. 344 at 2.  Additionally, Amimon explains that Hollyland's destruction of

evidence likely flouted a requirement in China that evidence be preserved during appeal.  Doc.

336 at 13 n.4.  Hollyland provides no explanation whatsoever for why it would have chosen not

to comply with Amimon's other "wishes," nor why it would have engaged in activity that is

"almost certainly fatal" to its own appeal.  *Id.*

　　　The Court finds similarly dubious Hollyland's claim that it destroyed evidence based on

advice from its counsel in China.  In what Amimon characterizes as "unreasonable and factually

unsupportable" guidance, Hollyland's Chinese counsel allegedly advised Hollyland to destroy

the evidence.[12]  Doc. 349 at 9 and n.9.  Hollyland admits that its Chinese counsel provided

---

[12] Hollyland submitted a declaration by Chinese counsel, which provides:  "In this case, the plaintiff, Amimon LLC, has requested that the court require the defendant to immediately destroy all items related to the plaintiff's MAC source code . . . . In order to enforce the court's order, I recommend that my client fully comply with this order, destroying any elements that enable my client to engage in any alleged infringing activities."  Amimon notes the declaration is inadmissible as it "does not conform with the requirements of 28 U.S.C. 1746" because it does not state "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America

advice based in part on its "interpretation" of the Beijing IPC's judgment.  Doc. 344 at 18.  As already established, that judgment did not adopt Amimon's request, which itself applied only to "chipsets pre-installed with unauthorized MAC firmware" and was "wholly unrelated to the Spoliated Materials."  Doc. 349 at 8.  Hollyland even concedes that the judgment merely "*did not prohibit* the destruction of firmware, components development kits etc. as requested by the Plaintiffs."  Doc. 344 at 13 (emphasis added).  Hollyland's claim that it relied in good faith on evidently unsound advice from Chinese counsel strains credulity.  *See Mule v. 3-D Building and Construction Management Corp.*, No. 18 Civ. 1997 (JS) (AKT), 2021 WL 2788432, at *11 (E.D.N.Y. July 2, 2021) (citation omitted) ("Of course, a court is not required to credit explanations for the loss of the relevant evidence that it finds incredible.").

Worse yet, Hollyland nowhere purports to have acquired, or even sought, the advice of U.S. counsel as to its preservation responsibilities in *this litigation*.  Such lack of diligence is even more damning based on the timing of Hollyland's destruction—in "January or early February 2022," "at the same moment in time it [was] being asked to produce [those materials] in this litigation."  Doc. 336 at 2, 5; *see* 344 ¶ 6; *see also In re Gorsoan Ltd.*, No. 17 Civ. 5912 (RJS), 2020 WL 3172777, at *8 (S.D.N.Y. June 15, 2020) (inferring bad faith in part because of the destruction's timing).  Therefore, even taking Hollyland at its word that it relied in good faith on the advice of its Chinese counsel, its gross disregard of its evidence preservation obligations in the U.S., combined with the timing of its destruction, strongly indicates a highly culpable mental state.  *See Henkel Corp. v. Polyglass USA, Inc.*, 194 F.R.D. 454, 457 (E.D.N.Y. 2000) (citation omitted) ("[P]laintiff's failure properly to notify [Defendant as to the removal of

---

that the foregoing is true and correct. Executed on (date). (Signature)."  Doc. 349 at 9 n.8.  Moreover, Amimon argues the advice from Chinese counsel is "unreasonable and factually unsupportable" based on the language of the Beijing IPC's order, which expressly declined to order destruction of the materials.  *Id.* at 9 and n.9.

evidence] is troubling, and this Court finds plaintiff highly culpable for the destruction of the relevant evidence."); *Shaffer v. RWP Grp., Inc.*, 169 F.R.D. 19, 26 (E.D.N.Y. 1996) ("[T]he Court concludes that, while the defendants' conduct may not have risen to the level of bad faith, it nevertheless demonstrated a conscious and reckless disregard for their discovery obligations."). Further, the Court agrees with Amimon that Hollyland's failure to disclose its purportedly righteous destruction "despite Amimon's multiple attempts to discover such information over the course of 28-months of fact discovery" is particularly telling and supports a finding that Hollyland's "intent was not compliance, but concealment and deprivation." Doc. 349 at 9; *see In re Gorsoan Ltd.*, 2020 WL 3172777, at *8 (relying on circumstantial evidence to find an individual spoliated evidence "intentionally and in bad faith").

For all these reasons, the Court finds Hollyland highly culpable of its willful destruction of both the Spoliated Evidence and the Amimon Chipsets. The Court is hesitant to attribute to Hollyland the highest degree of culpability, bad faith, given the Court is unable to definitively rule out as mitigating factors (i) that Amimon specifically requested in its Beijing pleading that some of the materials be destroyed and (ii) that Chinese counsel advised, however "unreasonabl[y]," Doc. 349 at 9 n.9, that some materials be destroyed. Still, Hollyland's persistent failure to disclose that it had destroyed evidence Amimon sought through discovery is egregious, especially in light of Amimon's explicit request that Hollyland specify in its discovery responses whether any "document requested was, but is no longer, in the possession, custody, or control of [Hollyland]" and "has been destroyed." Doc. 336 at 4. As such, the Court readily finds that Hollyland's spoliation was grossly negligent and sufficiently egregious to support an inference that the spoliated evidence "would have been of assistive relevance" to Amimon. *Orbit One Commc'ns, Inc.*, 271 F.R.D. at 439; *see also Binson v. Max Kahan, Inc.*, No. 12 Civ.

4871 (ER), 2014 WL 5089751, at *8 (S.D.N.Y. Sept. 30, 2014) ("As the Second Circuit made clear in *Residential Funding,* just as the intentional or grossly negligent destruction of evidence can support an inference that the evidence was harmful to the destroying party, so too can intentional or grossly negligent acts that hinder discovery.") (citing *Residential Funding*, 306 F. 3d at 110).

### 3. Relief

Amimon requests monetary sanctions and terminating sanctions, or in the alternative of terminating sanctions, that the Court adopt adverse inferences. Doc. 336 at 8. The Court finds monetary sanctions and an adverse inference instruction to be appropriate remedies in light of its findings.

First, the Court awards Amimon's monetary sanctions to fulfill "the remedial purpose of making [Amimon] whole for the costs he has incurred as a result of [Hollyland's] spoliation." *Taylor v. City of New York*, 293 F.R.D. 601, 616 (S.D.N.Y. 2013). Monetary sanctions are especially adequate here given Hollyland's intentional destruction of the materials Amimon requested through discovery was followed by an "28-month concealment of that destruction" which "resulted in a waste of judicial resources, substantially increased Amimon's costs of litigation, and delayed Amimon's evaluation of this case and resolution of its claims." Doc. 336 at 8; *see Abreu v. City of New York*, 208 F.R.D. 526, 529 (S.D.N.Y. 2002) ("The Court may consider the full record in the case in order to select the appropriate sanction."); *see also R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 52–53 (S.D.N.Y. 2010), *opinion adopted*, 271 F.R.D. 55 (S.D.N.Y. 2010) (internal quotation marks and citation omitted) ("Costs, including attorneys' fees, are appropriate when a defendant has unjustifiably destroyed evidence that it was under a duty to preserve, causing the plaintiff to expend time and effort in attempting to track down the

relevant information."). The Court will award Amimon reasonable attorney fees and costs in connection with its efforts to obtain the Spoliated Materials and Amimon Chipsets, to the extent not duplicative of the attorney fees and costs the Court awarded in its August 2024 opinion. *Amimon*, 2024 WL 3862147. The Court will also award Amimon reasonable attorney fees and costs in connection with briefing this motion.

Second, the Court's legal findings permit an adverse inference that the missing evidence would have been favorable to Amimon. Hollyland having conceded that it destroyed the Spoliated Materials and Amimon Chipsets during the pendency of this litigation, and Amimon having established that Hollyland did so with a culpable state of mind sufficient to infer the relevance of those materials, the Court will issue an adverse inference instruction. *See Chin*, 685 F.3d at 162. The Court declines, however, to adopt Amimon's proposed factual findings as part of its adverse inference instruction.[13] The Court will simply "allow the jury to draw an adverse inference against defendant after hearing evidence of the destruction of the documents." *Golia v. Leslie Fay Co.*, No. 01 Civ. 1111 (GEL), 2003 WL 21878788, at *11 (S.D.N.Y. Aug. 7, 2003)

---

[13] "Amimon requests this Court's adoption of adverse inferences, as follows:

• The Spoliated Materials prove Hollyland acquired Amimon's trade secret information through knowingly improper means;

• The Spoliated Materials prove Hollyland copied Amimon's copyrighted trade secret information without authorization to do so;

• The Spoliated Materials prove Hollyland used Amimon's trade secret information knowing it was acquired through improper means;

• The Spoliated Materials prove Hollyland's as a result of unauthorized copying of Amimon's trade secret information without authorization to do so, Hollyland used the copies to design, manufacture, and service products containing and/or derived from such the copyrighted trade secret information, with each product containing a stand-alone copy;

• The Spoliated Materials prove Hollyland knowingly used Amimon's trade secret information to design, manufacture, and service products containing and/or derived from such trade secret information;

• The Spoliated Materials prove Hollyland's use of Amimon's trade secret information was not authorized, and;

• The Chipset Quantity Materials prove Hollyland manufactured and sold 10,025 products incorporating Amimon's trade secret information acquired by Hollyland through improper means." Doc. 336 at 16–17.

(internal citation omitted) (explaining that this sanction "serv[es] the functions of placing the 'risk of an erroneous judgment on the party that wrongfully created the risk,' and 'restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence'").

The Court declines to impose termination sanctions. Outright dismissal is a "drastic remedy," which "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *West*, 167 F.3d at 779 (citation omitted). Given the Court did not find Hollyland's culpable mental state to be the most severe possible, it does not find the "most harsh" sanction, "entry of default judgment or dismissal (terminating sanctions)" to be warranted. *Regulatory Fundamentals Grp. LLC v. Governance Risk Mgmt. Compliance, LLC*, No. 13 Civ. 2493 (KBF), 2014 WL 3844796, at *15 (S.D.N.Y. Aug. 5, 2014).

### 4. Hollyland's Request

In its opposition, Hollyland adduces a terse, unsubstantiated request for sanctions against Amimon: "Plaintiffs' misconduct in gaming the system on an international stage should be sanctioned," and "Plaintiffs should be sanctioned for bringing a motion for spoilation after requesting the very destruction of Amimon components the motion is based on." Doc. 344 at 19.

In its July 25, 2024 opinion, the Court admonished Defendants that such "unwarranted and unsupported" requests for sanctions would result in sanctions against Defendants. *Amimon, Inc.*, 2024 WL 3534403, at *10. Because that opinion was published after Defendants filed their opposition to the instant motion for spoliation sanctions, the Court will not impose additional sanctions in this instance. However, the Court reminds Defendants that future such requests for sanctions will not be tolerated and will result in sanctions against Defendants.

## IV.    MOTION FOR SANCTIONS FOR NONAPPEARANCE AT DEPOSITION

Amimon moves for sanctions against Hollyland pursuant to Rule 37(b) and (d), on grounds that Hollyland failed to present its witness, Andrew Wu, at his scheduled deposition without good cause or substantial justification.  Doc. 338.

### A.  Legal Standard

District courts have "wide discretion in sanctioning a party for discovery abuses." *Reilly*, 181 F.3d at 267; *see also South New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 143 (2d Cir. 2010) (citation omitted) ("we review 'all aspects of a District Court's decision to impose sanctions for abuse of discretion'").  Rule 37(d) authorizes sanctions when "a party, or a party's officer, director or managing agent . . . fails, after being served with proper notice, to appear for that person's deposition."  Fed. R. Civ. P. 37(d)(1)(A)(i).  Rule 37(d)(3) also provides that available sanctions are set forth in Rule 37(b)(2).

Rule 37(b)(2) states that "if a party . . . fails to obey an order to provide or permit discovery," the court may impose various sanctions, including issuing an order "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[.]"  Fed. R. Civ. P. 37(b)(2)(A)(ii).

### B.  Discussion

At issue are the interrelated questions of (i) whether Wu was a "managing agent" who could be noticed for a deposition without a subpoena, (ii) whether Hollyland was responsible for Wu's appearance at a deposition, and (iii) how, if at all, Hollyland should be sanctioned for Wu's failure to appear.

#### 1.  Wu's Status as Managing Agent

A party seeking a deposition "may identify a specific officer, director, or managing agent to be deposed and notice that person under Rule 30(b)(1)."  *United States v. Afram Lines (USA),*

*Ltd.*, 159 F.R.D. 408, 413 (S.D.N.Y. 1994). The party seeking the deposition bears the burden of establishing "that there is at least a close question whether the proposed deponent is a managing agent" as opposed to a mere employee or agent who would need to be served with a Rule 45 subpoena. *Id.* "[T]his burden is 'modest' and any doubts are resolved in favor of the examining party." *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc*., 220 F.R.D. 235, 237 (S.D.N.Y. 2004) (citing *Dubai Islamic Bank v. Citibank, N.A.*, No. 99 Civ. 1930, 2002 WL 1159699 (RMB) (TH), *4 (S.D.N.Y. May 31, 2002)). Courts in this district generally consider five factors in determining whether a witness qualifies as a "managing agent" who can be noticed for a deposition under Rule 30(b)(1):

> (1) whether the individual is invested with general powers allowing him to exercise judgment and discretion in corporate matters; (2) whether the individual can be relied upon to give testimony, at his employer's request, in response to the demands of the examining party; (3) whether any person or persons are employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which the information is sought by the examination; (4) the general responsibilities of the individual respecting the matters involved in the litigation; and (5) whether the individual can be expected to identify with the interests of the corporation.

*Iron Mountain (Nederland) Data Centre Germany B.V. v. WSP USA Buildings, Inc.*, No. 23 Civ. 2858 (LGS) (JW), 2024 WL 2846607, at *1 (S.D.N.Y. May 30, 2024) (citation omitted). The test is not formulaic, but rather a "'fact-sensitive' and 'functional' test that is 'answered pragmatically on an ad hoc basis.'" *Id.* (quoting *Afram*, 159 F.R.D. at 413).

Considering these factors, the Court agrees with Amimon that Wu is best characterized as "a managing agent who Hollyland would be required to present for deposition pursuant to Rule 30(b)(1), and not merely a low level employee with limited responsibility and authority as Hollyland now contends." Doc. 338 at 10. First, Wu generally exercised judgment and discretion in corporate matters by overseeing U.S. sales, serving as a Hollyland representative in external communications, and executing documents on Hollyland's behalf. *See id.* at 7. Second,

40

the record reflects that Wu and Hollyland had at least a year's worth of a "history of cooperating" with one another in preparation for Wu's deposition, and thus Hollyland could rely on Wu to give testimony at its request. *Afram*, 159 F.R.D. at 415. Third, Hollyland provides no evidence for its claim that Wu had to "obtain permission from Vincent Ma, Vice President," before making certain final decisions, and in fact, "Mr. Ma testified that he is not Mr. Wu's direct supervisor." Doc. 348 at 8, 9. Therefore, there is no evidence that there was an employee with higher authority than Wu for his specific role. Fourth, as Director of Sales, and as Hollyland concedes in response to interrogatories, Wu was "involved in the design, development, marketing and manufacturer [sic] of each of the accused products." Doc. 338 ¶ 1. As such, Wu had "discretion specifically over matters at the crux of this litigation." *Iron Mountain*, 2024 WL 2846607, at *2. Fifth, as an employee of Hollyland, Wu "can be expected to identify with the interests of the corporation." *Id.* Amimon has more than met its modest burden of establishing "that there is at least a close question whether the proposed deponent is a managing agent." *Afram*, 159 F.R.D. at 413. Therefore, Wu did not need to be served with a subpoena pursuant to Rule 45 or the Hague Convention, and a notice of deposition pursuant to Rule 30(b)(1) was appropriate. *See Afram*, 159 F.R.D. at 413.

### 2. Hollyland's Responsibility for Wu's Nonappearance

Amimon argues that, "regardless of Mr. Wu's characterization under the Rules, Hollyland's conduct clearly establishes it accepted responsibility to present Mr. Wu for deposition." Doc. 338 at 10. Hollyland's counsel "accept[ed] responsibility for scheduling and presenting Mr. Wu for deposition" for a full year, including by accepting the deposition notices. *Id.* at 9; *see* Doc. 348 at 1. Therefore, Amimon argues it appropriately noticed Wu's deposition by serving the notice on Hollyland, and Hollyland can be sanctioned for Wu's nonappearance

under Rule 37(d).  Doc. 338 at 9–10 (citing *Bey v. City of New York*, No. 99 Civ. 3873 (LMM)

(RLE), 2007 WL 1771557, at *1 (S.D.N.Y. June 18, 2007) and *PrecisionFlow Tech. v. CVD*

*Equipment Corp.*, 198 F.R.D 33, 37–38 (N.D.N.Y. 2000), *aff'd*, 140 F. Supp. 2d 195 (N.D.N.Y.

2001)).

Hollyland counters that its counsel was not in an attorney-client relationship with Wu

and, in any event, Hollyland "rebutted the presumption of it's [sic] responsibility" for Wu's

appearance the moment it instructed Amimon to serve a subpoena on Wu directly.  Doc. 346 at

10–11 (citing to *PrecisionFlow*, 198 F.R.D at 37).

The Court again agrees with Amimon.  The record abounds with evidence that Hollyland

held itself out as responsible for presenting Wu at his deposition.  Whether a contractual

attorney-client relationship existed between Hollyland's counsel and Wu is of no moment, given

Amimon relied on Hollyland's representations of its apparent authority to produce Wu.  As the

Court told Hollyland's counsel in the June 5, 2024 conference:

> Either you could have said, from the very beginning:  Wu is an employee.  I represent
> Hollyland.  I don't represent Wu. You want to talk to Wu, you go find him.  But you didn't
> say that.  You said, okay, we will provide Mr. Wu on this date.  Okay.  We can't make it
> on this date.  Now they can't make it on this date.  Then I'll provide him on this date.  Then
> there comes a point where you say, look, you can go get him, but I don't represent him,
> and I don't know where you got that idea.

Doc. 333 at 30:16–24.  Moreover, the Court rejects Hollyland's argument that its March 15,

2024 request for a Rule 45 subpoena—in which it told Amimon that "[b]ased upon Plaintiffs

unavailability on the dates proffered by Defendants, Rule 45 is applicable," Doc. 332-4—

"rebutted" its responsibility.  Doc. 346 at 10–11 (citing to *PrecisionFlow*, 198 F.R.D at 37).

Hollyland relies on *PrecisionFlow*'s reference to *In re Keystone Foods, Inc.*, 134 B.R. 828

(Bankr. W.D. Pa. 1991), in which the court noted the accused party "could have avoided" the

responsibility for its witness's appearance at a deposition by "telling defendant to serve a

subpoena on the witness, or advising simply that the witness was not under counsel's control." (*PrecisionFlow*, 198 F.R.D at 37 (quoting *In re Keystone Foods, Inc.*, 134 B.R. at 829–30)). However, neither *PrecisionFlow* nor *In re Keystone Foods, Inc.* stand for the broad proposition that a party's counsel can simply invoke magic words requesting a Rule 45 subpoena for a witness, and *ipso facto* disclaim any responsibility for that witness's appearance. Here, Amimon relied on representations over the course of more than one year that Hollyland was responsible for Wu's appearance at the deposition, based on Hollyland's counsel's acceptance of deposition notices and engagement in scheduling efforts. Hollyland's sudden invocation of Rule 45—based on nothing more than scheduling challenges[14]—does not absolve Hollyland of its responsibility or otherwise "rebut" Amimon's reliance on it. Like in *PrecisionFlow*, the Court readily finds that Hollyland "assumed responsibility . . . for the appearance of its employee[] for [its] deposition[]" and "reasonably induced [Amimon] to rely on the sufficiency of the notices of deposition for the appearance[] of the employee[]." *PrecisionFlow*, 198 F.R.D. at 37. Therefore, Hollyland is responsible for Wu's nonappearance.

### 3. Relief

Having determined that Wu's deposition was properly noticed and Hollyland is responsible for Wu's nonappearance, the Court turns to the question of what relief should be granted. In determining the appropriate sanction, courts in this Circuit consider the following non-exclusive factors: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of

---

[14] Hollyland now alleges that its sudden request for a Rule 45 subpoena was based on "Andrew Wu's notification to [Hollyland's] attorneys that he opted to be represented by his own Chinese counsel." Doc. 346 at 8. However, the explanation that it provided to Amimon was that "Rule 45 became applicable after [Amimon's] failure to depose Mr. Wu when Defendants made him available." Doc. 346 ¶ 16.

noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *S.E.C. v. Setteducate*, 419 F. App'x 23, 24 (2d Cir. 2011) (summary order) (citation omitted).

Amimon requests that the Court (1) award Amimon its reasonable attorney fees and costs incurred in preparing for the deposition, preparing the submissions related to this motion, and attending any hearings related thereto, (2) prohibit Hollyland from "providing any testimony in support of this litigation (including rebuttal) related to sales of the Accused Products," (3) prohibit Andrew Wu from testifying orally or via declaration, including rebuttal, in support of this litigation, and (4) "treat[] factual disputes related to sales of the Accused Products as established in Amimon's favor." Doc. 338 at 12.

As an initial matter, Hollyland argues that it did not violate the Court's order, provided at the November 16, 2023 conference, that "the depositions be conducted in California," and that they be completed by the "middle of February." Doc. 275 at 9:16–17, 47:15. Hollyland incorrectly claims that the Court's order governed only the depositions of *parties*, not non-parties like Wu. Doc. 346 at 13. As Amimon notes, the Court's order as to "all depositions" clearly applied to Wu's since it had already been noticed, and because both parties explicitly included Wu's deposition in their letter submissions to the Court leading up to the November 16 conference. *See* Docs. 262, 263, 263-1 at 2. Both parties clearly understood the Court's order to encompass Wu's deposition,[15] and Hollyland cannot now, retroactively, carve out Wu from that order. Moreover, although the parties agreed to postpone the depositions past the middle of

---

[15] Even at the June 7, 2024 Court conference, Defendants did not dispute Amimon's statement that Wu's "deposition was going to occur in California, in person, because that is what [the Court] ordered in the November court conference." Doc. 333 at 20:22–24. In fact, Defendants argued, "by us providing Mr. Wu in January, we satisfied the Court's request." *Id.* 24:17–18.

February to engage in settlement discussions, Hollyland was still responsible for Wu's appearance at an as-noticed deposition—on whatever date the final amended notice provided.[16]

Hollyland also argues against sanctions on the basis that "none of [its] actions were taken in bad faith, for reasons of delay, or for any other improper purpose." Doc. 346 at 13. Indeed, the record indicates that both parties engaged in extensive, good faith attempts to find mutually convenient times to conduct Wu's deposition. Those scheduling efforts ultimately broke down in March 2024 when, after Amimon rejected Hollyland's proposed deposition dates of April 11 and April 10, Hollyland declined to provide any additional options. While the Court finds far from laudable Hollyland's abrupt attempt to back away from its responsibility to present Wu at deposition, there is insufficient evidence in the record that Hollyland acted in bad faith. Amimon's conclusory statement that Hollyland's "last-minute reversal and attempt to evade its responsibility" by requesting a personal subpoena was indicative of bad faith, without more, does not establish that severe sanctions on Hollyland based on Wu's nonappearance are warranted. Doc. 348 at 10.

Moreover, although Hollyland inexplicably told Amimon that its justification for suddenly requesting a Rule 45 subpoena was "Plaintiffs unavailability on the dates proffered by Defendants," Doc. 332-4, it did give Amimon clear notice that it should no longer expect Wu to

---

[16] Hollyland argues, "Additionally, the Court Ruled that the depositions be completed by mid-February. Plaintiff's counsel cancelled the depositions which had been scheduled by the parties in January to comply with the Court's Order." Doc. 346 at 13–14. While Hollyland's argument is not entirely clear, the Court construes it to be that the Court order could not be violated once the parties agreed to postpone the depositions past the middle of February. This is incorrect. Such agreement by the parties did not render null the crux of the Court's order, which was that the depositions be conducted in California on a date agreed-upon by the parties. *See* Doc. 275 at 9:16–20. *See Shanghai Weiyi*, No. 15 Civ. 3533 (CM) (BCM), 2017 WL 2840279, at *9 ("the order disobeyed can take a variety of forms, and need not even be written").

appear on April 20.  In fact, on March 16, 2024, Amimon conveyed its understanding that the

parties had reached an impasse, telling Hollyland that:

> [Its] unilateral cancellation of the confirmed April 20, 2024 deposition, followed by its refusal to provide alternative dates and disregard for its course of conduct related to Mr. Wu's deposition, was exemplary of bad faith and in direct contradiction of the Court's order that Hollyland present Mr. Wu for deposition in-person in California.

Doc. 338 ¶ 13.  Hollyland reiterated on April 7 that Amimon was proceeding at its "own expense

and peril" by moving forward with the April 20 deposition.  Doc. 346 ¶ 16.  Although Amimon

continued to prepare for an April 20 deposition, and it warned Hollyland of the potential

consequences it might suffer, the Court finds Hollyland should not bear the costs for that

preparation given it had unequivocally conveyed Wu would not appear.  Taking into account

Hollyland's apparent "willfulness" during the scheduling negotiations as well as the parties'

communications surrounding the break-down of the negotiations, the Court finds it would not be

"commensurate with the non-compliance" to award Amimon fees and costs, to prohibit

Hollyland from presenting any testimony in its defense, or to treat factual disputes in Amimon's

favor.  *In re Keurig Green*, 673 F. Supp 3d at 354.

However, given Hollyland's failure to comply with the properly served 30(b)(1)

deposition notice deprived Amimon of the ability to illicit Wu's testimony, the Court finds that

prohibiting Hollyland from having Wu testify in its defense will adequately deter

noncompliance, ensure that Hollyland "will not benefit from its failure to comply," and militate

against potential prejudice to Amimon.[17]  *Id.* at 353 (citation omitted); *Shanghai Weiyi*, 2017

WL 2840279, at *10 (citation omitted).

---

[17] While the best way to effectuate all these goals might be to now order that Hollyland make Wu appear for a deposition on a date certain, the Court notes that Amimon does not request such relief.

The Court therefore DENIES in part Amimon's motion for sanctions for Wu's nonappearance at his deposition, and GRANTS it in part, by prohibiting Hollyland from presenting defensive testimony from Wu.

## V.    CONCLUSION

For the reasons stated herein, Defendants' motion to compel, Amimon's request for spoliation sanctions against Hollyland, and Amimon's motion for sanctions against Hollyland for its failure to present Andrew Wu at his deposition, are each GRANTED in part and DENIED in part, as follows:

- The Court GRANTS Defendants' motion to compel Amimon to produce the printout from the October 30, 2023 discovery inspection.  However, the Court DENIES Defendants' motion to compel Amimon to (1) produce its Source Code and its full copyrighted work, (2) produce its Encryption Key, and (3) "immediately identify with reasonable particularity the trade secrets it claims were misappropriated by the defendants," identify "the details of all trade secrets and confidential information alleged to have been misappropriated," and identify "all documents and things which relate or contain the Plaintiffs' source code and other software which the Plaintiffs has asserted as it's [sic] trade secrets."  Doc. 300 at 21–22.

- The Court GRANTS Amimon's requests for monetary sanctions and for adverse inferences based on Hollyland's spoliation of evidence.  However, the Court DENIES Amimon's request for terminating sanctions based on Hollyland's spoliation of evidence.  Amimon is instructed to submit its fee application and corresponding billing records to the Court by January 24, 2025.

- The Court GRANTS Amimon's request that Wu be prohibited from testifying orally or via declaration, including rebuttal, in support of this litigation, based on Hollyland's failure to present Wu at his deposition.  However, the Court DENIES Amimon's requests that the Court (1) award Amimon its reasonable attorney fees and costs incurred in preparing for Andrew Wu's deposition, preparing the submissions related to this motion, and attending any hearings related thereto, (2) prohibit Hollyland from "providing any testimony in support of this litigation (including rebuttal) related to sales of the Accused Products," (3) "treat[] factual disputes related to sales of the Accused Products as established in Amimon's favor."  Doc. 338 at 12.

The parties are directed to appear for a status conference on January 30, 2025, at 11:30 a.m.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 299, 324, 328, 335, and 337.

It is SO ORDERED.

Dated:    January 10, 2025
          New York, New York

_____
Edgardo Ramos, U.S.D.J.